FILED

AUG 2 1 2015

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                                    DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AT SAN ANTONIO

CLIVIAN MELISSA **CONTRERAS-**
CASCO,

     *Petitioner,*

v.

ENRIQUE **LUCERO**, in his Official
Capacity as San Antonio Field Office
Director, U.S. Immigration and Customs
Enforcement – Enforcement and
Removal Operations; JANICE KILLIAN,
in her Official Capacity as Facility
Administrator of the South Texas Family
Residential Center; SARAH SALDAÑA,
in her Official Capacity as Director, U.S.
Immigration and Customs Enforcement;
JEH JOHNSON, in his Official Capacity
as Secretary of Homeland Security; and
LORETTA LYNCH, in her Official
Capacity as Attorney General of the
United States,

     *Respondents.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

# SA15CA0716XR

CIVIL ACTION

CASE NO.: _____

PETITION FOR WRIT OF HABEAS
CORPUS PURSUANT TO 28 U.S.C. §
2241

---

## MOTION FOR LEAVE TO EXCEED PAGE LIMIT

---

    Pursuant to Local Court Rules CV-7(b), Petitioner hereby respectfully requests leave

to file a Memorandum in Support of Motion for Expedited Order to Show Cause  pages

in excess of the limits set forth in Local Court Rule CV-7(d)(3). As good cause for this

Motion, Petitioner states that additional pages are necessary to fully apprise the Court

and the government of the factual and legal basis of her habeas claims. Granting leave

to exceed the page limit will promote judicial economy by allow a complete and

thorough presentation of Petitioner's reasons for granting the petition at the earliest possible stage in this case.

WHEREFORE, pursuant to Local Court Rule CV-7(b), Petitioner respectfully requests leave of this Court to file the Memorandum attached hereto as Exhibit 1, which exceeds the page limits let forth in Local Court Rule CV-7(d)(3).

August 20, 2015

Respectfully submitted,

R. Andrew Free, TN Bar No. 30513
LAW OFFICE OF R. ANDREW FREE
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 432-2642
Andrew@ImmigrantCivilRights.com
*Pro Bono* Counsel for Petitioner



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CLIVIAN MELISSA **CONTRERAS-**CASCO, | ) ) ) | |
| *Petitioner,* | ) ) | CIVIL ACTION |
| v. | ) ) | CASE NO.: _____ |
| ENRIQUE **LUCERO**, in his Official Capacity as San Antonio Field Office Director, U.S. Immigration and Customs Enforcement – Enforcement and Removal Operations; JANICE KILLIAN, in her Official Capacity as Facility Administrator of the South Texas Family Residential Center; SARAH SALDAÑA, in her Official Capacity as Director, U.S. Immigration and Customs Enforcement; JEH JOHNSON, in his Official Capacity as Secretary of Homeland Security; and LORETTA LYNCH, in her Official Capacity as Attorney General of the United States, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 |
| *Respondents.* | ) ) | |

---

**MEMORANDUM IN SUPPORT OF MOTION FOR EXPEDITED ORDER TO SHOW CAUSE PURSUANT TO 28 U.S.C. § 2243**

---

R. Andrew Free, TN Bar No. 30513
LAW OFFICE OF R. ANDREW FREE
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 432-2642
Andrew@ImmigrantCivilRights.com
*Pro Bono* Counsel for Petitioner

**TABLE OF CONTENTS**

Introduction .    .    .    .    .    .    .    .    .    .    1

Factual Background    .    .    .    .    .    .    .    3

        A. Statutory and Regulatory Framework .    .    .    .    3

        B. DHS's Family Detention Policies    .    .    .    .    6

        C. The Contreras Family's Experience in Detention    .    .    11

        D. Ms. Contreras's Withholding Claim .    .    .    .    13

        E. Procedural History    .    .    .    .    .    .    15

Jurisdiction    .    .    .    .    .    .    .    .    16

Argument    .    .    .    .    .    .    .    .    .    17

I.      Because she is awaiting an administratively final decision on her withholding claim, Ms. Contreras falls within INA § 236 — not INA § 241 — and she is therefore entitled to a bond hearing.    .    17

        A.  The plain language of the INA demonstrates Ms. Contreras's removal order is not administratively final.    .    .    17

        B.  The Fifth Circuit's binding precedent governing judicial review of withholding claims in the reinstatement context compels the conclusion that Ms. Contreras is entitled to a bond hearing.    .    .    .    .    .    21

II.     Regardless of which detention statute applies, Ms. Contreras is entitled to a constitutionally adequate bond hearing because her prolonged mandatory detention would otherwise raise serious due process concerns.    .    .    .    .    23

III.    DHS's arbitrary detention of Ms. Contreras and her daughter to 'dis-incentivize' future migration by Central American asylum-seekers violates her rights under the Due Process Clause.    .    30

Conclusion    .    .    .    .    .    .    .    .    .    32

INTRODUCTION

Melissa Contreras and her eight year-old daughter Helen have spent the past 237 consecutive days (and counting) imprisoned by federal immigration authorities. Each of these seven months and 25 days passed without any independent determination that Ms. Contreras and Helen pose a flight risk or a danger to the community. That is because the government refuses to afford them a bond hearing.

The question presented in this case is whether the government's prolonged, no-bond civil detention of this vulnerable mother and her child may continue. Both the Immigration and Nationality Act ("INA") and the Due Process Clause to the U.S. Constitution's Fifth Amendment dictate that it cannot. Ms. Contreras and her daughter are entitled to an immediate, constitutionally adequate bond determination by an Immigration Judge for at least three reasons.

*First*, Ms. Contreras is bond-eligible because she is currently awaiting a final administrative determination on her application for withholding of removal, *i.e.*, on whether she will be removed from the United States. As such, she falls within the plain language of INA § 236(a), which affords non-citizens like Ms. Contreras the right to a bond hearing.

The government says different. Respondents contend that because the Department of Homeland Security ("DHS") reinstated a prior order of removal against Ms. Contreras, she already has an administratively final order of removal. As a result, Respondents claim Ms. Contreras falls within Section 241(a)(2) of the INA, which requires no-bond detention during a 90-day "removal period." Not so.

INA Section 241(b)(3)(A) bars the government from deporting Ms. Contreras without first permitting her to present her claim for withholding of removal. She is in the process of presenting that claim. So long as it remains pending before the Board of Immigration Appeals (or the Immigration Judge, on remand), her reinstated removal order is not "administratively final" as defined by INA § 101(a)(47)(B)(i). Her detention therefore falls outside the scope of INA § 241(a)(2)—which requires an "administratively final" order of removal—and squarely inside the scope of INA § 236(a)—which requires a bond hearing. The INA thus entitles Ms. Contreras to a bond hearing.

*Second*, the Due Process Clause requires a constitutionally adequate bond hearing because the length of Ms. Contreras's detention has far surpassed the "brief period" presumptively sanctioned by the Supreme Court in the context of convicted criminal immigrants and those with final orders of removal. Regardless of which statutory authority governs—INA § 236(a) or INA § 241(a)—the protracted length of Ms. Contreras's detention raises serious due process concerns. Congress did not authorize prolonged detention under either statute. And both statutes must be read to avoid constitutional uncertainty. Allowing the government to continue detaining Ms. Contreras without an individualized determination from a neutral adjudicator as to her risk of flight and dangerousness would put the statute on a collision course with the Due Process Clause. To avoid this constitutional conflict, Respondents must afford Ms. Contreras a constitutionally adequate bond hearing.

*Third*, due process requires affording Ms. Contreras a bond hearing to ensure that her detention serves a constitutionally permissible purpose. DHS's initial decision to detain her and her daughter rested on legally impermissible grounds—namely, the deterrence rationale served by the agency's previous blanket no-release policy. Following judicial rejection of this policy, DHS shifted gears. Respondent Johnson announced publicly that passing a reasonable fear interview would entitle women and children in family detention to release on reasonable conditions. Ms. Contreras passed a reasonable fear interview. But she and her daughter remain in custody. As such, a bond hearing by a judicial officer is necessary to make the government carry its burden of proving her detention is arbitrary and capricious, in violation of the Administrative Procedure Act, and unrelated to any legitimate regulatory interest, in violation of the Due Process Clause.

FACTUAL BACKGROUND

*A. Statutory and Regulatory Framework*

The government's statutory authority to detain non-citizens in removal proceedings stems from two main sources relevant here. *First*, Section 236(a) of the INA governs detention "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Detention under INA § 236(a) is discretionary. *See* 8 U.S.C. §§ 1226(a)(1) & (a)(2) (the Attorney General "*may* continue" the noncitizen's detention, or *may* release the noncitizen on bond or conditional parole). Noncitizens detained pursuant to Section 236(a) are eligible for bond hearing. *See* 8 C.F.R. § 1003.19.

*Second*, Section 241 of the INA provides that the government "shall detain" noncitizens during a ninety-day window known as the "removal period." 8 U.S.C. § 1231(a)(2). The removal period begins on the "date the order of removal becomes administratively final." 8 U.S.C. § 1231(a)(1)(B)(i). A removal order becomes "administratively final" "upon a determination by the Board of Immigration Appeals affirming such order," or the "expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." INA § 101(a)(47)(B), 8 U.S.C. § 1101(a)(47)(B).

Separate from its detention provisions, INA § 241 supplies another body of statutory authority relevant here. When a person reenters the United States illegally after previously receiving an order of removal and being deported, immigration authorities may reinstate the prior order of removal. INA § 241(a)(5), 8 U.S.C. § 1231(a)(5). To do so, an immigration officer must first determine that (1) the person has "been subject to a prior order of removal," (2) the person "is in fact" the same one DHS previously removed, and (3) the person "unlawfully reentered the United States." 8 C.F.R. §§ 241.8(a)(1)-(3). INA § 241(a)(5) provides that individuals subject to reinstatement are "not eligible and may not apply for any relief." 8 U.S.C. § 1231(a)(5). DHS's regulations implementing the reinstatement statute purport to afford subjects of reinstated orders "no right to a hearing before an immigration judge[.]" 8 C.F.R. § 241.8(a).

Despite these seemingly absolute provisions, INA § 241(b)(3)(A) bars the government from removing a person "to a country if . . . the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality,

membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).
*See also Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 35 n.4 (2006) ("Notwithstanding the
absolute terms in which the bar on relief is stated, even an alien subject to § 241(a)(5)
may seek withholding of removal under 8 U.S.C. § 1231(b)(3)(A) . . . or under 8 C.F.R. §§
241.8(e) and 208.31[.]"). Withholding of removal and relief under the Convention
Against Torture ("CAT") are mandatory—the government cannot lawfully remove a
person to his or her home country if that person qualifies for either form of protection.
*Kane v. Holder*, 581 F.3d 231, 238 (5th Cir. 2009).

　　The withholding and CAT decision in a reinstatement case must pass through two
steps. *First*, if a person subject to a reinstated order of removal expresses a fear of return,
the government must provide an interview with an asylum officer. 8 C.F.R. § 1208.31(a)-
(c). The task of the asylum officer is to determine whether the individual has a
"reasonable fear" of being persecuted or tortured on account of a protected ground
upon return. 8 C.F.R. §§ 208.16(b) 241.8(e). If so, the asylum officer places the individual
into the second step of the process, which is a removal proceeding before an
Immigration Judge ("IJ") on the claims for relief. *See* 8 C.F.R. § 1208.31(e). As part of this
second step, the individual may appeal the decision of the Immigration Judge to the
Board of Immigration Appeals and the Court of Appeals. 8 C.F.R. § 208.31(e); *Garcia v.
Holder*, 756 F.3d 885, 890 (5th Cir. 2014). As the government has admitted, the
"reinstated removal order is necessarily stayed during the [noncitizen]'s proceedings
before the immigration judge and the Board." *See* Resp't-Appellee's Br., *Ortiz-Alfaro v.
Holder*, 694 F.3d 955 (9th Cir. 2012) (No. 10-73057) at 13.

*B.  DHS's Family Detention Policies*

In response to a sharp increase in women and children seeking refuge from the three most violent and unstable countries in Central America, El Salvador, Guatemala, and Honduras, the federal government took several steps in the summer of 2014. First, DHS adopted a policy of detaining women and children, even those who established they had a fear of persecution in their home countries, for the purpose of generally deterring future migration.[1] Second, DHS created a blanket no-release policy under which it detained "all female-headed families, including children, in secure, unlicensed facilities for the duration of the proceedings that determine whether they are entitled to remain in the United States."[2] In furtherance of both these policies, ICE expanded an Inter-Governmental Service Agreement ("IGSA") with the City of Eloy, Arizona, which then awarded CCA $96,977,056.00 during a two-month period to build the 2,400 bed for-profit family detention camp in Dilley, Texas where Contreras and her daughter are currently imprisoned.[3]

_____

[1] *See R.I.L–R v. Johnson*, --- F.Supp.3d ----, 2015 WL 737117 at *5 (D.D.C. Feb. 20, 2015) (citing

[2] *Flores v. Johnson*, No. 2:85-cv-04544-DMG-AGR, ECF No. 177, Order re Plaintiffs' Motion to Enforce Settlement of Class Action and Defendants' Motion to Amend Settlement Agreement (hereinafter "*Flores* Order") at 25, ¶ 4 (Jul. 24, 2015) *available at* http://graphics8.nytimes.com/packages/pdf/us/FloresRuling.pdf (last visited July 27, 2015), at 2 ("Since June, ICE has begun detaining all Central American families without the possibility of release on bond, recognizance, supervision or parole if it believes that those families arrived as part of the 'surge' of unauthorized entrants — mostly children — that purportedly began in the summer of 2014") (quoting Decl. of Bridget Cambria, ¶¶ 3-5)).

[3] *See* DROIGSA-06-0002//P00010 at page 3 of 7 (Sept. 23, 2014). *Available at* http://www.ice.gov/doclib/foia/contracts/south_texas_family_residential_center_city_of_elo y_igsa_modification.pdf (lasted visited Jul. 29, 2015) ("$96,977,056 will be obligated at award covering Months 1 and 2 of CLIN 0001 (Monthly Costs for the South Texas Family Residential Detention Center – up to 2,400 beds). The amount obligated at award is the minimum guarantee against this agreement.").

Federal courts rejected these policies. In response to DHS's first step—employing general deterrence of future migration as a rationale for detaining mothers and children fleeing persecution—the United States District Court for the District of Columbia found that the government's "remarkably expansive" claim to detention authority based on national security grounds amounted to "mere lip service."[4] The D.C. District Court also found that "detention harms putative class members in myriad ways, and as various mental health experts have testified, it is particularly harmful to minor children."[5] Accordingly, on February 20, 2015, the court granted the plaintiffs' motion to preliminarily enjoin DHS from utilizing general deterrence of Central American migration as a factor in making custody determinations.

The Administration's second policy shift—jailing female heads of household with their minor children in secure, unlicensed detention camps—met a similarly chilly reception in the courtroom. On July 24, 2015, the U.S. District Court for the Central District of California held that DHS's no-release policy constitutes a material breach of the *Flores* settlement the government reached with minor children nearly 20 years ago.[6] Rejecting DHS's attempt to renege on its promise to immigrant children, the Court ordered DHS to show cause why it cannot "release an accompanying parent [with her

---

[4] *R.I.L-R*, 2015 WL 737117 at *18.

[5] *Id.* at *19 (citing Wil S. Hylton, *The Shame of America's Family Detention Camps*, N.Y. Times Magazine MM25 (Feb. 8, 2015), *available at* http://nytimes.com/2015/02/08/magazine/the-shame-of-americas-family-detention-camps.html?_r=) (describing conditions in family detention centers)).

[6] *Flores* Order at 9.

child class member] as long as doing so would not create a flight risk or a safety risk"

within 90 days.[7]

As federal courts ruled DHS's family detention policies were impermissible as a

matter of law, the practical experience of detained mothers and their children confirmed

as a matter of fact that DHS's family detention policies violate other clearly established

standards.[8] There has been widespread, consistent reporting of woefully inadequate

medical and mental health treatment in family detention camps,[9] including a report

arising out of the significant emotional and psychological harm detention has had on

Ms. Contreras's own daughter.[10] Not unpredictably, women brave enough to flee

horrific violence in their own countries so they could make a better life for their

children only to be subjected to prolonged mandatory detention in the United States

---

[7] *Id.* at 9.

[8] *See, e.g., R.I.L-R*, 2015 WL 737117 at *19 (listing mental health expert declarations on irreparable harm visited upon those in family detention). *See also Flores* Order at 13-14 ("With evidence in the form of declarations, Plaintiffs contradict aspects of Defendants' rosy account of the conditions in the centers and contend they are not acceptable); *id.* (citing declarations as to the government's failure to provide adequate medical care in the Artesia facility).

[9] *See, e.g.,* Franco Ordoñez, "Family detention social worker speaks out," McClatchyDC (Jul. 27, 2015), *available at* http://www.mcclatchydc.com/news/nation-world/national/article28696174.html (last visited Jul. 29, 2015) (describing endemic abuses by GEO and ICE personnel of the personal medical rights of women and children in the Karnes facility); Ed Pilkington, "'Soul-Destroying': one migrant mother's story of life at Dilley detention center" The Guardian (May 22,2015), *available at* http://www.theguardian.com/us-news/2015/may/22/immigrant-mothers-dilley-family-detention-center-texas (last visited Jul. 29, 2015); Cristina Constantini, "'Drink more water': Horror stories from the medical ward of a Texas immigration detention center" Fusion.net (Jul. 14, 2015), *available at* http://fusion.net/story/165837/dilley-detention-center-horror-stories-from-the-medical-ward/ (lasted visited Jul. 29, 2015).

[10] Emily Gogolak, "What's Next for Immigrant Families in Detention?" The New Yorker (Jul. 30, 2015), *available at* http://www.newyorker.com/news/news-desk/whats-next-for-immigrant-families-in-detention (last visited Aug. 20, 2015).

have even attempted suicide.[11] DHS is now well aware of clinical findings that its family detention policies needlessly traumatize mothers and children.[12]

Following site visits by several Members of Congress, led by Rep. Zoe Lofgren and others, 33 senators and 133 House members called on Respondent Johnson to end family detention.[13] That number grew to 177 House Members by the end of July.[14]

Though privy in April to the *Flores* court's findings,[15] DHS officials chose not to end family detention. Rather, Respondents Johnson and Saldaña responded by formally

---

[11] Franco Ordoñez, "Detained teenage mom who cut her wrists pens suicide note," McClatchyDC (Jun. 5, 2015), *available at* http://www.mcclatchydc.com/news/immigration/article24785368.html (last visited Jul. 29, 2015).

[12] Complaint to Megan Mack, DHS Office for Civil Rights and Civil Liberties re: The Psychological Impact of Family Detention on Mothers and Children Seeking Asylum (Jun. 30, 2015), *available at* http://www.aila.org/advo-media/press-releases/2015/impact-family-detention-mental-health/complaint-crcl (last visited Jul. 29, 2015); Letter from Dr. Sandra G. Hassink, President of the American Academy of Pediatrics, to DHS Secretary Jeh Johnson (Jul. 24, 2015), *available at* https://www.scribd.com/doc/272823508/AAP-Letter-About-Family-Detentions-to-Secretary-Johnson (last visited Jul. 29, 2015) ("Yet we remain concerned that continued detainment of any children and mothers in the existing facilities puts them at greater risk for physical and mental health problems and unnecessarily exposes children and mothers to additional psychological trauma."); Complaint to DHS Office for Civil Rights and Civil Liberties and Office of the Inspector General re: ICE's Failure to Provide Adequate Medical Care to Mothers and Children in Family Detention Facilities (Jul. 30, 2015), *available at* http://www.aila.org/advo-media/press-releases/2015/deplorable-medical-treatment-at-fam-detention-ctrs/public-version-of-complaint-to-crcl (last visited Aug. 19, 2015).

[13] Letter to Secretary Jeh Johnson (May 27, 2015), *available at* https://lofgren.house.gov/uploadedfiles/family_detention.pdf (last visited August 18, 2015).

[14] Letter to Secretary Jeh Johnson (July 31, 2015), *available at* https://lofgren.house.gov/uploadedfiles/dhs_family_detention_letter_7.31.15.pdf (last visited August 28, 2015).

[15] *See* Franco Ordoñez, 'The beginning of the end' for Obama's migrant family detention? McClatchyDC (Apr. 28, 2015), *available at* http://www.mcclatchydc.com/news/immigration/article24783763.html (last visited Jul. 29, 2015).

abandoning general deterrence as a rationale for detention of families in May 2015[16],
and formulating a new family detention policy in June 2015. On June 24, 2015,
Respondent Johnson announced publicly that the agency he leads, the Department of
Homeland Security ("DHS") had adopted Respondent Saldaña's "plan to offer release
with an appropriate monetary bond or other condition of release to families at
residential centers **who are successful in stating a case of credible or reasonable fear
of persecution in their home countries.**"[17]

On August 6, 2015 DHS provided further insight into its latest policy revisions
surrounding family detention when it responded to the *Flores* court's finding that its
family detention policies were in contempt of its decades-old settlement agreement. In
its response, the government argued against releasing women and children like Ms.
Contreras and her daughter from family detention, in compliance with the *Flores* court's
order because it *could* have the effect of "incentivizing" future migration by adults with
children.[18] The government further maintained it needs to be able to continue using
family detention as an enforcement tool to "dis-incentivize[] future surges of families

---

[16] ICE Press Release, "ICE announces enhanced oversight for family residential centers"
(May 13, 2015), *available at* https://www.ice.gov/news/releases/ice-announces-enhanced-oversight-family-residential-centers (last visited Aug. 20, 2015).

[17] Statement by Secretary Jeh C. Johnson On Family Residential Centers (Jun. 24, 2015)
*available at* http://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers (last visited Jul. 29, 2015) (emphasis added).

[18] *Flores v. Johnson*, No. 2:85-cv-04544-DMG-AGR, Defendants' Response to the Court's
Order to Show Cause Why the Remedies Set Forth In the Court's July 24, 2015 Order Should
Not be Implemented, ECF No. 184 at 12 (filed Aug. 6, 2014).

crossing the Southwestern border."[19] Respondents thus cling to the deterrence rationale for family detention, despite a federal court's rejection of it, and notwithstanding the sworn statement of the head of the Asylum Division that 86.9% of women and children in family detention had passed their initial credible fear interviews in the latest round of data.[20]

C.  *The Contreras Family's Experience in Family Detention*

After nearly eight months in no-bond detention, Ms. Contreras and her daughter Helen are at an emotional and psychological breaking point. Following an independent evaluation on July 15, 2015 by a Board-Certified Texas Psychiatrist, Ms. Contreras was diagnosed with Post Traumatic Stress Disorder, Generalized Anxiety Disorder, and Major Depressive Disorder. Her symptoms included continuous neck and muscle tension, inability to focus or achieve restful sleep, constant sadness, spontaneous crying, anhedonia, decreased appetite, constant fatigue, and suicidal ideation. In the professional opinion of the psychiatric evaluator, Ms. Contreras's

> mental condition seems to be deteriorating as her confinement continues into the seventh month. She appears to have worsening depressive and anxiety symptoms. Also her PTSD symptoms are exacerbated by being held without any distractions to keep her mind off the severe trauma she has experienced.

Helen's emotional and psychological well-being has deteriorated to a critical point as well. After several months in detention, Ms. Contreras's eight year-old daughter regressed to the point where she began attempting to breastfeed. As the American

---

[19] *Id.* at 24.

[20] *Flores v. Johnson*, No. 2:85-cv-04544-DMG-AGR, ECF No. 184-3, Decl. of John L. Lafferty, ¶ 8 (filed Aug. 6, 2015).

Academy of Pediatrics has informed Respondent Johnson, these profoundly harmful

effects are the predictable and unavoidable consequence of the government's family

detention policy.[21]

Because of the prolonged length of her detention, ICE informed Ms. Contreras that it

would purportedly be conducting a review of her custody. Exhibit A, Notice of Family

Residential Center File Custody Review. The agency placed the burden on Ms.

Contreras to "demonstrate to the satisfaction of" a "Deciding Official" that her "release

will not pose a danger to the community or to the safety of other persons or property or

a flight risk." Ex. A. The Notice informed Ms. Contreras of eight factors the Deciding

Official would supposedly consider. *Id.* It instructed that Ms. Contreras "may submit

any documentation [she] wish[ed] to be reviewed in support of her release by <u>June 3,</u>

<u>2015</u>." *Id.* (emphasis in original). According to the Certificate of Service, ICE did not

provide her a copy of the Notice until **June 16, 2015**. Ex. A at 3. Though the Notice

provided that an "attorney or legal representative may also submit materials on your

[her] behalf," and though Ms. Contreras was represented by *pro bono* counsel, her

counsel did not receive a copy of the Notice.

Since providing her this notice, DHS has received repeated requests from Ms.

Contreras's counsel to release her and her daughter based on their prolonged length of

detention, her passage of a reasonable fear interview, and the serious and obvious

psychological harm detention is causing to Helen. DHS denied each and every request.

---

[21] *See* Letter to Secretary Jeh Johnson from Sandra G. Hassink, M.D., FAAP, President of the American Academy of Pediatrics (Jul. 24, 2015), *available at* https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAP%20Letter%20to%20 Secretary%20Johnson%20Family%20Detention%20Final.pdf (last visited August 18, 2015).

### D. *Overview of Ms. Contreras's Withholding and CAT Claims*

Ms. Contreras was born in Honduras in 1989. When she was 17, she became pregnant and left home to live with the father of her unborn child. Their daughter Helen was born in June of 2007. When Helen was approximately a year old, her father began to use drugs heavily and became violently abusive toward Ms. Contreras. He threatened her, beat her, kicked her, threw her against walls, and raped her repeatedly. He shamed her in public and claimed that because Ms. Contreras was his "property," she could never leave him. In approximately 2011, one of the violent, abusive episodes escalated into Helen's father throwing a hot iron at Ms. Contreras, missing her and hitting Helen instead. Ms. Contreras went to the police, showed them the burns, and filed a report. The police informed her that they do not interfere in "those things" and took no action to protect Ms. Contreras and her daughter. Helen's father threatened to kill Ms. Contreras if she went to the police again.

Beginning in 2012, Helen's father began to come and go, disappearing for weeks at a time. He would return, rape Ms. Contreras, throw a small amount of money at her, and leave. To provide for herself and Helen, Ms. Contreras opened a small concession selling gum, drinks, snacks, and fruit. She operated the stand alone, sometimes with Helen at her side. Soon after opening the business, members of the Mara-18 gang began threatening and extorting her. They assured Ms. Contreras that if she could not pay, they would kill her and her daughter. For the next several years, Ms. Contreras lived, and was viewed by her community, as a single mother.

In September 2014, she attempted to make a clean break with Helen's father. He categorically rejected this idea, telling Ms. Contreras, "Too bad, you're my property. And my daughter's my property, too. And you have to be with me." Ms. Contreras fled with Helen to her mother's house, then to her sister's house, then to her aunt's home. Helen's father followed them, showing up drunk and wielding a knife at the house of Ms. Contreras's aunt. He threatened Ms. Contreras and cut her with the knife.

Then, on the night of September 21, 2014, four armed members of the Mara-18 gang came to the house where Ms. Contreras and her daughter were hiding. They demanded Ms. Contreras pay a 'war tax' and threatened to kill her and Helen if she did not. When Ms. Contreras reported the threat to the police, they refused to help her. Ms. Contreras concluded that fleeing Honduras was her only remaining option if she wished to avoid further violence or death from Helen's father and the Mara-18 gang. In early October 2014, she left Helen in the care of her mother and sister and fled to the United States. She believed that by removing herself from Helen's life, she could protect her from her father and the Maras. But after she left, two members of Mara-18 stalked Helen at her school, and word got back to Ms. Contreras's mother that Helen's father had begun looking for Helen as well.

Ms. Contreras surrendered to U.S. Customs and Border Protection ("CBP") officials shortly after crossing the U.S.-Mexico land border in late October 2014. Out of concern for Helen's safety, she agreed to forego her asylum claim and accept what she believed was a "voluntary return" to Honduras. CBP issued an Expedited Removal Order and removed Ms. Contreras on November 14, 2014. After being deported to Honduras, Ms.

- 14 -

Contreras spent the night at the bus terminal and waited there for her sister to bring

Helen. They immediately fled Honduras and trekked north toward the promise of

safety and security in the United States.

   E. *Procedural History*

   Ms. Contreras crossed the U.S.-Mexico border with her daughter Helen on

December 27, 2014. On December 28, DHS reinstated her prior order of removal. Exhibit

B, Notice of Intent to Reinstate Prior Deport/Removal Order (Form I-831). Because she

expressed a fear of returning to her native Honduras, an asylum officer conducted a

reasonable fear interview on January 15, 2015. Exhibit C, Record of

Determination/Reasonable Fear Worksheet (Form I-899). The following day, the

asylum officer and his supervisor issued a determination finding Ms. Contreras

credible, and that she had demonstrated a reasonable fear sufficient to warrant referral

to an IJ to present her withholding claim. Ex. C at 3 (form I-899). The asylum office

issued a Notice of Referral to an Immigration Judge on January 22, 2015. Exhibit D,

Notice of Referral to Immigration Judge (Form I-863). The same day, ICE Supervisory

Detention and Deportation Officer Gonzalez served Ms. Contreras with a Warrant of

Arrest, and her daughter with a Notice of Custody Determination indicating they

would both be "[d]etained by the Department of Homeland Security." Exhibit E, Notice

of Custody Determination (Form I-286).

   On April 21, 2015, Ms. Contreras, appeared *pro se* to present the merits of her and

her daughter's claims for asylum, withholding of removal, and relief under the CAT to

the IJ. The IJ pretermitted the asylum applications and denied the remaining claims for

relief. Ms. Contreras later secured the *pro bono* assistance of the CARA Project and on

May 21, 2015, timely appealed the decision of the IJ to the Board of Immigration

Appeals. As of July 23, 2015, the appeal was full briefed and awaiting a decision from

the BIA. Exhibit F, BIA Appeal Briefing Package. In addition, the American Immigration

Council took the rare step of submitting an *amicus* brief to the BIA on Ms. Contreras's

behalf.

### JURISDICTION

This Court has subject-matter jurisdiction over Ms. Contreras's habeas petition

pursuant to 28 U.S.C. § 2241(c). Ms. Contreras is a prisoner "in custody in violation of

the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). No

jurisdiction-channelling provision of the INA divests this court of its habeas power.

Though the courts of appeal have jurisdiction to review removal orders directly

through petitions for review, *see* 8 U.S.C. §§ 1252(a)(1), (b), the federal district courts

have jurisdiction under 28 U.S.C. § 2241 and U.S. Const. art. I, § 9, cl. 2, to hear habeas

claims by non-citizens challenging the lawfulness or constitutionality of their detention

by U.S. Immigration and Customs Enforcement (ICE). *Zadvydas v. Davis*, 533 U.S. 678

(2001); *Demore v. Kim*, 538 U.S. 510, 517 (2003) (holding nothing in the INA bars a habeas

petition challenging no-bond detention); *Tran v. Mukasey*, 515 F.3d 478 (5th Cir. 2008).

Ms. Contreras's petition is ripe for review because the INA does not require

exhaustion of administrative remedies, and Respondents have afforded her no non-

futile administrative remedy to exhaust. Section 242(d)(1) of the INA only requires

exhaustion prior to seeking review of a removal order. 8 U.S.C. § 1252(d)(1). *See also*

*Norales-Lopez v. Gomez*, No. SA-14-CA-149 2014 Lexis 125830 (W.D. Tex. Jun. 24, 2014)

(Hudspeth, J.) (citing *Garcia v. Moore*, 539 F. Supp. 2d 899, 904 (S.D. Tex. 2007) ("Under

the INA[,] exhaustion of administrative remedies is only required by Congress for

appeals on final orders of removal.").

   In addition, no common-law exhaustion requirement applies because there is no

non-futile remedy to exhaust. *See McCarthy v. Madigan*, 503 U.S. 140, 147-48 (1991)

(noting discretionary exhaustion not required when the agency has "predetermined"

the outcome or where the remedy would be "futile"). The Board of Appeals has held

that noncitizens cannot invoke the bond jurisdiction of the Immigration Judge unless

DHS serves them with a charging document called a Form I-862, Notice to Appear, that

places them in removal proceedings under Section 240 of the INA. *Matter of A-W-*, 25

I&N Dec. 45 (BIA 2009). Ms. Contreras received a Form I-863, Notice of Referral to

Immigration Judge, indicating she was the subject of a reinstated removal order under

INA § 241. Ex. D. Accordingly, BIA precedent forecloses and renders futile any attempt

by Ms. Contreras to avail herself of an administrative remedy before the immigration

court.

## ARGUMENT

I. **Because She Is Awaiting An Administratively Final Decision On Her Withholding Claim, Ms. Contreras Falls Within INA § 236(a) — Not INA § 241(a) — And She Is Therefore Entitled To A Bond Hearing.**

   Whether the INA entitles Ms. Contreras to a bond hearing turns on this Court's

answer to a simple question: Is she subject to an administratively final order of

removal? If so, that final order triggered the "removal period" defined in § 241(a)(1)(B),

- 17 -

8 U.S.C. § 1231(a)(1)(B), and thus empowered DHS to detain her without a bond hearing pursuant to § 241(a)(2). 8 U.S.C. § 1231(a)(2). On the other hand, if there is no administratively final removal order, the removal period has not begun, and Ms. Contreras is eligible for a bond hearing because she is awaiting "a decision on whether [she] is to be removed from the United States." INA § 236(a), 8 U.S.C. § 1226(a).

The plain language of the statutory text and the Fifth Circuit's binding precedent governing judicial review of withholding proceedings following a reinstated removal order conclusively demonstrate that Ms. Contreras is not subject to an administratively final order of removal. The INA therefore entitles her to a bond hearing.

    A.   *The plain language of the INA demonstrates Ms. Contreras's removal order is not administratively final.*

An administratively final removal order is the dividing line no-bond detention during the removal period under INA § 241(a)(2) and bond-eligible detention under INA § 236(a) while a noncitizen awaits a determination on whether she will be removed. This is because the removal period begins, as relevant here, on "the date the order of removal becomes administratively final." INA § 241(a)(1)(B)(i), 8 U.S.C. § 1231(a)(1)(B)(i). A removal order becomes "final" upon "a determination by the Board of Immigration Appeals affirming such order" or the "expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." INA § 101(a)(47)(B), 8 U.S.C. § 1101(a)(47)(B). As long as a case remains pending on direct appeal to the BIA, the underlying removal order is not administratively final.

Nothing about the reinstatement process alters INA § 101(a)(47)(B)'s plain meaning. In the reinstatement context, until the BIA completes administrative appellate review of an IJ's decision on withholding of removal, the reinstatement order is not "final" within the meaning of INA § 101(a)(47)(B)(i). That is because the issue in a withholding-only proceeding filed after DHS enters a reinstatement order is whether the noncitizen's "fear of returning to the country designated in *that order*"—*i.e.*, the reinstatement order—qualifies her for withholding of removal. 8 C.F.R. § 241.8(e) (emphasis added). 8 C.F.R. § 208.31(e) specifically confers jurisdiction upon the Immigration Judge to adjudicate withholding applications filed after a reinstatement order. And it provides that "[a]ppeal of the Immigration Judge's decision shall lie to the Board of Immigration Appeals." 8 C.F.R. § 208.31(e).

In other words, the government's authority to carry out no-bond detention under INA § 241(a)(2) does not begin until the removal period starts; the removal period does not start until the individual is subject to an administratively final order of removal, INA § 241(a)(1)(B)(i); and an order does not become administratively final until the BIA completes administrative appellate review of the IJ's withholding determination. INA § 101(a)(47)(B)(i); 8 C.F.R. § 208.31(e).

As clear as it is that INA § 241(a)(2) *does not* govern Ms. Contreras's detention, it is equally clear that INA § 236(a) *does* govern it. DHS "may not remove" a person who qualifies for withholding of removal, notwithstanding its entry of a reinstatement order against her. INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). *See also Fernandez-Vargas*, 548 U.S. at 35 n.4. The withholding-only determination is therefore "a decision on whether

the alien is to be removed from the United States." INA § 236(a), 8 U.S.C. § 1226(a). Because she falls within the plain language of INA § 236, it is this statute—not INA § 241—that supplies the detention authority of the government over Ms. Contreras. The INA therefore entitles Ms. Contreras to a bond hearing

This conclusion, drawn from the plain language of the INA, reflects the clear and growing consensus of federal courts reviewing habeas petitions for individuals in an identical procedural posture. *Guerra v. Shanahan*, No. 14-cv-4203, 2014 WL 7330449 (S.D.N.Y. Dec. 23, 2014) (holding INA § 236 governs detention of noncitizen in ongoing administrative withholding-only proceedings following reinstatement order); *Guerrero v. Aviles*, No. 14-cv-4367, 2014 WL 5502931 (D.N.J. Oct. 30, 2014) (same); *Uttecht v. Napolitano*, No. 8:12-cv-347, 2012 WL 5386618 (D. Neb. Nov. 1, 2012) (same); *Campos v. Napolitano*, No. C 12-2682 CW 2012, WL 5379556 (N.D. Cal. Oct. 31, 2012) (same); *Pierre v. Sabol*, No. 1:11-cv-2184, 2012 WL 1658293 (M.D. Pa. May 11, 2012).

The conclusion that Ms. Contreras is bond-eligible because she is not subject to an administratively final order also comports with the decisions of the only two federal courts of appeal to address the issue. *See Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir. 2012) (holding a "reinstated order does not become final until the reasonable fear of persecution and withholding of removal proceedings are complete."). *Accord Luna-Garcia v. Holder*, 777 F.3d 1182, 1183 (10th Cir. 2015) (holding "ongoing reasonable fear proceedings render the reinstated removal order nonfinal").

In sum, the plain language of the INA demonstrates Ms. Contreras is not subject to an administratively final order of removal. Consequently, she is not within the

"removal" period defined in INA § 241(a)(2), and INA § 236(a) therefore entitles her to a bond hearing before an immigration judge.

> B. *The Fifth Circuit's binding precedent governing judicial review of withholding claims in the reinstatement context compels the conclusion that Ms. Contreras is entitled to a bond hearing.*

If the plain language of INA §§ 101(a)(47), 236, and 241 leaves any room to doubt that no administratively final removal order exists in this case, the Fifth Circuit's published decision in *Garcia v. Holder* eliminates it. 756 F.3d 885, 890 (5th Cir. 2014). In *Garcia*, a Salvadoran citizen received an *in absentia* removal order after missing his 2006 immigration court hearing. 756 F.3d at 887. DHS executed the order in 2011 by removing him to El Salvador. *Id.* When he unlawfully reentered the United States in February of 2012, DHS reinstated the prior removal order. *Id.*

Then Mr. Garcia expressed a fear of persecution or torture, triggering an interview with an asylum officer pursuant to 8 C.F.R. § 241.8(e). *Id.* The asylum officer found he had a reasonable fear of torture and referred his case to an Immigration Judge. 756 F.3d at 887 (citing 8 C.F.R. § 208.31(e)). Garcia filed a *pro se* application for withholding of removal under INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). *Id.* The Immigration Judge denied Garcia's withholding and CAT claims, so he appealed to the BIA, which affirmed the Immigration Judge's denial. 756 F.3d at 889-90.

Of paramount importance here, the Fifth Circuit concluded it had jurisdiction to review Mr. Garcia's withholding and CAT claims on the merits. *Id.* at 890. If the position the government takes in this case were correct, the Fifth Circuit could not have reached the conclusion it did in *Garcia*. That is because jurisdiction in the courts of appeal lies to

- 21 -

review a removal order *only if* the person subject to the order files a petition for review within 30 days of the order becoming administratively final. INA § 242(b)(1), 8 U.S.C. § 1252(b)(1) ("The petition for review must be filed not later than 30 days after the date of the final order of removal."). "This deadline is jurisdictional." *Navarro-Miranda v. Ashcroft*, 330 F.3d 572, 676 (5th Cir. 2003). *See also Roy v. Ashcroft*, 389 F.3d 132, 135-37 (5th Cir. 2004). As such, the 30-day deadline is "not subject to equitable tolling." *Stone v. INS*, 514 U.S. 386, 405 (1995) (analyzing the time limits set forth in a prior version of the INA).

Yet, if the government were correct, Mr. Garcia's reinstatement order became administratively final in March of 2012, when DHS reinstated his prior order. 756 F.3d at 887. The INA's thirty-day deadline would have required him docket his appeal to the Fifth Circuit by April 2012. He did not. According to PACER, Garcia filed his petition for review on June 6, 2013. *See* PACER Appellate Case Search 13-60381. The Fifth Circuit held that it had jurisdiction over the reinstatement order, 756 F.3d at 890, and reviewed in detail the decisions of both the BIA. *Id.* at 887-893. The court ultimately granted Garcia's petition with respect to his claim for relief under the Convention Against Torture and remanded to the BIA for further proceedings. *Id.* at 893. The decision the Fifth Circuit vacated was that of the Board—and not the reinstatement determination DHS reached in March 2012—because it was the Board, not DHS, that rendered the administratively final order under review. *Id.* ("we . . . GRANT the petition as to BIA's denial of Garcia's petition for protection under the CAT, VACATE the BIA's decision regarding CAT protection, and REMAND to the BIA"). If Garcia's reinstatement order

became administratively final when DHS issued it in March of 2012, none of this would have been possible.

Just as the removal order in *Garcia* did not become administratively final until the BIA rendered its decision, no administratively final removal order exists here. Ms. Contreras's appeal before the BIA remains pending. Consequently, the removal period set forth in INA § 241(a)(2) has not begun. She is, in every relevant respect, awaiting a "determination on whether [she] will be removed from the United States." INA § 236(a) therefore governs her detention. This provision entitles Ms. Contreras to a bond hearing.

II.     **Regardless of which detention statute applies, Ms. Contreras is entitled to a constitutionally adequate bond hearing because her prolonged mandatory detention would otherwise raise serious due process concerns.**

Whether INA § 236 or § 241 governs Ms. Contreras's detention, neither provision empowers the government to subject her to prolonged detention without a bond hearing. Wherever possible, courts must interpret the INA to avoid "'serious doubt' as to its constitutionality[.]" *Zadvydas*, 533 U.S. at 689 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932) and applying the canon of constitutional avoidance to INA § 241(a)(6), 8 U.S.C. § 1231(a)(6)). Because detention that becomes indefinite would "raise a serious constitutional problem," the Court interpreted the INA to prohibit such indefinite detention. *Zadvydas*, 533 U.S. at 689. For the same reason, the Supreme Court has strongly suggested, and every federal court of appeals to address the question has concluded, that even where the INA makes detention mandatory, it does not permit unreasonably prolonged detention. *See Demore*, 538 U.S. at 513, 529 n.12, and 531.

- 23 -

*Rodriguez v. Robbins*, 715 F.3d 1127, 1139 (9th Cir. 2013) (detention is presumptively prolonged when it surpasses six months in duration); *Diop v. ICE/Homeland Security*, 656 F.3d 221, 234-35 (3d Cir. 2011) (adopting a multi-factor reasonableness inquiry to determine when prolonged detention violates due process); *Ly v. Hansen*, 351 F.3d 263, 271 (6th Cir. 2003) (same).

   In *Demore v. Kim*, the Court upheld an INA provision requiring the mandatory detention of noncitizens convicted of certain criminal offenses. 538 U.S. at 531. The Court explicitly based its holding on the premise that the mandatory detention would only last for a "very limited time." *Id.* at 529 n.12. Based on government-supplied data, *Demore* assumed the "brief period necessary for removal proceedings," *id. at* 513, would equal around one month for decisions from the Immigration Judge, and about five months when a noncitizen chooses to appeal. *Id.* at 530-31. Justice Kennedy, who supplied the decisive fifth vote for the *Demore* Court's holding on the constitutionality of mandatory detention, offered what has since become an influential concurrence. *Id.* at 531-33.[22] In it, he contemplated that mandatory detention which initial would pass constitutional muster could ripen into prolonged detention which raised due-process concerns if that detention exceeded a reasonable period. *Id.*

   "The Fifth Circuit has not addressed what constitutes a 'reasonable' period of detention." *Norales-Lopez v. Gomez*, No. SA-14-CA-149, 2014 U.S. Dist. Lexis 125830 *8 (W.D. Tex. Jun. 26, 2014) (Hudspeth, J.) (citing *Garcia v. Levy*, 2013 U.S. Dist. Lexis 101110, 2013 WL 3805730 at *4 (S.D. Tex. 2013)). Applying a case-by-case inquiry, this

---

   [22] The pagination of the U.S. reporter is inaccurate. The pin-cited page numbers reflect the inaccurate pagination appearing in Justice Kennedy's concurrence.

Court and other district courts within this circuit have held that unreasonably prolonged, no-bond civil immigration detention violates due process. *See Kambo v. Poppell*, No. SA-07-CV-800-XR, 2007 U.S. Dist. Lexis 77857, 2007 WL 3051601 (W.D. Tex. Oct. 18, 2007) (granting writ based on detention for a "longer period than was contemplated by the Supreme Court in *Demore v. Kim*"). *See also Ramirez v. Watkins*, No. B-10-126, 2010 U.S. Dist. Lexis 142508, 2010 WL 6269226 (S.D. Tex. Nov. 3, 2010) (collecting cases and thoroughly summarizing the law of the Circuit as it stood in 2010).

The facts of this case reveal that Ms. Contreras's nearly eight-month detention with her child in a refugee family internment camp has become unreasonably prolonged. Ms. Contreras has a fundamental liberty interest in being free from immigration detention. *Zadvydas*, 533 U.S. at 693-94; *see also Clark*, 543 U.S. at 384 (extending *Zadvydas* to persons who entered the United States unlawfully). By depriving Ms. Contreras of her liberty and confining her and her daughter to the family internment camp in Dilley, DHS "trigger[ed] the protections of the Due Process Clause[.]" *Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 200 (1989). To continue this deprivation, substantive due process requires the government to put forward a sufficiently compelling regulatory justification that outweighs Ms. Contreras's constitutionally protected liberty interest in avoiding imprisonment. *See Zadvydas*, 533 U.S. at 690-91; *United States v. Salerno*, 481 U.S. 739, 746-51 (1987) (applying heightened scrutiny to weigh regulatory interest in pretrial detention against individual interest in liberty); *Kambo v. Poppell*, No. SA-07-CV-800-XR, 2007 U.S. Dist. Lexis 77857, 2007 WL 305601 at *18 (W.D. Tex. Oct. 18, 2007) (applying strict scrutiny).

The Supreme Court has acknowledged two legitimate regulatory purposes that may, in general, justify immigration detention: preventing flight and protecting the community. *Zadvydas*, 533 U.S. at 690-91. Where Congress specifically legislates a general presumption of flight risk or dangerousness, the Court has consistently upheld that Congressional preference against due-process challenges. *See, e.g., Demore*, 538 U.S. at 519-524 (upholding INA § 236(c)'s mandatory detention provision for noncitizens with certain criminal convictions based on a categorical presumption of flight risk and dangerousness); *Reno v. Flores*, 507 U.S. 292, 213-14 (1993) (upholding the government's practice of releasing juveniles only to parents, legal guardians, or certain other adult relatives based on a categorical best-interests of the child analysis); *Carlson v. Landon*, 342 U.S. 524, 541 (1952) U.S. (upholding no-bail provision for detained Communist noncitizens based on a categorical presumption that Communists posed a danger to the community).

Unlike in *Demore*, *Reno*, and *Carlson*, Congress has reached no conclusion at all regarding Ms. Contreras's flight risk or dangerousness, much less enacted a conclusive legislative presumption of dangerousness or flight risk. In fact, Respondent Johnson publicly announced a policy of releasing women and children, like Ms. Contreras, who passed reasonable fear interviews. *See supra n.16*. The only reason the government will not release Ms. Contreras pursuant to this policy is because an IJ denied her claim, and she has a pending appeal. Yet, that fact is not linked in any automatic way to Ms. Contreras's flight risk dangerousness. Indeed, data indicate that she is even less of a flight risk now than she was when the IJ denied her claims because Ms. Contreras has

- 26 -

now secured the assistance of well-resourced and very competent *pro bono* counsel. Government data from 2014 revealed that unaccompanied children who obtained counsel showed up to court at a rate of 92.5%, where as unrepresented minors appeared only 27.5% of the time.[23] More recent data from July 2015 revealed that immigrant families—the group Ms. Contreras falls within—attend their hearings 98% of the time when they have legal counsel, compared to roughly 60% showing up *pro se*.[24]

Even if this Court were to accept the government's untenable position that Ms. Contreras is detained under INA § 241 pursuant to an administratively final order, DHS has failed to comply with the express provisions of that section, and violated Ms. Contreras's due-process rights in the process. Assuming Ms. Contreras has an administratively final order that triggered the removal period (and thus, ignoring INA § 101(a)(47)(B) and *Garcia v. Holder*), INA § 241(a)(3) only provides the government 90 days to effectuate the order. After that, Congress authorized continued detention only under limited circumstances. *See* INA § 241(a)(6), 8 U.S.C. § 1231(a)(6). Specifically, INA § 241(a)(6) authorizes detention beyond the removal period only when the government determines a person is "a risk of flight or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6).

---

[23] *See* Taking Attendance: New Data Finds Majority of Children Appear in Immigration Court, American Immigration Council (Jul. 24, 2014), *available at* http://www.americanimmigrationcouncil.org/sites/default/files/docs/taking_attendance_new_data_finds_majority_of_children_appear_in_immigration_court_final_1.pdf (last visited Aug. 18, 2015).

[24] *Myth vs. Fact: Immigrant Families' Appearance Rates in Immigration Court*, Human Rights First (July 2015), *available at*, http://www.humanrightsfirst.org/sites/default/files/MythvFact-Immigrant-Families.pdf (last visited Aug. 20, 2015).

DHS promulgated regulations to effectuate "Post Order Custody Reviews" ("POCR"s) as a means of assessing continued custody of detainees beyond the removal period. *See* 8 C.F.R. §§ 241.4, 241.13, 241.14. The POCR regulations require reviews at the 90- and 180-day mark. *See* 8 C.F.R. §§ 241.4(k)(1), (k)(2). However, as several courts of appeal have observed, because applying these regulations in the prolonged detention context would raise serious due process concerns, they are no substitute for a constitutionally adequate bond hearing. *See, e.g., Diouf v. Napolitano*, 634 F.3d 1081, 1089-91 (9th Cir. 2011) (finding POCRs inadequate "because they do not provide for an in-person hearing, they place the burden on the alien rather than the government and they do not provide for a decision by a neutral arbiter such as an immigration judge"); *Casas-Castrillon v. Dep't of Homeland Security*, 535 F.3d 942, 951-52 (9th Cir. 2008) (noting POCRs fall "far short of the procedural protections afforded in ordinary bond hearings"). Similarly, in *Zadvydas*, the Court held prolonged detention under INA § 241(a)(6) raises due-process concerns, notwithstanding the agency's POCR process, because the "sole procedural protections" were administrative custody reviews that lacked judicial review and placed the burden of proof on the detainee. 533 U.S. at 691-92.

In sum, Ms. Contreras has every incentive to pursue her withholding claim before the BIA and, upon remand the IJ, or if the Board upholds the decision of the IJ, before the Court of Appeals. Her withholding claim is, in a very real sense, her last best chance at a life of safety and security for herself and her daughter. They have both sacrificed tremendously while in detention. And now they have the tools, in the form of

competent immigration counsel, to succeed. There is simply no reason to believe Ms.

Contreras would abandon her case now after suffering so greatly for so long. Moreover,

even if the IJ decision created *some* risk of flight, that risk could be easily mitigated by

the use of alternatives to detention such as intensive supervision, telephonic check-in, or

electronic monitoring.

Because of the length of Ms. Contreras's detention and the absence of any statutory

presumption that she is a flight risk or danger to the community, due process now

requires the government and Ms. Contreras to appear at an in-person bond hearing. *See*

*Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (requiring in-person hearing before

termination of welfare benefits); *Memphis Light, Gas & Water Div. v. Craft*, 426 U.S. 1, 16

(1978) (requiring hearing before depriving beneficiary of public utilities); *Califano v.*

*Yamasaki*, 442 U.S. 682, 696 (1979) (requiring hearing before cutting Social Security

payments). Because it is Ms. Contreras and her daughter's liberty that is at stake,

longstanding Supreme Court case law holds the government must bear the burden of

proof during this hearing. *See, e.g., Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) ("due

process places a heightened burden of proof on the State in civil proceedings in which

the individual interests are at stake . . . are both particularly important and involve

more than mere loss of money.").

The burden the government must carry is one of clear and convincing evidence that

it has a compelling government interest that can only be accomplished through

continued detention. *Santosky v. Kramer*, 455 U.S. 745, 768-69 (1982) (holding due

process requires government to bear burden of proof by clear and convincing evidence

- 29 -

before terminating parental rights); *see also Kambo v. Poppell*, No. SA-07-CV-800-XR, 2007 U.S. Dist. Lexis 77857, 2007 WL 3051601 (W.D. Tex. Oct. 18, 2007) (applying strict scrutiny).

**III.    DHS's arbitrary detention of Ms. Contreras and her daughter to "disincentivize" future migration by Central American asylum-seekers violates her rights under the Due Process Clause.**

Even if INA § 236(a) did not entitle Ms. Contreras to a bond hearing (it does), and even if her detention had not been unreasonably prolonged (it has), she is still entitled to a constitutionally adequate bond hearing to determine whether DHS has any constitutionally legitimate purpose in continuing her detention. To comply with due process, the government's detention of Ms. Contreras must bear a reasonable relation to a legitimate government purpose. *Zadvydas*, 533 U.S. at 690. Three facts offer significant reason to doubt Ms. Contreras's continued detention satisfies this due-process requirement.

*First* is the history of the government's family detention policy. As the District of Columbia found in *R.I.L-R v. Johnson*, ICE had "a policy of taking deterrence of mass migrations into account in making custody determinations, and that such consideration [ ] played a significant role in the large number of Central American families detained since June 2014[.]" 2015 U.S. Dist. Lexis 20441 *17 (D.D.C. Feb. 20, 2015). The *R.I.L-R* court also found that the plaintiffs in that case had a significant likelihood of prevailing on their claim that DHS's use of deterrence violated the Due Process Clause, and *Zadvydas*. *Id.* at *56. DHS detained Ms. Contreras while its unlawful detain-to-deter policy was in force. But for this policy, she may have been released. Accordingly, the

government's new position as to the reasons for continuing Ms. Contreras's detention—which were necessarily adopted in response to the litigation in *R.I.L-R*—is owed no deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).

*Second*, even though the Secretary of Homeland Security publicly promised that mothers in family detention who passed their reasonable fear interviews would be released subject to reasonable conditions, Ms. Contreras and her daughter remain imprisoned. Secretary Johnson's announcement said nothing about limiting releases for those pressing their claims before the BIA and the immigration court. Rather, it offered a blanket policy. That policy has not been followed in Ms. Contreras's case, offering further reason to question what legitimate government interest justifies her continued, prolonged detention. As such, an independent evaluation is necessary to put the government to its burden of demonstrating its regulatory interest in further depriving Ms. Contreras and her daughter of their liberty

*Third*, the August 6 response by the government to the U.S. District Court for the Central District of California's Order to Show Cause reveals that the government is still using deterrence as a justification for keeping women and children in family detention. The government spent 60 pages arguing why it should not be forced to release women and children from family detention, including Ms. Contreras and Helen, within 90 days.[25] The government failed to explain why depriving a small percentage of Central American asylum-seeking mothers and their children of their liberty was reasonably

_____

[25] *Flores v. Johnson*, No. 2:85-cv-04544-DMG-AGR, Defendants' Response to the Court's Order to Show Cause Why the Remedies Set Forth In the Court's July 24, 2015 Order Should Not Be Implemented, ECF No. 184 (filed Aug. 6, 2014).

related to the recognized government interests of preventing flight and ensuring community safety. Instead, when forced to justify to the *Flores* court what actual harm would befall the government if it were forced to close its family internment camps, the government returned to its position that doing so would "incentivize" future migration.[26]

"Dis-incentivizing" future migration is simply deterrence rebranded. Accordingly, a constitutionally adequate bond hearing is necessary and required by *Zadvydas* to determine whether the government is detaining Ms. Contreras and her daughter Helen pursuant to valid government interest, and whether that interest is reasonably related to their continued detention.

CONCLUSION

For the foregoing reasons, Ms. Contreras respectfully requests that this Court GRANT her Motion for Expedited Order to Show Cause, and, upon reviewing any submissions from the government, that the Writ of Habeas Corpus ISSUE, and that the government be ordered to afford Ms. Contreras a constitutionally adequate bond hearing without no more than 10 days following this Court's ruling.

Date:  August 20, 2015

Respectfully submitted,

R. Andrew Free, TN Bar No. 30513
LAW OFFICE OF R. ANDREW FREE
Bank of America Plaza
414 Union Street, Suite 900

---

[26] *Id.* at 12, 24.

Nashville, TN 37219
(615) 432-2642
Andrew@ImmigrantCivilRights.com
*Pro Bono* Counsel for Petitioner



EXHIBIT A

*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
300 El Rancho Way
Dilley, Texas 78017



**U.S. Immigration
and Customs
Enforcement**

CONTRERAS-Casco, Clivian Melissa
South Texas Family Residential Center
300 El Rancho Way
Dilley, TX 78017

A202-138-499

## Notice of Family Residential Center File Custody Review

You are detained in the custody of U.S. Immigration and Customs Enforcement (ICE). ICE has initiated a review of your custody status to determine whether you should be released from ICE custody pending either a decision in your removal proceedings or your removal from the United States. ICE's Deciding Official will review your case for consideration of release, including pursuant to an Order of Release on Recognizance, an Order of Supervision, or bond, as appropriate. In order to be eligible for release, you must demonstrate to the satisfaction of the Deciding Official that your release will not pose a danger to the community or to the safety of other persons or property or a flight risk. If you are subject to an administratively final order of removal, you may also be released if it is determined that your removal is not significantly likely in the reasonably foreseeable future.

Review of your custody status will be completed on or about **June 3, 2015** . The Deciding Official may consider, but is not limited to considering:

1. Family ties in the United States;
2. Whether a relative/sponsor has a fixed address in the United States;
3. Manner of entry and prior immigration history;
4. Any prior arrests, convictions, or records of nonappearance at court hearings or Department of Homeland Security (DHS) appointments;
5. Relationship with community organizations that may be available to aid in placement;
6. Whether you are represented before DHS or the immigration court;
7. Proof of identity; and
8. Any serious medical concerns of yourself or your child detained with you.

You may submit any documentation you wish to be reviewed in support of your release by **June 3, 2015**, to the attention of the Officer and address below. English translations accompany any foreign-language documents, consistent with 8 C.F.R. § 103.2(b)(3). An attorney or legal representative may also submit materials on your behalf. The deciding official will notify you of the decision in your case.

www.ice.gov

**Notice to Alien of Family Residential Center File Custody Review**
CONTRERAS-Casco, Clivian Melissa A202-138-499
Page 2

If you have been detained more than 180 days after your order of removal has become
administratively final, jurisdiction over the custody decision in your case has been transferred to
the Headquarters Post Order Review Unit (HQ POCRU), Potomac Center North, 500 12th Street
SW, Washington, DC 20536.   You may provide any documentation relevant to your custody
determination to DDO Maria Stokes.


Valentin De La Garza
Assistant Field Office Director
Deciding Official Name/Title                                  Date

**Notice to Alien of Family Residential Center File Custody Review**
CONTRERAS-Casco, Clivian Melissa A202-138-499
Page 3

---

**PROOF OF SERVICE**

**(1)    Personal Service (Officer to complete both (a) and (b) below.)**

(a)    I    David Gripentrog    ,    Deportation Officer
Name of ICE Officer                                    Title

certify that I served    Clivian Melissa Contreras-Casco    with a copy of
Name of Resident

this document at    STFRC    on    6/16/15, at    (140)    .
Institution                                    Date                    Time

(b)    I certify that I served the custodian _____,
Name of Official

_____, at _____, on
Title                                    Institution

_____ with a copy of this document.
Date

**OR**

**(2)    Service by certified mail, return receipt.  (Attach copy of receipt)**

I _____, _____, certify
Name of ICE Officer                                    Title

that I served _____ and the custodian _____
Name of Resident                                    Name of Official

with a copy of this document by certified mail at _____ on _____.
Institution                                    Date

Resident Signature: x Clivian Melissa Contreras Date: 16/6/15

( ) cc:  Attorney of Record or Designated Representative
( ) cc:  A-File



EXHIBIT B

**U.S. Department of Homeland Security**          **Notice of Intent/Decision to Reinstate Prior Order**

| | |
|---|---|
| | File No. A202 138 499 |
| FINS #:1177334877 | Event No:WSLI1512000329 |
| | Date: December 28, 2014 |

Name: CLIVIAN MELISSA CONTRERAS-CASCO

In accordance with section 241(a)(5) of the Immigration and Nationality Act (Act) and 8 CFR 24 1.8, you are hereby notified that the Secretary of Homeland Security intends to reinstate the order of _____ REMOVAL _____ entered against you. This intent

(Deportation / exclusion / removal)

is based on the following determinations:

1. You are an alien subject to a prior order of deportation / exclusion / removal entered on ___November 12, 2014___ at

(Date)

___MCALLEN, TEXAS___

(Location)

2. You have been identified as an alien who:

   [X] was removed on ___November 19, 2014___ pursuant to an order of deportation / exclusion / removal.

   (Date)

   [ ] departed voluntarily on _____ pursuant to an order of deportation / exclusion / removal on or

   (Date)

   after the date on which such order took effect (i.e., who self-deported).

3. You illegally reentered the United States on or about ___December 27, 2014___ at or near ___HIDALGO, TEXAS___

   (Date)                                                                      (Location)

In accordance with Section 241(a)(5) of the Act, you are removable as an alien who has illegally reentered the United States after having been previously removed or departed voluntarily while under an order of exclusion, deportation or removal and are therefore subject to removal by reinstatement of the prior order. You may contest this determination by making a written or oral statement to an immigration officer. You do not have a right to a hearing before an immigration judge.

*The facts that formed the basis of this determination, and the existence of a right to make a written or oral statement contesting this determination, were communicated to the alien in the* ___SPANISH___ *language.*

JOHNNY D. CAVAZOS

(Printed or typed name of official)                                      (Signature of officer)

**Border Patrol Agent**

(Title of officer)

---

### Acknowledgment and Response

I [ ] do [X] do not wish to make a statement contesting this determination.          Subject Refused To Sign

___12/28/14___                                                Witnessed by _____

(Date)                                                       (Signature of Alien)

---

### Decision, Order, and Officer's Certification

Having reviewed all available evidence, the administrative file and any statements made or submitted in rebuttal, I have determined that the above-named alien is subject to removal through reinstatement of the prior order, in accordance with section 241(a)(5) of the Act.

___December 28, 2014___          ___MCALLEN, TEXAS___

(Date)                           (Location)                       (Signature of authorized deciding official)

MATTHEW DEPAOLA                                              ACTING PATROL AGENT IN CHARGE

(Printed or typed name of official)                              (Title)

Form I-871 (Rev. 08/01/07)



EXHIBIT C

U.S. Department of Justice
Immigration and Naturalization Service

## Record of Determination/Reasonable Fear Worksheet

| DEN | ZHN | A202 138 499 | |
|---|---|---|---|
| District Office Code | Asylum Office Code | Alien's File Number | |
| Crisp | Aaron | Honduras | |
| Asylum Officer's Last Name | Asylum Officer's First Name | Alien's Nationality | |
| | | Contreras-Casco | Clivian |
| | | Alien's Last/ Family Name | Alien's First Name |

### *All statements in italics must be read to the applicant*

**SECTION I:**                               **INTERVIEW PREPARATION**

1.1  1/15/2015                     1.2   Dilley, TX
     Date of interview [MM/YY/DD]        Interview site

1.3  ☒ Applicant received and signed Form M-488 and relevant *pro bono* list on        1/13/2015
                                                                                        Date signed [MM/DD/YY]

1.4  Representative name, address, telephone number and relationship to applicant:

1.5  Persons present at the interview (check which apply)
     ☐ Representative
     ☐ Other(s), list: _____
     ☒ No one other than applicant and asylum officer

1.6  Language used by applicant in interview:        Spanish

1.7  Lionbridge# 2902429 _____        ☒ Yes  ☐ No           0956           1232
     Interpreter Service, Interpreter ID Number.   Interpreter Has Forms   Time Started   Time Ended

1.8  _____   ☐ Yes  ☐ No           _____        _____
     Interpreter Service, Interpreter ID Number.   Interpreter Has Forms   Time Started   Time Ended

1.9  _____   ☐ Yes  ☐ No           _____        _____
     Interpreter Service, Interpreter ID Number.   Interpreter Has Forms   Time Started   Time Ended

1.10  ☒ Interpreter oath completed.
1.11  ☒ Interpreter was not changed during the interview
1.12  ☐ Interpreter was changed during the interview for the following reason(s) :
      1.13  ☐ Applicant requested a female interpreter replace a male interpreter, *or vice versa*
      1.14  ☐ Applicant found interpreter was not competent    1.15  ☐ Applicant found interpreter was not neutral
      1.16  ☐ Officer found interpreter was not competent      1.17  ☐ Officer found interpreter was not neutral
      1.18  ☐ Bad telephone connection
1.19  ☒ Asylum officer read the following paragraph to the applicant at the beginning of the interview:

*The purpose of this interview is to determine whether you should be referred to an immigration judge to apply for withholding or deferral of removal. You will be eligible for such a referral if the INS finds that there is a reasonable possibility you would be persecuted or tortured in the country to which you have been ordered removed. I am going to ask you questions about why you fear returning to the country to which you have been ordered removed, or any other country. It is very important that you tell the truth during the interview and that you respond to all of my questions. This may be your only opportunity to give such information. Please feel comfortable telling me why you fear harm. U.S. law has strict rules to prevent the disclosure of what you tell me today about the reasons you fear harm. The information you tell me about the reasons for your fear will not be disclosed to your government, except in exceptional circumstances. The statements you make today may be used in deciding your claim and in any future immigration proceedings. It is important that we understand each other. If at any time I make a statement you do not understand, please stop me and tell me you do not understand so that I can explain it to you. If at any time you tell me something I do not understand, I will ask you to explain.*

Form I-899 (11/5/02)

| Alien's File Number: | A202 138 499 |
|---|---|

## SECTION II:                     BIOGRAPHIC INFORMATION

2.1  <u>Contreras-Casco</u>
Last Name/ Family Name [ALL CAPS]

2.2  <u>Clivian</u>                       2.3  <u>Melissa</u>
First Name                           Middle Name

2.4  <u>10/5/1989</u>                    2.5  Gender  ☐ Male   ☒ Female
Date of birth [MM/DD/YY]

2.6  <u>None</u>
Other names and dates of birth used

2.7  <u>Honduras</u>                     2.8  <u>Honduras</u>
Country of birth                     Country (countries) of citizenship (list all)

2.9  Prior address in last country in which applicant fears persecution or torture (List Address, City/Town, Province, State, Department and Country):

<u>Barrio El Estruendo Choluteca, Honduras</u>

2.10  <u>12/27/2014</u>                  2.11  <u>Hidalgo, TX</u>
Date of last arrival [MM/DD/YY]            Port of arrival

2.12  <u>12/27/2014</u>                  2.13  <u>South Texas Family Residential Center   1925 West Highway 85 Dilley, TX  78017</u>
Date of detention [MM/DD/YY]              Place of detention

2.14  Grounds provided by Deportation Officer for removal:
☒ Prior order reinstated pursuant to 241 (a)(5) of the INA
☐ Removal order pursuant to 238(b) of the INA (based on aggravated felony conviction)

2.15  <u>White</u>            2.16  <u>Evangelical</u>         2.17  <u>Spanish</u>
Applicant's race or ethnicity    Applicant's religion        All languages spoken fluently by applicant

2.18  Does the applicant claim to have a medical condition (physical or mental), or has the officer observed any indication that a medical condition (physical or mental) exists?      ☐ Yes   ☒ No

2.19  If YES, Explain:

2.20  Does applicant indicate, or does officer believe medical condition is serious?      ☐ Yes   ☒ No
2.21  Does applicant request immediate attention for a medical condition, or does the officer believe applicant needs immediate attention for a medical condition?      ☐ Yes   ☐ No
2.22  Does applicant claim that medical condition relates to torture?      ☐ Yes   ☐ No

Form I-899 (11/5/02)

| Alien's File Number: | A202 138 499 |
| --- | --- |

**SECTION III:**                         **REASONABLE FEAR FINDING**

**TYPED SWORN STATEMENT IN QUESTION AND ANSWER FORMAT AND ASSESSMENT OF REASONABLE FEAR MUST BE ATTACHED TO THIS WORKSHEET.** If the asylum officer finds the applicant not credible, the sworn statement must reflect that the applicant was asked to explain any inconsistencies or lack of detail on material issues.
A person has a reasonable fear of persecution or torture if there is a reasonable possibility the person would be persecuted or subjected to torture.

**A.   Credibility Determination**

3.1  ☒  The applicant's testimony was sufficiently detailed, consistent and plausible in material respects and therefore is found credible.

3.2  ☐  The applicant's testimony was found not credible in material respects. [Assessment must (1) identify specific discrepancies, inconsistencies, kind of detail applicant was unable to provide, etc. (2) Summarize applicant's explanation for the inconsistencies, inability to provide detail, etc.; and why the explanation failed to overcome reasons for finding the applicant not credible; and (3) explain how the non-credible aspects of the testimony are material to the claim.]

3.3  ☐  Material aspects of the applicant's testimony were found credible in part and not credible in part. [Assessment must identify which material aspects were credible and which were not credible. For part of testimony found not credible, (1) identify specific discrepancies, inconsistencies, kind of detail applicant was unable to provide, etc.; (2) Summarize applicant's explanation for the inconsistencies, inability to provide detail, etc.; and (3) Explain how the non-credible aspects of testimony are material to the claim.]

**B.   Reasonable Fear Determination**

3.4  ☒  **Reasonable Fear of Persecution Established** (I-863 Box 6)
[The applicant has established that there is a reasonable possibility of suffering harm constituting persecution in the country to which the applicant has been ordered removed, AND the applicant has established that there is a reasonable possibility the persecution she/he fears is on account of race, religion, nationality, membership in a particular social group, or political opinion.]
Is political opinion related to Coercive Family Planning?   ☐ Yes   ☐ No

3.5  ☐  **Reasonable Fear of Torture Established** (I-863 Box 6)
[The applicant has established that there is a reasonable possibility that 1) the applicant would be subject to severe pain or suffering in the country to which the applicant has been ordered removed; 2) the feared harm would be specifically intended to inflict severe physical or mental pain or suffering; 3) the pain or suffering would be inflicted by or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity; 4) the feared harm would be inflicted while the applicant is in the custody or physical control of the offender; and 5) there is a reasonable possibility that the feared harm would not be in accordance with lawful sanctions.]

3.6  ☐  **No Reasonable Fear of Persecution Established and No Reasonable Fear of Torture Established** (I-863 Box 5, if applicant requests review) [Assessment must explain reasons for both findings.]

**ASYLUM OFFICER / SUPERVISOR NAMES AND SIGNATURES**

3.7  Aaron Crisp ZHN 0207                 3.8  _[signature]_                 3.9  01/16/15
     Asylum officer name and ID CODE (print)      Asylum officer's signature          Decision date

3.10 _Caashmi Uclayi ZHN 280_            3.11 _[signature]_                3.12  01/16/15
     Supervisory asylum officer name             Supervisor's signature             Date supervisor approved decision

Page 3 of 3

Form I-899 (3/22/99)



# EXHIBIT D

U. S. Department of Homeland Security

## Notice of Referral to Immigration Judge

| | |
|---|---|
| **Date** | |
| **A-File** | 202 138 499 |

| **Name** <br> **Clivian CONTRERAS-CASCO** | **Country of Citizenship** <br> **Honduras** |
|---|---|
| **Place and Manner of Arrival** <br> **Hidalgo, TX; Entered Without Inspection** | **Date of Arrival** <br> **12/27/2014** |

**To immigration judge:**

☐ 1. The above-named alien has been found inadmissible to the United States and ordered removed pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act). A copy of the removal order is attached. The alien has requested asylum and/or protection under the Convention against Torture and the matter has been reviewed by an asylum officer who has concluded the alien does not have a credible fear of persecution or torture. The alien has requested a review of that determination in accordance with section 235(b)(1)(B)(iii)(III) of the Act and 8 CFR § 208.30(g) as a

☐ 2. The above-named alien arrived in the United States as a stowaway and has been ordered removed pursuant to section 235(a)(2) of the Act. The alien has requested asylum and/or withholding of removal under the Convention against Torture and the matter has been reviewed by an asylum officer who has concluded the alien does not have a credible fear of persecution or torture. The alien has requested a review of that determination in accordance with section 235(b)(1)(B)(iii)(III) of the Act.

☐ 3. The above-named alien arrived in the United States in the manner described below and has requested asylum and/or withholding of removal under the Convention against Torture. The matter is referred for a determination in accordance with 8 CFR 208.2(c). Arrival category (check one):

    ☐ Crewmember/applicant    ☐ Crewmember/refused    ☐ Crewmember/landed

    ☐ Crewmember/violator    ☐ VWP/applicant    ☐ VWP/violator

    ☐ 235(c) order    ☐ S-visa nonimmigrant    ☐ Stowaway: credible fear determination attached

☐ 4. The above-named alien has been ordered removed by an immigration officer pursuant to section 235(b)(1) of the Act. A copy of the removal order is attached. In accordance with section 235(b)(1)(C) of the Act, the matter is referred for review of that order. The above-named alien claims to be (check one):

    ☐ a United States citizen    ☐ a lawful permanent resident alien

    ☐ an alien granted refugee status under section 207 of the Act    ☐ an alien granted asylum under section 208 of the Act.

☐ 5. The above-named alien has been ordered removed pursuant to section 238(b) of the Act, or the Department of Homeland Security (DHS) has reinstated a prior exclusion, deportation, or removal order of the above-named alien pursuant to section 241(a)(5) of the Act. A copy of the removal order and, if applicable, the notice of reinstatement, are attached. The alien has expressed fear of persecution or torture and the claim has been reviewed by an asylum officer who has concluded the alien does not have a reasonable fear of persecution or torture. The alien has requested a review of that determination in accordance with 8 CFR §§ 208.31(f) and (g).

☒ 6. The above-named alien has been ordered removed pursuant to section 238(b) of the Act, or the DHS has reinstated a prior exclusion, deportation, or removal order of the above-named alien pursuant to section 241(a)(5) of the Act. A copy of the removal order and, if applicable, the notice of reinstatement, are attached. The alien has expressed fear of persecution or torture and the claim has been reviewed by an asylum officer who has concluded the alien has a reasonable fear of persecution or torture. The matter has been referred for a determination in accordance with 8 CFR § 208.31(e).

☐ 7.. The Secretary of Homeland Security has determined that the release from custody of the above-named alien who is under a final order of removal would pose a special danger to the public according to the standards set in 8 CFR § 241.14(f)(1). The DHS has therefore invoked procedures to continue the alien's detention even though there is no significant likelihood that the alien will be removed from the United States in the reasonably foreseeable future. The matter is referred to the immigration judge for a review of this determination in accordance with 8 CFR § 241.14(g).

Form I-863 (Rev.08/01/07)

U. S. Department of Homeland Security **Notice of Referral to Immigration Judge**

### NOTICE TO APPLICANT

You are ordered to report for a hearing before an immigration judge for the reasons stated above. Your hearing is scheduled on

**To Be Determined**   at   **To Be Determined**
(Date)                      (Time)

**You are to appear at:  Denver EOIR 1961 Stout Street, # 3-101 Denver, Colorado 80294**

___
**(complete office address)**

☒ You may be represented in this proceeding, at no expense to the government, by an attorney or other individual authorized and qualified to represent persons before an Immigration Court. If you wish to be so represented, your attorney or representative should appear with you at this hearing. In the event of your release from custody, you must immediately report any change of your address to the Immigration Court on Form EOIR-33, which is provided with this notice. If you fail to appear for a scheduled hearing, a decision may be rendered in your absence.

☒ You may consult with a person or persons of your own choosing prior to your appearance in Immigration Court. Such consultation is at no expense to the government and may not unreasonably delay the process.

☐ Attached is a list of recognized organizations and attorneys that provide free legal service.

_Karen C. Lleam_  Acting SAPSO
(Signature and title of immigration officer)

=====================================================

### CERTIFICATE OF SERVICE

☑ The contents of this notice were read and explained to the applicant in the 01/22/15 Spanish language.

☑ The original of this notice was delivered to the above-named applicant by the undersigned on 01/22/15 and the alien has been advised of communication privileges pursuant to 8 CFR 236.1(e). Delivery was made:

☐ in person   ☐ by certified mail, return receipt # _____ requested   ☐ by regular mail

(Signature and title of immigration officer)

**Attachments to copy presented to immigration judge:**

☐ Passport            ☐ Form I-860
☐ Visa                ☐ Form I-869
☐ Form I-94           ☐ Form I-898
☐ Forensic document analysis   ☐ Asylum officer's reasonable fear determination worksheet (I-899)
☐ Fingerprints and photographs
☐ EOIR-33             ☐ Asylum officer's credible fear determination worksheet (I-870)

☐ FOR 8 CFR 241.14(f) CASES ONLY: Written statement including summary of the basis for the Commissioner's determination to continue the alien in detention, and description of the evidence relied on in finding the alien specially dangerous (with supporting documents attached).

☐ EOR 8 CFR 241.14(f) CASES ONLY: Written notice advising the alien of initiation of proceedings and informing alien of procedures governing the Reasonable Cause Hearing at 8 CFR 241.14(h).

☒ Other (specify): _Officer's Notes_

Form I-863 (Rev.08/01/07)



EXHIBIT E

DEPARTMENT OF HOMELAND SECURITY
**NOTICE OF CUSTODY DETERMINATION**

Alien's Name:  HELEN NAOMI BETANCO-CONTRERAS

A-File Number: 206-887-159

Date: 01/22/2015

Event ID:  WSL1512000329

Subject ID: 351867282

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be:

[X] Detained by the Department of Homeland Security.

[ ] Released (check all that apply):

    [ ] Under bond in the amount of  $ _____

    [ ] On your own recognizance.

    [ ] Under other conditions. [Additional document(s) will be provided.]

A 2105  GONZALES
Name and Signature of Authorized Officer

01/22/2015 11:53
Date and Time of Custody Determination

Supervisory  Det. & Dep. Officer
Title

Dilley TX 780173745
Office Location/Address

---

You may request a review of this custody determination by an immigration judge.

[✓] I acknowledge receipt of this notification, and

    [✓] I do request an immigration judge review of this custody determination.

    [ ] I do not request an immigration judge review of this custody determination.

Elivian  Contreras
Signature of Alien

01/22/2015
Date

---

The contents of this notice were read to HELEN NAOMI BETANCO-CONTRERAS in the ___ SPANISH ___ language.
(Name of Alien)                    (Name of Language)

SYLVIA  LOPERENA
Name and Signature of Officer

Name or Number of Interpreter (if applicable)

DEPORTATION OFFICER
Title

DHS Form I-286 (1/14)

Page 1 of 1



EXHIBIT F

# MACIAS & GREENSTEIN, LLC
## 20 Meridian Street, 3rd Floor, East Boston, MA 02128

L. Manuel Macias                                      (617) 561-0400 phone
Ilana Etkin Greenstein                                (617) 561-1222 fax
Megan Parker Johnson
Abbagail Geroux

Department of Justice
Board of Immigration Appeals                          July 23, 2015
Office of the Clerk
5107 Leesburg Pike, Suite 2000
Falls Church, VA    20530
            (22041)

> Re:   Clivian CONTRERAS-Casco, A202 138 499
>       Helen Naomi BETANCO Contreras, A206 887 159
>       Respondent's Brief in Support of Appeal
>       Motion to Take Administrative Notice
>       Motion to Strike DHS' Motion for Summary Affirmance

Dear Sir/Madam,

I represent Clivian Contreras-Clasco and Helen Naomi Betanco Contreras in these consolidated removal proceedings. Enclosed please find the following in connection with the respondents' appeal from the April 21, 2015 decision of the Immigration Judge:

1.    Briefing Schedule Extension Notice;

2.    Respondent's Brief in Support of Appeal;

3.    Motion to Take Administrative Notice;

4.    Embassy of the United States Tegucigalpa, Honduras, *Crime Victim Assistance* (current as of 7/20/2015);

5.    OSAC, *Honduras 2015 Crime and Safety Report*, 4/21/2015;

6.    United Nations General Assembly, *Report of the Special Rapporteur on violence against women, its causes and consequences, Rashida Manjoo*, March 31, 2015;

7.    Motion to Strike DHS' Motion for Summary Affirmance.

Please do not hesitate to contact me if you have any questions, or require any additional information.

Sincerely,

Ilana Etkin Greenstein

Encl
cc: DHS Office of Chief Counsel, Centennial, CO



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 20530*

Greenstein, Ilana Etkin
Macias & Greenstein, LLC
20 Meridian Street
3rd Floor
East Boston, MA 02128

DHS/ICE Office of Chief Counsel - DEN
12445 East Caley Avenue
Centennial, CO 80111-5663

Name: CONTRERAS-CASCO, CLIVIAN                 A 202-138-499

Riders:206-887-159

Type of Proceeding: Withholding Only              Date of this notice: 6/29/2015

Type of Appeal: Case Appeal                         Filed By: <u>Alien</u>

### NOTICE -- BRIEFING EXTENSION REQUEST GRANTED

Alien's <u>original</u> due date:  7/6/2015          DHS' <u>original</u> due date:  7/6/2015

o   The request by <u>the alien</u> for an additional amount of time to submit a brief, which was received on 6/26/2015                 , is GRANTED.

o   The alien's brief must be **received** at the Board of Immigration Appeals on or before 7/27/2015

o   The DHS' brief must be **received** at the Board of Immigration Appeals on or before 7/27/2015

PLEASE NOTE

**WARNING:** If you indicate on the Notice of Appeal (Form EOIR-26) that you will file a brief or statement, you are expected to file a brief or statement in support of your appeal. If you fail to file a brief or statement within the time set for filing in this briefing schedule, the Board may summarily dismiss your appeal. See 8 C.F.R. § 1003.1(d)(2)(i)(E).

The Board generally does not grant more than one extension per party or per case, if detained. Therefore, if you have received an extension, you should assume that you will not be granted any further extensions. Each party's current due date is stated above.

If you file your brief late, you must file it along with a motion for consideration of your late-filed brief. There is no fee for such a motion. The motion must set forth in detail the reasons that prevented you from filing your brief on time. You should support the motion with affidavits, declarations, or other evidence. Only one such motion will be considered by the Board.

FILING INSTRUCTIONS

IMPORTANT: The Board of Immigration Appeals has included **two copies** of this notice.

**Please attach one copy of this notice to the front of your brief when you mail or deliver it to the Board, and keep one for your records. Thank you for your cooperation.**

Use of an over-night courier service is strongly encouraged to ensure timely filing.

If you have any questions about how to file something at the Board, you should review the Board's Practice Manual at www.justice.gov/eoir.

Proof of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals -- including correspondence, forms, briefs, motions, and other documents. If you are the Respondent or Applicant, the "Opposing Party" is the District Counsel for the DHS at the address shown above. Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them. Any submission filed with the Board without a certificate of service on the opposing party will be rejected.

**FILING ADDRESS:**

> Board of Immigration Appeals
> Clerk's Office
> 5107 Leesburg Pike, Suite 2000
> Falls Church, VA  20530

> Business hours:  Monday through Friday, 8:00 a.m. to 4:30 p.m.

Use of an overnight courier service is strongly encouraged to ensure timely filing.

**Userteam:**PCM

Ilana Etkin Greenstein                                    **Detained**
Macias & Greenstein, LLC
20 Meridian Street, 3rd Floor
East Boston, MA 02128
(617) 561-0400
igreenstein@mgk-law.com

## UNITED STATES DEPARTMENT OF JUSTICE
## BOARD OF IMMIGRATION APPEALS
## FALLS CHURCH, VIRGINIA

| | |
|---|---|
| In the Matter of: | |
| | **In Withholding Only Proceedings** |
| Clivian Melissa CONTRERAS-Casco<br>A202 138 499 | |
| | |
| Helen Naomi BETANCO Contreras<br>A206 887 159 | **In Removal Proceedings** |

## RESPONDENTS' BRIEF IN SUPPORT OF APPEAL

**I       Statement of the Case**

Respondent Clivian Melissa Contreras-Casco ["respondent" or "Ms. Contreras"] appeals

from the decision of the Immigration Judge to deny her and her minor child Helen Betanco

Contreras ["Helen"]'s applications for asylum and withholding of removal. Ms. Contreras

respectfully submits that the Immigration Judge's credibility determination is clearly erroneous,

and that the record evidence establishes both her credibility and her and Helen's eligibility for

asylum and withholding of removal. Finally, Ms. Contreras asserts that she must be deemed

eligible to apply for asylum despite the fact that she is the subject of a reinstated removal order,

and has been placed in "withholding only" proceedings.

## II      Procedural Posture

Lead respondent Clivian Contreras was removed from the United States in November of 2014. On December 27 of that year, she attempted to reenter with Helen, who at the time was seven years old. They were apprehended, detained at the South Texas Family Residential Center in Dilley, Texas and, when Ms. Contreras expressed a fear of return to Honduras, were interviewed by an officer of the USCIS Asylum Office. That officer determined that Ms. Contreras had established a reasonable fear of persecution on account of a protected ground, and that Helen had established a credible fear of such persecution.

Accordingly, DHS instituted withholding only proceedings against Ms. Contreras and removal proceedings against Helen. Those proceedings were consolidated before Immigration Judge Donn Livingston, sitting via video conference from the Immigration Court in Denver, Colorado. Ms. Contreras filed independent applications for asylum and withholding of removal for herself and Helen, and testified in support of both applications at a consolidated hearing on April 21, 2015. Judge Livingston pretermitted Ms. Contreras' application for asylum, and denied both her application for withholding of removal and Helen's application for asylum on the merits. She prepared and filed a *pro se* application and declaration, along with supporting documents, and proceeded through the hearing on the merits without counsel.

Ms. Contreras was represented by *pro bono* counsel at her first master calendar hearing. Thereafter, her counsel withdrew and Ms. Contreras proceeded *pro se* for the duration of the Immigration Court proceedings.

## III     Facts

Clivian Melissa Contreras-Casco was born on October 5, 1989 in Honduras. When she

2

was seventeen years old, she became pregnant and went to live with the father of her then-unborn child, Gerardo Jovani Betanco. Their daughter Helen was born on June 18, 2007. [Affidavit of Clivian Melissa Conteras-Casco ("Affidavit") at p1; Transcript at 48-49.

Beginning when Helen was approximately a year old, Mr. Betanco began to use drugs heavily, and became violently abusive. He beat Ms. Contreras, threatened her, kicked her, threw her against walls, and raped her repeatedly. He shamed and embarrassed her in public, and in private told her that she and Helen were his "property," and that she could never leave him. [Transcript at 48-49, 51-52; Affidavit at p1]. On one occasion in approximately 2011, he threw a hot iron at her and hit Helen with it in the process. [Transcript at 67]. At trial, Ms. Contreras showed the Judge scars on her body from Mr. Betanco's years of abuse, and told him that Helen bore scars from the burns as well. After the incident with the iron, Ms. Contreras went to the police, showed them the burn marks on Helen's body, and filed a report. The police told her that they didn't interfere in "those things," and took no action whatsoever. [Transcript at 52-53, 67].

The abuse continued, and Ms. Contreras made no further attempts to seek the assistance of the police. She was afraid - Mr. Betanco told her that if she did go to the police he would kill her and take their daughter. [Transcript at 52; Affidavit at 1]. And she had no reason to think the police would actually take steps to protect her and her daughter; she testified repeatedly that domestic violence was very common in Honduras, and that neither the police nor anyone else did anything to prevent it, punish it, or to protect women and children from it. [Transcript at 52, 53, 54, 59, 67, 68, 69, 72]. And she testified that in another circumstance, when her cousin had beaten her badly in a drunken rage and she had gone to the police for help, they had simply sent her to a justice of the peace, who told her that "what you have to do is reconcile" with him. [Transcript at 52]. Nor was there anyone else who would help her. When she told her pastor

about Betanco's abuse, he counseled her to pray that Betanco would change. [Transcript at 53].

Betanco came and went, often disappearing for weeks at a time. He would come home, rape Ms. Contreras, throw a small amount of money at her, and leave. In approximately 2012, Ms. Contreras opened a small stand where she sold gum, drinks, snacks and fruit. She operated the stand alone, sometimes with Helen at her side. Soon thereafter, members of the Mara-18 gang began extorting and threatening her. She testified that the gang knew that she was "alone, just my daughter and I," and that they targeted her because they knew she was a single mother. [Transcript at 61]. They demanded money, and when she couldn't pay, they threatened to kill her and her daughter. [Transcript at 54-55].

Indeed, by then most members of the community in which Ms. Contreras and Helen lived viewed her as a single mother. She talked to her friends, neighbors and family members about Mr. Betanco's abuse; everyone knew that he was nothing but a burden and a source of pain for her, that he did not support them financially, and that he was not in any real sense a father to their daughter. [Transcript at 61].

In September of 2014, Ms. Contreras told Mr. Betanco that she did not want to be with him any more. He told her "too bad, you're my property. And my daughter's my property too, and you have to be with me." [Transcript at 49]. She fled with their daughter to her mother's house, then to her sister and brother in law's, and then to her aunt's. Betanco followed them, and showed up at her aunt's house drunk, wielding a knife. He threatened Ms. Contreras, and cut her with the knife. [Transcript at 50].

On the evening of September 21, 2014, four armed members of the Mara-18 came to the house where Ms. Contreras was staying; she and Helen were there alone. They demanded that she pay them a "war tax," and threatened to kill her and her daughter if she didn't. Ms. Contreras

4

filed a police report that same evening, but the police took no action to help her. [Transcript at 54].

Ms. Contreras finally decided that her only option was to flee. In early October, 2014, she left Helen in the care of her mother and sister, and traveled overland through Central America and Mexico to the United States. She believed that Helen would be safe without her, but after she left two members of the M-18 went to Helen's school, looking for her. Mr. Betanco, meanwhile, also began looking for Helen, and told people that she and Ms. Contreras were his property. [Transcript at 60-61; Affidavit at 2]. Ms. Contreras was terrified. Betanco did not know that Helen was staying with her aunt and grandmother, but he did know where she went to school, and she knew that it would be easy enough for him to find out where the little girl was living. [Transcript at 59-60].

Ms. Contreras crossed the U.S./Mexico border in late October, 2014 and was apprehended by Customs and Border Protection officials. At the time, she had recently heard from her mother that both Betanco and the M-18 were looking for Helen, and she was terrified for her daughter's safety. She told the CBP officers that she wanted to go home, and signed a stipulated removal order. She was deported to Honduras on November 14, 2014. [Affidavit at 2-3]. She spent the night in the bus terminal and the next day her sister brought Helen to her there, and they left. She retraced the route she had so recently traveled, this time with her seven year-old child in tow, and reentered the United States on December 27, 2014. They were apprehended again and have remained in detention at the South Texas Family Residential Center in Dilley, TX ever since. At the time of the hearing, Ms. Contreras' mother reported that Betanco was still looking for her. [Transcript at 70].

Ms. Contreras prepared and submitted *pro se* applications for asylum and withholding of

5

removal for herself and Helen, as well as corroborating evidence which her family in Honduras sent to her. DHS counsel submitted the State Department Country Report on Honduras, and the USCIS Asylum Officer's Reasonable Fear Interview worksheet and summary. The information in the Asylum Officer's summary is almost entirely consistent with Ms. Contreras' written application and oral testimony with one exception: the summary reflects that Ms. Contreras did not report Betanco's abuse to the police and that she believed the police and government could have protected her from him. On cross examination, Ms. Contreras testified clearly that the Asylum Officer's summary was simply incorrect on that point, and that it attributed to her statements which she simply never made. [Transcript at 68-69].

DHS counsel did not call the Asylum Officer to testify, or otherwise establish the reliability and accuracy of the summary. Judge Livingston, however, deemed the inconsistency between the summary and Ms. Contreras' testimony to be fatal to her credibility, and fatal to her claim that the Honduran government was unable or unwilling to control private acts of domestic abuse like those which she suffered at Betanco's hands. [Decision at 5].

IV.   **Standard of Review**

Prior to September 25th, 2002, federal regulations permitted the Board of Immigration Appeals to engage in *de novo* factfinding. *See Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 377 (9th Cir. 2003) (en banc); *Matter of Vilanova-Gonzalez*, 13 I & N Dec. 399, 402 (BIA 1969). On August 26th, 2002, however, the Department of Justice promulgated a new rule, to take effect on September 25th; that rule (subsequently codified at 8 CFR §1003.1(d)(3)) "establishes the primacy of the immigration judges as factfinders by utilizing a clearly erroneous standard of

6

review for all determinations of fact." Board of Immigration Appeals: Procedural Reforms to

Improve Case Management, 67 Fed. Reg. 54878, 54881 (Aug. 26, 2002). The new rule

precludes the Board from engaging in *de novo* factfinding, and from reversing an IJ's factual

finding unless the finding is clearly erroneous.

> (i) The Board will not engage in *de novo* review of findings of fact determined by
> an immigration judge. Facts determined by an immigration judge, including
> findings as to the credibility of testimony, shall be reviewed only to determine
> whether the findings of the immigration judge are clearly erroneous. (ii) The
> Board may review questions of law, discretion and all other issues in appeals from
> decisions of the immigration judges *de novo*. (iii) The Board may review all
> questions arising in appeals from decisions issued by Service officers *de novo*.
> (iv) Except for taking administrative notice of commonly known facts such as
> current events or the contents of official documents, the Board will not engage in
> factfinding in the course of deciding appeals. A party asserting that the Board
> cannot properly resolve an appeal without further factfinding must file a motion
> for remand. If further factfinding is needed in a particular case, the Board may
> remand the proceeding to the immigration judge, or as appropriate, to the Service.

*See* 67 Fed. Reg. at 54902 (codified at 8 CFR §1003.1(d)(3)).

In this case, the Board reviews the IJ's credibility determination to assess whether or not

it is clearly erroneous. It reviews *de novo* all other issues, including the availability of asylum in

withholding only proceedings and the question whether or not the Honduran government is

willing or able to protect the respondents from persecution by non-state actors.


V    **Argument**

Ms. Contreras respectfully submits that the Immigration Judge abused his discretion,

violated her right to due process of law, and erred as a matter of law in denying her and Helen's

applications for relief. She asserts that his credibility determination is clearly erroneous, that he

failed to conduct a reasoned analysis of the various bases for their claims, and that he ignored

objective country condition evidence which established the very elements which he found

7

lacking in her testimony. Finally, she submits that he erred in pretermitting her application for asylum, and asserts that she should be deemed eligible to apply for asylum notwithstanding the reinstatement of her prior removal order.

With the exception of a brief period during which *pro bono* counsel represented her at her initial master calendar hearing, Ms. Contreras proceeded *pro se* throughout the Credible Fear and Immigration Court proceedings. She was detained throughout those proceedings. Notwithstanding those tremendous disadvantages, she was able to prepare a complete *pro se* written application and declaration, to present clear, detailed, compelling and almost entirely consistent testimony throughout, and to corroborate essential elements of her claim with documentary evidence. She articulated, documented, and testified to facts which established the following claims:

- For herself, a claim to a well-founded fear or clear probability of persecution at the hands of her former domestic partner on account of her membership in the particular social group of as a Honduran woman in a domestic relationship which she cannot leave;

- For herself, a claim to a well-founded fear or clear probability of persecution at the hands of members of the M-18 gang because of her membership in the particular social group of single Honduran mothers/female Honduran heads of household;

- For Helen, a claim to a well-founded fear of persecution at the hands of her father on account of her membership in the particular social group of Honduran children in a domestic/familial relationship to their fathers which they cannot leave;

8

- For Helen, a claim to a well-founded fear of persecution at the hands of members of her father and of the M-18 gang on account of her membership in the particular social group of her nuclear family;

- For Helen, a claim to a well-founded fear of persecution at the hands of members of the M-18 gang on account of her membership in the particular social group of minor children of single Honduran women/female Honduran heads of household.

The Immigration Judge did not analyze any of these claims in any meaningful detail. The sole basis for his decision to deny both mother and daughter's domestic violence-related claims was a determination that Ms. Contreras could not be deemed a credible witness because she testified in Court that she had reported Mr. Betanco's abuse to the police four years ago, but did not mention that report in her *pro se* declaration, and because the Asylum Officer's summary of her credible fear interview indicated that she had never filed a police report against Betanco. [Decision at 5].

The Judge's credibility determination is clearly erroneous. And even if Ms. Contreras did not present credible testimony on that one fact, her testimony and corroborating evidence more than made up for any deficiencies in her testimony, and established all of the elements of her claims. As such, she respectfully moves this Board to reverse the decision of the Immigration Judge, and to grant her relief from removal.

1.    **Burden of proof**

In order to establish eligibility for asylum, an applicant must demonstrate both that he is statutorily eligible and that he deserves a favorable exercise of discretion. The statutory

9

eligibility may rest on one of two grounds:  the applicant may demonstrate either that he has suffered past persecution, or that he has a well-founded fear of future persecution, on account of his race, religion, nationality, membership in a particular social group, or political opinion. *See* INA §§208(b)(1)(A); 101(a)(42); 8 CFR §208.13(b); *Dallakoti v. Holder*, 619 F.3d 1264 (10th Cir. 2010).

One who has suffered past persecution on account of a protected ground is presumed to have a well-founded fear of persecution on that same account.  Once past persecution is established, the burden shifts to the Department of Homeland Security to demonstrate a fundamental change in circumstances which vitiates the reasonableness of the applicant's fear.  8 CFR § 1208.16(b)(1)(i)(A).

If that presumption is rebutted, or if the applicant has not suffered persecution in the past, he bears the burden to establish a well-founded fear of future persecution on account of one of the five protected grounds.  An applicant for asylum is not required to establish the nexus between his experiences and his inferences beyond a reasonable doubt, or even by a preponderance of the evidence; he is required only to demonstrate that it is reasonable to infer such a nexus.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 440, 107 S.Ct. 1207, 1217, 94 L.Ed.2d 434, ___ (1987).  And, by the same token, an asylum applicant need not establish that the persecution which he fears would be visited upon him solely on account of a protected ground; he is required to show simply that a protected ground constitutes one central reason for his feared persecution.  INA §208(b)(1)(B)(I).

The burden of proof in asylum cases is an extremely flexible and generous one.  In *Cardoza-Fonseca*, the Supreme Court held that, to establish a well founded fear, an applicant for asylum need only show that he or she faces a "reasonable possibility" of persecution in his or her

country of origin.  *Id* at 430-431.  After stating unequivocally that, "[o]ne can certainly have a well-founded fear of an event happening when there is less than a fifty percent chance of the occurrence taking place," Id. at 431;  the Court went on to suggest that even a one-in-ten chance of persecution would satisfy the applicant's burden of proof.  *Id.* at 440; *See also Rivera-Barrientos v. Holder*, 666 F.3d 641 (10th Cir. 2012).

In order to establish eligibility for withholding of removal, in contrast, the applicant must demonstrate that it is more likely than not that her life or freedom would be threatened in the country of removability on account of a protected ground.  INA §241(b)(3)(A); *Karki v. Holder*, 715 F.3d 792 (10th Cir. 2013).

**2.       The IJ's credibility assessment is clearly erroneous.**

Judge Livingston did not address the viability of any of the social groups at issue in Ms. Contreras and Helen's case, the nexus between their abuse and a protected ground, or the likelihood that mother and daughter would be persecuted or killed if they were forced to return to Honduras.  The sole reason which the IJ invoked to deny the respondents' applications for relief is his determination that Ms. Contreras did not present credible testimony with regard to the question whether she had ever reported Mr. Betanco's abuse to the Honduran police.  That determination is clearly erroneous.  And even if it is not clearly erroneous, it is not dispositive of the respondents' claims.  Accordingly, Ms. Betanco moves this Board to reverse the IJ's decision and to grant her and her daughter's applications for relief from removal.

Under the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat 231 (2005); INA §208(b)(1)(B), the Immigration Judge is authorized to base a credibility assessment on the respondent's demeanor, candor, responsiveness, the inherent plausibility of the claim, the internal

consistency of her statements, the consistency of her statements with the evidence of record, and any inaccuracy or falsehood in such statements, regardless of whether that inaccuracy or falsehood goes to the heart of the claim. INA §208(b)(1)(B)(iii). Although a credibility determination may be based on any inaccuracies or falsehoods in the applicant's written or oral statements without regard to whether an inconsistency, inaccuracy or falsehood goes to the heart of the applicant's claim, "the trier of fact must look to the totality of the circumstances and all relevant factors." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007).

If an applicant's testimony is not entirely credible, corroborating evidence may overcome that deficit, and establish her credibility. When the Judge deems corroborating evidence necessary, she may find the applicant to be lacking in credibility if the applicant fails to provide that evidence, unless she does not have the evidence and cannot reasonably be expected to obtain it. INA §208(b)(1)(B)(iii).

At their heart, the credibility rules hold simply that inconsistencies, a lack of corroboration, and inherent implausibility are all proper bases on which to find an applicant lacking in credibility *if those elements lead to the conclusion that the applicant is lying.* Nothing in the REAL ID Act, the caselaw which interpreted it, or any provision of the INA stands for the proposition that an applicant for asylum may be denied relief simply because the holes exist in her story. Not all holes, simply put, are indicias of untruthfullness. There are times when an applicant simply misspeaks or is unable to recall certain facts, or to produce particular documents. In such instances, it is incumbent upon the adjudicator to view those failures in light of the totality of the circumstances, and in light of the other evidence of record, and to determine whether the failure is indicative of fraud. And there are times when holes in a claim simply do not indicate that one is lying.

12

In this case, Ms. Contreras testified in a manner which was detailed, articulate, compelling, internally consistent, and with one exception entirely consistent with her *pro se* asylum application and declaration and with the Asylum Officer's summary of her reasonable fear interview. The sole inconsistency on which the Judge relied to deny her claims relates to the question whether Ms. Contreras reported Mr. Betanco's physical abuse to the Honduran police in approximately 2011. [IJ Decision at 5]. The Judge's determination in this regard is clearly erroneous.

It is unclear whether Judge Livingston deemed Ms. Contreras' testimony entirely incredible based on that single inconsistency, or only incredible as to the claim that she had filed a police report in 2011: "Based on this inconsistency, the Court cannot find the applicant to be a credible witness... Certainly she is not a credible witness with reference to whether she had ever reported the harm to the police." [IJ Decision at 5]. Insofar as his reasoning is not clear, this Board may not uphold it. And in any event, deeming Ms. Contreras' testimony to be lacking in credibility in whole or in part based on that single discrepancy is clearly erroneous.

A.    **Ms. Contreras' testimony is not inconsistent with her *pro se* written declaration.**

As a preliminary matter, the "inconsistency" upon which the Judge relies is not on its face an inconsistency at all. Ms. Contreras testified clearly and repeatedly that she reported Betanco's abuse to the Honduran police in approximately 2011 after he burned Helen with a hot iron which he had thrown at Ms. Contreras. The fact that her *pro se* application and declaration do not mention that fact is not inconsistent with her testimony; Ms. Contreras stated in her declaration that she was afraid to file a police report for fear that it would put her and her child in more harm.

13

At trial, she restated that fact, and explained why she was so afraid. The fact that she is afraid to file a report against her abuser is not inconsistent with having previously filed a report; indeed, the fact that the police did nothing to help her after she filed one four years ago is entirely consistent with her current reluctance to file. The fact that she did not see fit to mention that 2011 report in the declaration that she prepared *pro se* in 2015 does not render her more detailed testimony incredible.

At no point did the IJ instruct Ms. Contreras as to what information she should include in her application and declaration, which documents she should try to collect, or how she should prepare for her trial. While the IJ is not an advocate, and does not bear the responsibility of assisting *pro se* respondents in preparing their cases for trial, he does have a responsibility to "aid in the development of the record... particularly where an alien appears pro se...." *Matter of J-F-F-*, 23 I & N Dec. 912, 922 (AG 2006). The Attorney General in *J-F-F-* cited with approval to the Ninth Circuit's opinion in *Agyeman v. INS*, 296 F.3d 871, 884 (9th Cir. 2002) for the proposition that "the IJ has a duty to fully develop the record when an alien proceeds pro se." The *Agyeman* Court held that,

> Although the BIA was correct in noting Agyeman bore the responsibility to provide evidence supporting his applications,... the IJ also had an obligation to assist him, as a pro se applicant, in determining what evidence was relevant and by what means he could prove his claims... [W]e are concerned here that Agyeman lacked the legal knowledge to discern what evidence was relevant and in what form that evidence could be presented.

*Id.* In this case, the IJ gave Ms. Contreras no guidance whatsoever as to what evidence and information would be important, and which facts to include in her declaration. In the absence of any guidance whatsoever, his decision to deem a *pro se* applicant's testimony incredible because it contains more information than her written declaration violates the letter and spirit of the law,

14

and is clearly erroneous.

**B.** **An inconsistency between Ms. Contreras' live testimony and an uncorroborated hearsay document is not a proper basis upon which to deem her testimony incredible.**

Ms. Contreras' testimony is, however, clearly inconsistent with the Asylum Officer's summary of her reasonable fear interview; the Q&A clearly states that Ms. Contreras did not report Betanco's abuse to the police. That summary, however, does not have sufficient indicias of reliability to render Ms. Contreras' contradictory testimony incredible.

The summary, although presented in question and answer format, is not, and does not purport to be, a verbatim transcript; rather, it is a summary of the Asylum Officer's recollection of the interview which he or she conducted with Ms. Contreras, prepared the day after the interview itself.[1] The Q&A is not read back to the applicants during or after credible fear/reasonable fear interviews, and it is not translated into Spanish.

The vast majority of the information in the Q&A summary is entirely consistent with Ms. Contreras' testimony at trial. On cross-examination, however, Ms. Contreras testified in no uncertain terms that there were clear errors in the Asylum Officer's summary of her interview. She denied telling the Asylum Officer that she had never filed a complaint against Helen's father, and pointed to three specific "responses" in the Q&A which she simply never made: that if she had reported him the police would have detained him for 24-48 hours and called her to testify, that she did not want to testify against him, and that the police probably would have been capable of stopping her husband from harming her, but she never asked them to. [Transcript at 68-69].

---

[1] The Reasonable Fear Determination indicates that the interview was conducted on January 15, 2015 and that the writeup was prepared on January 16.

Counsel for the Department of Homeland Security did not call the Asylum Officer to testify, nor did the Judge or DHS counsel make any attempt to verify the veracity of the information in the Q&A. Instead, the Judge took the notes of a government officer prepared 24 hours after the interview as undisputable truth, and deemed any discrepancy between them and Ms. Contreras' clear, unequivocal, and otherwise uncontroverted testimony, as evidence that she was lying.

Indeed, the Judge himself misstated Ms. Contreras' testimony in this regard: despite Ms. Contreras' clear testimony to the contrary, in his oral decision Judge Livingston states, "the applicant acknowledged that she did give those answers." [Decision at 4]. The Judge admitted into evidence and relied upon uncorroborated hearsay evidence which the applicant stated clearly contained glaring errors, made no attempt to confirm the validity of the disputed statements by calling the Asylum Officer to testify, granted the uncorroborated hearsay statements within the Q&A full weight to the exclusion of Ms. Contreras' live testimony, and misstated Ms. Contreras' own testimony in his oral decision. At each pass, the Judge violated Ms. Contreras' right to due process of law, and abused his discretion.

The Asylum Officer's summary and Q&A constitute hearsay. The Judge was within his rights to admit and consider that hearsay evidence, but had a responsibility to weigh and balance it appropriately according to its reliability and to exclude it if its admission would be fundamentally unfair. 8 CFR 1240.7(a); *Matter of Wadud,* 19 I & N Dec. 183 (BIA 1984).   And given the circumstances, the Judge's treatment of the Q&A in this case was clearly fundamentally unfair. When the IJ not only admitted the Q&A, but took the information in it as conclusively accurate in the absence of any testimony or other indicias of reliability, and to the exclusion of Ms. Contreras' otherwise credible testimony, he violated her right to due process of law and committed reversible error.

16

The Judge was within his rights to look to the inconsistencies in Ms. Contreras' testimony, and to weigh them in his credibility analysis. The proper inquiry, however, is not simply whether those inconsistencies exist, but whether they are indicative that Ms. Contreras is not telling the truth. And when viewed as a whole, the sole discrepancy between Ms. Contreras' testimony and the summary prepared by the Asylum Officer does not indicate that Ms. Contreras is fabricating an essential portion of her claim.

3.  **The documentary evidence of record is sufficient to establish Ms. Contreras' credibility, and to establish the essential elements of her claims.**

Even if the Judge were within his rights to deem the discrepancy between Ms. Contreras' testimony and the Asylum Officer's summary damaging to her credibility, the documentary evidence of record and well-known facts of which the Judge should have taken administrative notice are sufficient to make up for any gaps in her credibility, and to establish the essential elements of her claim.

A  **The evidence of record is sufficient to establish Ms. Contreras' credibility and the essential elements of her claims.**

To the extent the Judge deemed Ms. Contreras' testimony to be lacking in credibility in its entirety, his decision is clearly erroneous. Ms Contreras submitted, and the Judge entered into evidence, documents which corroborated specific elements of her claim, and which were more than sufficient to make up for any gaps in her testimony. That evidence included:

   1)  a copy of the police report which she filed on September 21, 2014 confirming that members of the Mara-18 came to her house on that day and threatened to kill her and Helen if she did not pay a "war tax;"

2)   the written statement of Ms. Contreras' mother, confirming that Ms. Contreras suffered domestic violence at the hands of her common-law husband in the presence of their daughter, that he did not provide for them economically and that after Ms. Contreras established her own business in order to provide for her daughter herself members of the gang "18" demanded a "war tax" and almost killed her and her daughter;

3)   the written statement of Ms. Contreras' pastor, confirming that she was forced to leave Honduras because of physical mistreatment and extortion by her husband and;

4)   the police report filed by Ms. Contreras' aunt Ignacia Contreras after the elder Mrs. Contreras' husband (the respondent's uncle) was killed, confirming that Ms. Contreras and Helen both witnessed the murder and that the murderers threatened to kill them if they "opened their mouths to file a complaint."

DHS counsel did not object to the admission of any of those documents, and the Judge admitted all of them into evidence. That evidence was sufficient to establish most of the essential elements of Ms. Contreras' and Helen's claims for relief. To the extent that the IJ relied on the single inconsistency between her testimony and the Asylum Officer's reasonable fear interview summary to deem her testimony lacking in credibility in its entirety, he erred.

**B    Current country conditions demonstrate that the Honduran government is unwilling or unable to control private perpetrators of domestic violence.**

Although the IJ's decision is not entirely clear on this point, however, he appears to have deemed Ms. Contreras' testimony lacking in credibility not in its entirety, but only as to whether or not she filed a police report against Mr. Betanco in 2011. [Decision at 5]. As such, his decision is based almost entirely on a finding that Ms. Contreras had not established that the government of Honduras is unwilling or unable to control Mr. Betanco's private acts of persecution. [Decision at 5]. Because the objective country condition evidence of record is more than sufficient to establish

18

that element, Ms. Contreras must be deemed to have met her burden of proof.

An asylum applicant who is deemed to lack credibility may nonetheless establish eligibility for relief if the record contains sufficient evidence to meet her burden of proof. *Yao Shi v. Holder*, 530 Fed. Appx. 557, 559 (6th Cir. 2013) ("An applicant who is found not to be credible may nevertheless qualify for relief if there is evidence in the record sufficient to meet her burden of proof); *Djadjou v. Holder*, 662 F.3d 265, 275 (4th Cir. 2011) ("Despite an adverse credibility determination, applicants for asylum can establish past persecution through independent evidence."), *cert. denied*, – U.S. –, 133 S.Ct. 788 (2012); *Vakeesan v. Holder*, 343 Fed. Appx. 117, 125 (6th Cir. 2009); *Gebreeyesus v. Gonzales*, 482 F.3d 952, 955 (3rd Cir. 2007); *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000).

In this case, to the extent that the IJ found Ms. Contreras lacking in credibility solely as to the question whether or not she had reported Betanco's abuse to the police in 2011, the documentary evidence of record and commonly known facts of which the IJ should have taken administrative notice are more than sufficient to compensate for her lack of credibility, and to establish that the Honduran government is unwilling or unable to control private acts of domestic violence, and to protect women like her from it.

The 2014 State Department Country Report on Human Rights Practices for Honduras [State Department Report], which DHS offered into evidence at trial, lists the ineffectiveness of the Honduran security forces as one of the most serious human rights problems in the country:

> Among the most serious human rights problems were corruption, intimidation, and institutional weakness of the justice system leading to widespread impunity; unlawful and arbitrary killings by security forces; and harsh and at times life-threatening prison conditions.

[State Department Report at p1]. The report notes that, "[o]ther human rights problems

included... violence against and harassment of women..." [Id.] , and that, "corruption, intimidation, and the poor functioning of the justice system were serious impediments to the protection of human rights." [Id.; *see also* pages 8, 17-18].

The State Department Report contains an entire section on rape and domestic violence. That section begins with the statement, "[v]iolence against women and impunity for perpetrators continued to be a serious problem." [State Department Report at p20]. In a country the geographic size of the state of Kentucky, and with a population smaller than that of Virginia, the Honduran National Observatory of Violence reported 636 violent deaths of women during 2013, 30 more than in 2012. The law criminalizes rape (including spousal rape), but "[r]ape continued to be underreported due to fear of stigma, retribution, and further violence." [State Department Report at p20].

The report confirms that under Honduran law, the police would in fact not have taken any action against Mr. Betanco when Ms. Contreras filed the first police report against him: It notes that, "[d]omestic and intimate partner violence continued to be widespread and affected all aspects of society." [State Department Report at p21]. And, "[t]he only legal sanctions for the first offense of domestic abuse are community service and 24-hour preventive detention if the violator is caught in the act." Id. Unless the police actually caught Betanco in the act of physically abusing Ms. Contreras or their daughter, in other words, they would not have even considered taking any action against him.

To a large degree, the Judge relied on the existence of Honduran laws protecting victims of domestic violence, and the existence of government-operated shelters for them to find that the Honduran government was willing and able to control private acts of domestic abuse. The State Department Report indicates that the Honduran government operated three domestic violence

shelters in Honduras in 2014, including one in Ms. Contreras' home department of Choluteca.  It

states in no uncertain terms, however, that, "[t]he government provided insufficient financial and

other resources to enable these facilities to operate effectively.  Id.  Indeed, it notes that "[b]oth

government prosecutors and NGOs reported that many female victims of domestic violence were

trapped in their situation of violence due to economic dependence on their male partner, their role

in caring for children, and the lack of shelters." Id.

      The country condition evidence submitted by DHS is sufficient to establish that the

Honduran government is unwilling or unable to control private acts of domestic violence like that

which Ms. Contreras and Helen suffered at Mr. Betanco's hands.  When the Judge found to the

contrary, he erred.

**C.**    **The IJ erred in failing to take administrative notice of commonly known facts which establish the essential elements of the *pro se* respondents' claims.**

      And even if the documentary evidence which DHS submitted were not sufficient to

establish that element, the Judge should have taken administrative notice of commonly known

facts which do establish it.

      Federal regulations grant the IJs and the Board the authority to take administrative notice

of "commonly known facts such as current events or the contents of official documents."  8 CFR

§1003.1(d)(3)(iv).  And,

> The most common facts about country conditions appropriate for administrative
> notice are those contained in country reports and profiles prepared by experienced
> foreign service officers in the Department of State who are experts on specific
> regions and countries.

*BIA: Procedural Reforms,* 67 Fed.Reg. at 5492 (discussing administrative notice of facts);

*Halmenschlager v. Holder,* 577 F.3d 1122, 1133 n.4 (10th Cir. 2009) ("As the courts have

recognized, they, the immigration judges, and the Board owe deference to the Department of State
on such matters of foreign intelligence as assessments of conditions.").

In this case, given his duty to ensure that a detained, *pro se* applicant's rights were
adequately protected, the Judge should have taken administrative notice of information published
by the U.S. Embassy in Honduras, and posted on its website, which confirmed precisely the facts
he found lacking in her case.  That information confirms that, "[m]any crime investigations never
result in the arrest of a suspect," and that, "[c]ollection of forensic evidence is not a common
practice in Honduras."  Embassy of the United States Tegucigalpa, Honduras, *Crime Victim
Assistance, http://honduras.usembassy.gov/victcrime.html.*  With regard to domestic violence in
particular, the U.S. Embassy advises that "Violencia Domestica" ("Domestic Violence") under
Honduran law is a term of art referring to actions which do not involve physical injury.  Violencia
Domestica is a civil, not a criminal matter, and the most Honduran police would be authorized to
do if a police report is filed would be to detain the aggressor for a few hours and possibly issue a
protection/restraining order.  "Violencia Intrafamiliar," ("Intrafamilial Violence") is violence
which does involve physical injury, and is a crime.  Id. at p4.

The protections available even to victims of criminal Intrafamilial Violence, however, are
minimal.  Whereas the 2014 State Department Report indicated that the Honduran government
operated three shelters for victims of domestic violence, in 2015 the U.S. Embassy indicated that
it was only aware of two nationwide, neither in Choluteca, both operated by NGOs, not the
Honduran government, and each with a capacity to house approximately fifteen people at a time.
The Embassy reports that "[t]here are no domestic violence hotlines in Honduras."  Id.
The U.S. Embassy's 2015 information clearly contradicts the IJ's finding that the Honduran
government operates shelters for victims of domestic abuse.  As such, even if the shelters were an

22

effective means of protecting women, they cannot be deemed evidence that the *government* is willing or able to protect women like Ms. Contreras from domestic abuse.

And even if the shelters were government-run or funded, the existence of two shelters with a combined capacity to house 30 women nationwide is wholly insufficient to establish any meaningful level of control. *See* State Department Country Report at 21 (Reporting the Honduran Office of the Special Prosecutor for Women had received 6,721 complaints of domestic abuse as of July, 2014).

Information from the Overseas Security Advisory Committee[2] confirms that the Honduran government is wholly incapable of controlling private acts of violence like those which Ms. Contreras and Helen suffered:

> The government lacks resources to properly investigate and prosecute cases, and police often lack vehicles or fuel to respond to calls for assistance. In practice, this means police may take hours to arrive at the scene of a violent crime or may not respond at all. As a result, criminals operate with a high degree of impunity.

OSAC *Honduras 2015 Crime and Safety Report* p4.

And a report from the United Nations Special Rapporteur on violence against women, issued after the Rapporteur's eight-day mission to Honduras, and posted just three weeks before Ms. Contreras' hearing, concludes,

> In Honduras, violence against women is widespread and systematic and it impacts women and girls in numerous ways. It precludes the exercise of civil, political, economic, social, cultural, and development rights, and is thus a barrier to effective citizenship. The climate of fear, both in the public and private spheres, and the lack of accountability for violations of human rights of women, is the norm despite

---

[2] The OSAC is a public/private sector partnership which operates under a federally-mandated charter to promote security cooperation between American private sector interests worldwide and the U.S. Department of State. OSAC reports are published under the auspices of the State Department. https://www.osac.gov/pages/aboutus.aspx. The current OSAC information on the State Department's website is more up to date than the year-end Country Reports, and bear similar indicias of reliability.

legislative and institutional developments.

United Nations General Assembly Human Rights Council, *Report of the Special Rapporteur on violence against women, its causes and consequences, Rashida Manjoo,* March 31, 2015, A/HRC/29/27/Add.1. (P4). The Rapporteur found that,

> access to justice for women... is seriously compromised due to a range of institutional and procedural factors. These obstacles include insufficient resources and poor infrastructure; the lack of specialized units and staff trained on gender issues within the different criminal justice institutions, including police, prosecutors and judges; and the length of trials and delays in the criminal justice process. Moreover, the lack of proper investigation, evidence collection and forensic facilities and capabilities further hinder women's access to justice.

*Id.* at 10. She notes that, "while there are legal provisions aimed at securing the safety of those accessing justice through protection orders, injunctions or other interim measures, the Special Rapporteur was informed that perpetrators seldom abide by these provisions." *Id.* And after reviewing Honduras' laws aimed at protecting victims of domestic violence (*Id.* at 14-19), the Special Rapporteur concluded,

> The Government has undertaken a number of legislative and institutional initiatives to meet its human rights obligations to address the situation of women and girls in the country. However, these have not been translated into practical improvements in the lives of the majority of women who remain marginalized, discriminated against and at a high risk of being subjected to numerous human rights violations, including violence and sexual and reproductive rights violations. Impunity, socioeconomic disparities, and corruption continue to foster a generalized state of violence. The absence of a comprehensive data collection system to guide policy development and to monitor progress in the field of violence against women is a further challenge. **Moreover, the failure of the State to exercise its due diligence obligation to investigate, prosecute, and punish perpetrators of gender-based violence contributes to an environment of impunity that results in a decline of trust in national mechanisms and the rule of law among the Honduran population.**

Id. at 19 (*emphasis added*).  And in the absence of an effective response by the Honduran

government, the Rapporteur concludes with the recommendation:

> The Special Rapporteur recommends that, in light of the systemic, widespread and
> pervasive problem of violence against women and girls in Honduras, there is a
> need to review the presence, programmes and resources of United Nations agencies
> that exist in the country in the quest to respond to and prevent violence against
> women and girls.  Technical cooperation and assistance is needed to ensure that
> this human rights violation is addressed more substantively by United Nations
> agencies.

Id. at 21.

Judge Livingston had a responsibility to inform himself of the current country conditions

in Honduras.  At a bare minimum, that included a duty to review current information on the State

Department's website, including that issued by the U.S. Embassy in Tegucigalpa.  Information on

those websites was easily available, had impeccable indicias of reliability, and was directly

dispositive of the one element he found lacking in Ms. Contreras case.  His failure to inform

himself and to take administrative notice of those commonly known facts constitutes reversible

error.[3]


4.   **The respondents each established a well-founded fear or clear probability of
     persecution on account of their membership in multiple particular social
     groups.**

Both Ms. Contreras and Helen established a well-founded fear and a clear probability of

persecution on account of their membership in several particular social groups.  When the IJ

found the to the contrary, he committed reversible error.

This Board laid forth the definition of a particular social group in the seminal *Matter of*

---

[3]  In the alternative, Ms. Contreras moves this Board to take administrative notice of the
information itself (copies attached).

*Acosta*, 19 I & N Dec. 211 (BIA 1985), holding that, "persecution on account of membership in a

particular social group" refers to,

> persecution that is directed toward an individual who is a member of a group of
> persons all of whom share a common, immutable characteristic. The shared
> characteristic may be an innate one such as sex, color, or kinship ties, or in some
> circumstances it might be a shared past experience such as former military
> leadership or land ownership. The particular kind of group characteristic that will
> qualify under this construction remains to be determined on a case-by-case basis.
> However, whatever the common characteristic that defines the group, it must be
> one that the members of the group either cannot change, or should not be required
> to change because it is fundamental to their individual identities or consciences.
> Only when this is the case does the mere fact of membership become something
> comparable to the other four grounds of persecution under the Act, namely,
> something that is beyond the power of the individual to change or that is so
> fundamental to his identity or conscience that it ought not be required to be
> changed. By construing "persecution on account of membership in a particular
> social group" in this manner, we preserve the concept that refuge is restricted to
> individuals who are either unable by their own actions, or as a matter of conscience
> should not be required, to avoid persecution.

*Acosta* at 233-234. Thereafter, the Board clarified that a social group must be clearly defined or

"particular," and must possess a level of social distinction. *Matter of M-E-V-G-*, 26 I & N Dec.

227 (BIA 2014); *Matter of W-G-R-* 26 I & N Dec. 208 (BIA 2014). The 10th Circuit Court of

Appeals, in which jurisdiction this case arises, has adopted the Board's PSG formulation. *Rodas-*

*Orellana*, – F.3d – Slip Op. at 14 (10th Cir., March 2, 2015, Nos. 14-9516, 14-9548).

In this case, Ms. Contreras and Helen established both a well-founded fear and a clear

probability of persecution at the hands of Mr. Betanco and members of the 18th Street gang on

account of their membership in various particular social groups.

> **A.** **Ms. Contreras established a well-founded fear or clear**
> **probability of persecution at the hands of her former domestic**
> **partner on account of her membership in the particular social**
> **group of as a Honduran woman in a domestic relationship**
> **which they cannot leave.**

In the landmark *Matter of A-R-C-G-*, 26 I & N Dec. 388 (BIA 2014), this Board held that women of a particular nationality in a domestic relationship which they cannot leave may constitute members of a particular social group for the purposes of establishing eligibility for asylum and withholding of removal. Ms. Contreras submits (and the IJ does not appear to have disputed [*See* IJ Decision at 6]) that her case is precisely analogous to that which the Board considered in *A-R-C-G-*, that her proposed social group meets all of the Board's requirements for a PSG, and that she was targeted for persecution on account of membership in that group.

Ms. Contreras' relationship to Mr. Betanco is immutable: every time she tried to leave him, he followed her, beat her, raped her, and threatened to kill her and their daughter. He called her and Helen his "property," and told her and other people in their community that she could never leave him. After she fled to the United States, he continued to look for her.

Ms. Contreras' testimony, combined with the country condition evidence of record, clearly establishes that members of her proposed group are socially distinct within Honduran society. The country condition evidence reflects that domestic violence is extremely prevalent in Honduras, and that the government and NGOs have established some shelters and outreach programs for its victims.

Mr. Betanco clearly targeted Ms. Contreras for persecution on account of her status as a woman in a domestic relationship with him which she was unable to leave. His ongoing abuse over the course of more than seven years, the fact that he referred to her and their child as his "property" both to her and to other members of their community, and the fact that he searched for mother and daughter relentlessly after they fled from him, all establish that nexus.

The seven years of rape, beatings, death threats, stalking, and threats against their child which Mr. Betanco inflicted upon Ms. Contreras constituted persecution. *Woldemeskel v. INS*,

27

257 F.3d 1185, 1188 (10th Cir.2001) (Persecution involves "the infliction of suffering or harm . . . in a way regarded as offensive," and "encompasses more than just restrictions or threats to life and liberty,"); *Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir.1992). Because conditions in Honduras have not changed in a manner which is durable, substantial and fundamental, Ms. Contreras must be deemed to have established both a well-founded fear and a clear probability of persecution.

**B.  Helen established a well-founded fear of persecution at the hands of her father on account of her membership in the particular social group of Honduran children in a domestic/familial relationship which they cannot leave.**

The same facts which establish Ms. Contreras' claim to a well-founded fear/clear probability of persecution at Mr. Betanco's hands establish Helen's claim to a well-founded fear. The PSG of Honduran children in a domestic/familial relationship which they cannot leave is analytically identical to Ms. Contreras'; Helen's relationship to her father is as immutable as is Ms. Contreras' (indeed, as his minor child that relationship is arguably more immutable), and it is equally particular and socially visible. Mr. Betanco clearly targeted her for physical violence and death threats because she is his child.

The climate of fear and violence which Mr. Betanco instilled in Helen's childhood home, the physical violence which he inflicted on her (burning her with a hot iron), and the repeated death threats which he made against her cumulatively constitute persecution.

**C.**   **Ms. Contreras established a well-founded fear or clear probability of persecution at the hands of members of the M-18 gang because of her membership in the particular social group of single Honduran mothers/female Honduran heads of household.**

Ms. Contreras also established a well-founded fear of persecution on account of her membership in particular social group of single Honduran mothers or female Honduran heads of household.

Her status as a single mother is immutable insofar as it is something which she cannot or should not have to change (indeed, Ms. Contreras testified clearly that she had no interest in marrying Mr. Betanco, but that nonetheless Mr. Betanco considered her to be his property [Transcript at 63]). It was clearly socially visible within her community: the objective country condition documents of record reflect the prevalence of Honduran children being raised by single mothers. And her particular situation was clearly visible to her particular community: unable to rely on her domestic partner for financial support, she operated a small stand where she sold gum, snacks, drinks and fruit either alone or with her daughter. Indeed, the Judge asked her explicitly, "do you think the people in your community view you as a single mother also?" she answered in the affirmative, and explained. [Transcript at 61].

It is also clear that the M-18 targeted Ms. Contreras because her status as a single mother/head of household who made her all the more vulnerable. She was out on the street all day, selling small foodstuffs to make a living for herself and her daughter, with no husband or male partner to protect or provide for her. Her status made her all the more visible, and all the more vulnerable.

29

Ms. Contreras does not assert that the M-18's extortion attempts against her constitute persecution on account of a protected ground.  She does, however, assert that the gang's threats to kidnap and kill Helen as a means of "getting at" Ms. Contreras do constitute persecution.  The persecution which Ms. Contreras fears is that the violent harm to her child by criminal elements within Honduran society who see her child as a means to punish Ms. Contreras herself.  Critical to the case is the fact that any harm to Helen will visited upon her not out of any desire to punish the child herself but in order to "get at" Ms. Contreras.  That violence against Helen, visited upon her specifically as a means of punishing her mother, would constitute persecution of Ms. Contreras herself.

The BIA and Circuit Courts across the country have recognized that in some circumstances persecution of one individual may constitute persecution of close family members.  In *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004), the petitioner argued that she was eligible for asylum because of her fear that her daughter would be forced to undergo female genital mutilation if they returned to Ethiopia. *Id.*  In support of this argument, the petitioner cited the Board's decision in *C-Y-Z*, in which the BIA found an alien to be a refugee based upon his wife's past persecution in the form of forced sterilization. *Matter of C-Y-Z*, 21 I&N Dec. 915, Int. Dec. 3319 (BIA 1997).  The Sixth Circuit in *Abay* quoted from a concurrence in *C-Y-Z*:

> It not only constitutes persecution for the asylum applicant
> to witness or experience the persecution of family members,
> but it serves to corroborate his or her own fear of persecution. . .
> The treatment of the applicant's wife supports the conclusion
> that the applicant, by virtue of the events culminating in his
> wife's forced sterilization, has suffered past persecution an that
> his fear is well founded.

*Abay* at 641, *quoting C-Y-Z* at 926-927.  The Sixth Circuit concluded that the petitioner's fear of having to witness the "pain and suffering of her daughter" if they returned to Ethiopia was

30

well-founded, and sufficient to find that she was a refugee. *Abay* at 642. That conclusion is fully in keeping with the Board's holding in *C-Y-Z*. In that case, the BIA found that the forced sterilization of one spouse is an act of persecution against the other, and the husband can "essentially stand in [his wife's] shoes and make a bona fide and non-frivolous application for asylum based on problems impacting more intimately on her than on him." *Id.* at 918.

The First Circuit has followed its sister circuits, and has recognized that persecution of one member of a family may, in and of itself, constitute persecution of others. *Chen v. Gonzales*, 428 F.3d 110, 111 (1st Cir. 2005) (Recognizing that asylum is available to "persons forced to undergo abortions or sterilization procedures themselves *and to their spouses*." (Emphasis in original)). Moreover, recognizing the harm to a parent at being forced to helplessly witness a child's persecution is fully in keeping with the First Circuit's recognition of the primacy of family ties, and the unity of families. *Gebremichael v. INS*, 10 F.3d 28 (1st Cir. 1993). *See Navas v. INS*, 217 F.3d 646, 658 (9th Cir. 2000) (Concluding that the petitioner "unquestionably demonstrated persecution" by showing that his aunt and uncle had been murdered, his mother had been beaten, and he had been shot at.).

In this case, the M-18 threatened to kill Ms. Contreras' daughter explicitly as a means of getting to Ms. Contreras herself. That type of attack on a small child specifically to punish her parent clearly constitutes persecution of the parent. As such, the death threats and violence against Helen would persecution of Ms. Contreras herself.

**D.   Helen established a well-founded fear of persecution at the hands of members of her father and of the M-18 gang on account of her membership in the particular social group of her nuclear family.**

Both Mr. Betanco and the M-18 clearly targeted Helen for death threats and physical violence as a means of punishing Ms. Contreras. Just as those threats constitute persecution of Ms. Contreras on account of her status as Helen's mother, they constitute persecution of Helen on account of her status as Ms. Contreras' daughter. As such, Helen has established a well-founded fear of persecution on account of her membership in the particular social group of her nuclear family. *Matter of Acosta*, 19 I & N Dec. 211, 233 (BIA 1985) (listing "kinship ties" as the type of immutable trait which would define members of a particular social group).

**E.   Helen established a well-founded fear of persecution at the hands of members of the M-18 gang on account of her membership in the particular social group of minor children of single Honduran women/female Honduran heads of household.**

The same analysis which applies to Ms. Contreras' claimed PSG of single Honduran women/female Honduran heads of household applies to Helen's claimed group defined as minor children of those women. The evidence of record clearly reflects that Helen was targeted for death threats by the M-18 specifically because she is the minor, dependent child of a single mother/female head of household.

32

**VI     Ms. Contreras was improperly denied the opportunity to apply for asylum.**

Ms. Contreras respectfully submits that she was denied the opportunity to file for asylum based on an improper reading of federal regulations restricting individuals with prior orders of removal to applying for withholding of removal. 8 C.F.R. § 208.31(e) and 241.8. Reading those regulations so as to preclude individuals with reinstated removal orders from asylum eligibility puts the regulations into conflict with the asylum statute.

INA §208(a) permits "[a]ny alien...irrespective of such alien's status," to apply for asylum, unless the alien falls under clearly delineated exceptions. These exceptions do not include individuals with prior orders of removal. The regulations were promulgated pursuant to the reinstatement statute, which purports to bar applications for all immigration "relief." I.N.A. § 241(a)(5). However, established cannons of statutory construction dictate that the asylum statute governs who is eligible to apply for asylum, and that the reinstatement statute does not bar individuals subject to reinstatement from applying for asylum. The legislative history of these statutes also supports Ms. Contreras' position that the Immigration and Nationality Act (INA) unambiguously permits individuals with prior orders of removal to apply for asylum.

The reinstatement regulations, promulgated pursuant to INA §241(a)(5), erroneously deprive individuals subject to reinstatement of removal, like Ms. Contreras, the right to file for asylum under INA §208(a). The asylum statute clearly permits individuals with prior orders of removal the right to apply for asylum. The plain language of the asylum statute gives "[a]ny alien . . . irrespective of such alien's status" the right to apply. I.N.A. § 208(a). The statute contains clearly delineated exceptions to this rule and does not include an exception for those individuals subject to reinstated removal orders. Another provision of the INA, the reinstatement statute, purports to render anyone subject to reinstatement ineligible for "any relief." I.N.A. §

241(a)(5). The Agency's regulations interpret that prohibition on "relief" to trump the asylum statute's broad grant of eligibility. The regulations categorically prohibit individuals subject to reinstatement from applying for asylum, and limit them to applying for withholding of removal under INA §241(b)(3)(A). 8 C.F.R. §§ 208.31(e) and 241.8. However, under traditional rules of statutory construction, the asylum statute, not the reinstatement statute, controls who is eligible to apply for asylum. Furthermore, an examination of the legislative history also supports Ms. Contreras' position that Congress intended individuals with prior orders of removal to be eligible for asylum.   Accordingly, the reinstatement regulations cannot be read so as to bar such individuals from applying for asylum. 8 C.F.R. §§ 208.31(e) and 241.8.

## A.  The Plain Text of the Asylum Statute Establishes Ms. Contreras' Right to Apply for Asylum.

The Immigration Judge erred in pretermitting Ms. Contreras' application for asylum because the asylum statute unambiguously provides any individual the right to apply for asylum unless he or she falls within a list of enumerated exceptions. The statute does not create an exception for those subject to reinstatement of removal. Consequently, reading the reinstatement statute as an independent bar would be inconsistent with the language of the asylum statute and would contravene Congressional intent.  As such, the regulations must be read so as to allow for asylum eligibility in immigration court proceedings following reinstatement of removal.

The text of INA § 208(a) is what governs an individual's eligibility to seek asylum. Subject to three limited exceptions, it affords *any* noncitizen who is physically present in, or who arrives in, the United States an opportunity to apply for asylum, *without regard to status*. The exceptions limiting an individual's ability to seek asylum are spelled out

equally clearly. Individuals may not seek asylum if they: (A) can be removed to a safe third country, (B) applied more than one year after arrival, or (C) previously filed for asylum. INA §§208(a)(2)(A)-(C).  If a noncitizen is not covered by §208(a)(2) (or she is but meets an exception to an otherwise applicable exception), she may apply for asylum.

The next part of § 1158 addresses the "[c]onditions for granting asylum." *See* §208(b). Congress also divided this subsection into two: §208(b)(1) provides the general authority to grant asylum to those who meet the "refugee" definition;  §208(b)(2) establishes the exceptions—those applicants who must be denied even if they establish past persecution or a well-founded fear of persecution on account of a protected ground.  The mandatory grounds for denial include: persecution of others, conviction for a particularly serious crime, commission of a serious nonpolitical crime outside the United States, national security threats, firm resettlement in a third country, and various provisions relating to terrorism. *Id.* §§208(b)(2)(A)(i)-(vi). The terrorism-related exception is particularly notable: §208(b)(2)(A)(v) provides that one who is subject to the terrorism and related grounds of inadmissibility must be denied asylum.  That provision is the only instance in which Congress employed by cross-reference an existing inadmissibility or deportability ground to serve also as a bar to asylum. *See Id.* §§208(a)(2), (b)(2)(A).

Section 1158 creates a closed universe of asylum eligibility.  It provides clear parameters of eligibility and an equally clear, detailed list of bars to eligibility.  And although it does authorize the Attorney General to establish by regulation "additional limitations and conditions, *consistent with this section,* under which an alien shall be ineligible for asylum under paragraph (1)," *Id.* §208(b)(2)(C) (emphasis added), that authority may not conflict with or exceed the parameters of §208 itself. Regulatory

35

constraints on the availability of asylum, in other words, must derive directly from §208 itself or fall within §208's parameters.  Reading §241(a)(5) as creating an independent bar to asylum stands in direct contravention of Congress's explicit and limited delegation of authority to the Attorney General in §208.

### B.  Traditional Cannons of Statutory Construction Dictate that the Asylum Statute, Not the Reinstatement Statute, Governs Eligibility for Asylum.

The Immigration Judge should have considered Ms. Contreras' application to include an application for asylum because the traditional cannons of statutory construction dictate that the asylum statute, not the reinstatement statute, controls who is eligible to apply for asylum.  The asylum statute, rather than the reinstatement statute, controls who is eligible for asylum because it is the more specific statute.

It is well-settled that, if there is a question about which statute applies, the more specific statute controls the analysis. *U.S. v. Bormes*, 133 S. Ct. 12, 18 (2012) ("a precisely drawn statute dealing with a specific subject controls over a statute covering a more generalized spectrum") (citing *Hinck v. U.S.*, 550 U.S. 501, 506 (2007) (quoting *EC Terms of Years Trust v. U.S.*, 550 U.S. 429, 434 (2007)).

This general/specific cannon is true even if the more specific statute was enacted prior to the more general one. In this case, however, Congress reenacted the asylum statute at the time it enacted the reinstatement statute, *see* IIRIRA, Pub. L. No. 104-208, div. C, §305, 110 Stat. 3009, providing for reinstatement of a prior removal order when an individual illegally reenters the United States after removal or other departure under an order of removal. The reinstated individual "is not eligible and may not apply for any

relief under this chapter" and "shall be removed under the prior order." INA eligibility 241(a)(5). This provision does not bear on asylum.

The asylum statute, INA §208, which specifically addresses the question of who can seek and be granted asylum, is quite clear. Nothing on its face suggests that individuals who reenter (or seek to reenter)[1] after removal can categorically be barred from asylum. To the contrary, such persons are authorized to apply for and be granted that protection. Congress explicitly provided that "any alien . . . irrespective of such alien's status" may apply for asylum. INA eligibility 208(a)(1); *see Matter of Benitez*, 19 I.&N.Dec. 173, 176 (BIA 1984) (interpreting "any alien" literally to mean "any"); *Matter of M-R-*, 6 I. & N. Dec. 259, 260 (BIA 1954) (same). Further, nowhere in the asylum statute did Congress provide (or even hint) that one may not apply for or be granted asylum if he reenters following removal. And §208's omission of any reference to §241(a)(5) is particularly striking given that Congress crafted the two provisions at the same time. To infer a bar to asylum for those noncitizens who reenter after removal would stand in direct contravention of Congressional intent.

In contrast to the asylum statute, the reinstatement statute is general and vague, stating only that an individual subject to reinstatement is not eligible to apply for any "relief." I.N.A. § 241(a)(5). Nothing in the reinstatement statute states that individuals subject to reinstatement are barred from applying for asylum. The statute does not expressly repeal, amend, or reference the asylum statute. Nor does it contain the word "asylum."

---

[1] An additional ambiguity worth noting is that §241(a)(5), which pertains only to one who has "reentered . . . illegally," does not even clearly apply to an asylum seeker who comes into custody without having effected an entry.

The reinstatement's statute's broad ban on relief, if construed to encompass asylum, would be in tension with various subsections of §208 (for example, the right to file a successive asylum application based on changed circumstances. INA §241(a)(2)(D)). And although §241(a)(5) imposes a bar to eligibility to "relief," it does not define "relief." Reading that provision to bar eligibility for asylum but not withholding of removal has no basis in law or reason.

The term "relief" is ambiguous, and these ambiguities reinforce the conclusion that §241(a)(5) was not intended to, and does not in fact, disrupt the statutory scheme for asylum. Indeed, where there is ambiguity, this Court is required to resolve that ambiguity in favor of Petitioner. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *Lee v. Ashcroft*, 368 F.3d 218, 225 (3d Cir. 2004).

At the same time that it created reinstatement of removal, Congress added an inadmissibility ground that is related to reinstatement, IIRIRA, Pub. L. No. 104-208, div.C, §301, 110 Stat. 3009, *codified at* 8 U.S.C. §1182(a)(9)(C)(i)(II); INA § 212(a)(9)(C)(i)(II) (deeming inadmissible one who is ordered removed and then enters or attempts to reenter without being admitted). Inadmissibility grounds not listed in §208 do not bear on asylum eligibility; but §212(a)(9)(C)(i)(II) is nonetheless notable because it shows that Congress acted explicitly when it wished to make a post-order reentry relevant. Had Congress intended §241(a)(5) to bar asylum eligibility, it would have created a cross-reference in §208, as it did when it incorporated terrorism-related exceptions to the general provision that one who meets the "refugee" definition may be granted asylum. *See* 8 U.S.C. §1158(b)(2)(A)(v) (cross-referencing §1182(a)(3)(B)(i) and §1227(a)(4)(B) (relating to terrorist activity) to create grounds for denial of asylum).

38

Viewed in the context of Congress's focus on the details of the asylum scheme, the lack of any reference to reinstatement is strong evidence that §241(a)(5)'s generalized provision does not displace §208's specific provisions. "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the enactment." *MacEvoy Co. v. United States*, 322 U.S. 102, 107 (1944). To read §241(a)(5) as barring asylum, the Court would have to conclude that Congress, though aware of the general/specific cannon, wanted the word "relief" in §241(a)(5) to burrow its way into §208 without referencing §208 or asylum at all, despite the varying understandings of "relief" and the broader, clearer terms Congress had at its disposal. It would also have to believe that asylum is a form of "relief" within the meaning of §241(a)(5), but that withholding of removal (a form of protection closely related to, and sharing most elements of, asylum) is not. And the Court would have to conclude that Congress meant §241(a)(5), unlike any other INA provision, to be an additional "exception" besides those that Congress specifically set forth in §208. None of this is sustainable.

Simply put, §241(a)(5) cannot bar asylum because §208 creates a closed universe for asylum eligibility. Unless §208, on its own or by explicit incorporation of another provision, bars a noncitizen from seeking or being granted asylum, that person must be permitted to seek such protection. The Agency does not derive power from §241(a)(5) to exclude from consideration for asylum those whom §208 deems eligible, including those who return after removal. The reinstatement regulations cannot be read so as to limit protection from persecution to withholding of removal. When the Immigration Judge found to the contrary, he erred.

## VII   Conclusion

For all of these reasons, the respondents respectfully move this Board to reverse the decision of the Immigration Judge, and to grant their applications for relief from removal.

Respectfully submitted this _23rd_ day of July, 2015

Respectfully submitted
Clivian Melissa Contreras-Casco &
Naomi Betanco Contreras, by their attorney,

Ilana Etkin Greenstein
Macias & Greenstein, LLC
20 Meridian Street, 3rd Floor
East Boston, MA 02128
(617) 561-0400

### CERTIFICATE OF SERVICE

I, Ilana Etkin Greenstein, hereby certify that a copy of the enclosed documents were delivered by regular mail, postage prepaid to:

Office of Chief Counsel
Department of Homeland Security
12445 East Caley Avenue
Centennial, CO 80111-5663

this _23rd_ day of July, 2015

Ilana Etkin Greenstein

40

Ilana Etkin Greenstein                                          **Detained**
Macias & Greenstein, LLC
20 Meridian Street, 3rd Floor
East Boston, MA 02128
(617) 561-0400
igreenstein@mgk-law.com

## UNITED STATES DEPARTMENT OF JUSTICE
## BOARD OF IMMIGRATION APPEALS
## FALLS CHURCH, VIRGINIA

| | |
|---|---|
| In the Matter of: | |
| | **In Removal Proceedings** |
| Clivian Melissa CONTRERAS-Casco | |
| A202 138 499 | |
| | |
| Helen Naomi BETANCO Contreras | |
| A206 887 159 | |

## MOTION TO TAKE ADMINISTRATIVE NOTICE

Now come the respondents, by and through counsel, and move this Honorable Board to

take administrative notice of the facts contained in the attached documents.

Federal regulations grant the IJs and the Board the authority to take administrative notice

of "commonly known facts such as current events or the contents of official documents." 8 CFR

§1003.1(d)(3)(iv). And,

> The most common facts about country conditions appropriate for administrative
> notice are those contained in country reports and profiles prepared by experienced
> foreign service officers in the Department of State who are experts on specific
> regions and countries.

*BIA: Procedural Reforms,* 67 Fed.Reg. at 5492 (discussing administrative notice of facts);

*Halmenschlager v. Holder,* 577 F.3d 1122, 1133 n.4 (10th Cir. 2009) ("As the courts have

recognized, they, the immigration judges, and the Board owe deference to the Department of State on such matters of foreign intelligence as assessments of conditions."). The attached documents, issued by the U.S. Department of State and the United Nations, are directly dispositive of the one element of Ms. Contreras' claim which the IJ found lacking.

Ms. Contreras has argued separately that the Immigration Judge erred in failing to take administrative notice of the commonly known and easily verifiable facts found in the enclosed documents. She moves the Board to similarly take notice of those facts, and to weigh them in its analysis of her case.

Respectfully submitted
Clivian Melissa Contreras-Casco &
Naomi Betanco Contreras, by their attorney,

Ilana Etkin Greenstein
Macias & Greenstein, LLC
20 Meridian Street, 3rd Floor
East Boston, MA 02128
(617) 561-0400

CERTIFICATE OF SERVICE

I, Ilana Etkin Greenstein, hereby certify that a copy of the enclosed documents were delivered by regular mail, postage prepaid to:

Office of Chief Counsel
Department of Homeland Security
12445 East Caley Avenue
Centennial, CO 80111-5663

this 23 day of July, 2015

Ilana Etkin Greenstein

# Embassy of the United States Tegucigalpa, Honduras

## CRIME VICTIM ASSISTANCE

6

TRANSLATION:    Español

Read the Department of State's page for victims of crime overseas.

Being the victim of a crime in a foreign country can be a devastating and traumatic experience.  While no one can undo the emotional trauma, physical injury, or financial loss you may have experienced, the U.S. Embassy in Tegucigalpa is ready to help.  We are very concerned about violent crimes committed against U.S. citizens in Honduras.  We will assist you in managing the practical consequences of being a crime victim and provide you with information about accessing the local criminal justice system, as well as other resources for crime victims abroad and the United States.  This office can assist you to find appropriate medical care, contact family or friends on your behalf and explain how funds can be transferred.  We can also help you to better understand the criminal justice system in Honduras, which is very different from the system in the United States.

The information included in this guide relating to the legal requirements in Honduras is provided for general information purposes only.  The information may not be accurate or relevant to a particular case.  Questions involving interpretation of Honduran laws should be addressed to legal counsel licensed to practice law in Honduras.  The investigation and prosecution of the crime is solely the responsibility of local authorities.  The Federal Bureau of Investigation (FBI) may assist local authorities in certain cases of kidnapping, hostage-taking and terrorism.

### Reporting Crimes

Victims of crime can file police reports or register complaints at the local investigative police (Dirección Nacional de Investigación Criminal) in the jurisdiction where the crime took place.  There are no special police officers that assist foreigners.  Police reports must be filed by the victim as soon as possible.  The victims will receive a copy of the report.  Police does not provide interpreters.  If the victim has left the country, they may file a report with the Police or the Public Ministry through a letter.  The crime may also be reported to the U.S. Embassy which in return can file it with the Police or the Public Ministry.

If you have difficulties filing your police report with an official, please contact the U.S. Embassy or Consulate immediately.  You may need a police report to file for crime victim compensation or insurance reimbursement.  If you do decide to file a report, please send a copy to us, along with your address and phone number in the event we need to communicate with you.  While we are not authorized to act as your legal representative, prosecutor or investigator, our office can help you track the progress of your case and

advise you of any developments.

## Investigations

Many crime investigations never result in the arrest of a suspect. The Dirección Nacional de Investigación Criminal is the entity in charge of investigating crimes. Collection of forensic evidence is not a common practice in Honduras. The victim may obtain information about the progress of the investigation through the investigative police, Dirección Nacional de Investigación Criminal. The victim should report threats, harassment or intimidation directly to the Dirección Nacional de Investigación Criminal. A case for which an arrest warrant has not been issued, may remain open the amount of time plus half of the equivalent maximum sentence of the crime.

## Arrests

Not all suspects are detained until the trial; some may be released on personal recognizance, depending on the crime. The victim is usually not notified of the arrest. The victim will be asked to identify the perpetrator in-person or in a procedure similar to a police lineup.

## Pretrial Period

The prosecutor's office (Ministerio Público also known as Fiscalía) decides if charges will be filed and if the case will go to trial. They will also be responsible for the prosecution. Criminal courts have jurisdiction in criminal cases and the victim is represented by the prosecutor's office. Plea bargains are possible during the pre-trial period and on the first day of the trial.

## Trial

Trials usually only last a couple of days. However, the time that elapses between the time of the arrest and the time of the trial may take up to two years. In some cases, the victim is required to return to Honduras once for the arraignment hearing and then again for the trial. Trials are open to the general public, including media; consular officers may be present as well. Due to lack of funding, the Honduran judicial system usually asks victims to bring their own translators. The ruling court consists of three magistrates, no jury. There are only a few special protocol requirements in the courtroom, such as standing when the judge enters the courtroom, turning off cell phones, not speaking during the trial. No one is permitted to enter or leave the courtroom once the trial has begun.

## Sentencing

The verdict will be rendered immediately after the close of the trial or the following day. The sentence will be pronounced at a separate hearing within 30 days of the verdict. The victim will not be notified when the perpetrator is transferred or released.

## Appeals

The accused may appeal the court's decision and/or sentence. An appeal can take up to

two years. The decision made by the court of appeals can also be appealed, prolonging the case for another two years. Appeals in Honduras are written not oral. Therefore, the victim does not have to testify again.

## Attorneys

You may want to consider hiring a local attorney to secure appropriate legal guidance. Local legal procedures differ from those in the United States. Although the Public Ministry is responsible for prosecuting your case, your attorney can promote your interests with the police and the court. While our office cannot recommend specific attorneys, we can provide you with a list of attorneys who have expressed interest in representing U.S. citizens (PDF 351KB).

## Victim Compensation in Honduras

In Honduras, there is no national crime victim assistance office, nor are there any domestic violence or sexual assault hotlines. The Honduran government does not provide monetary compensation to crime victims. However, the victim may file a civil suit for damages.

## Embassy Location

Americans living or traveling in Honduras are encouraged to register with the nearest U.S. Embassy or Consulate through the State Department's Smart Traveler Enrollment Program so that they can obtain updated information on travel and security within Honduras. Americans without Internet access may register directly with the nearest U.S. Embassy or Consulate. By registering, American citizens make it easier for the Embassy or Consulate to contact them in case of emergency.

The U.S. Embassy is located at Avenida La Paz, Tegucigalpa, phone: (504) 2238-5114, extension 4400, fax: (504) 2238-4357, e-mail: usahonduras@state.gov, website: U.S. Embassy in Tegucigalpa, Honduras

## Special Information for Cases of Sexual Assault and Rape

Physical evidence is very important in sexual assault cases and can deteriorate as time passes. As such, victims should not change clothes, avoid bathing if possible and have a physical exam at the first opportunity. You should take these steps even if you are unsure about whether to report the crime to police. If you decide to pursue a prosecution at a later time, these steps preserve evidence that will assist the prosecutor. A consular officer or after-hours duty officer from the U.S. Embassy may be able to accompany victims of sexual assault for the medical exam.

Forensic sexual assault exams are ordered by the Public Ministry. However, not all cities have access to this type of examination and therefore, they are not always ordered. When ordered, these exams are performed by a medical forensic doctor at their office. These exams normally include a pelvic exam, physical collection of body specimens for evidentiary purposes and blood samples. Pregnancy and HIV testing are also performed. Victims are allowed to bring a support person throughout the examination. These examinations are free of charge.

If the victim decides not to have a medical exam, rape/sexual assault charges can still be filed. However, if there is no other evidence, it may affect the outcome of the trial.

You should get medical attention to determine if you have been injured in any way and to discuss treatment and prevention options for pregnancy and sexually transmitted diseases. Emergency contraception (the morning-after pill) is available in Honduras. HIV prophylaxis is also available. The U.S. Embassy can provide you with a list of local hospitals where most doctors have their offices.

The victim will be initially interviewed by the police and by the prosecutors and will be later cross examined by the defense attorney and the judge at the trial. Acquaintance rape (date rape) is considered rape as well as spousal rape. There are no special considerations for male sexual assault, it is legally considered the same as female sexual assault and prosecuted the same way.

There are no laws that protect the identity of sexual assault survivors, except when the victim is a minor. Media attention is always a possibility, but not customary.

There are no rape crisis hotlines in Honduras.

**Special Information for Cases of Domestic Violence**

There are two categories of Domestic Violence in Honduras, "Violencia Doméstica" and "Violencia Intrafamiliar".

"Violencia Doméstica" does not involve physical injury and is considered a civil matter, not a crime. Whenever a police report is filed under this category, the aggressor will be detained for a few hours and a protection/restraining order may be issued.

"Violencia Intrafamiliar" involves physical injury and is considered a crime. Once the police report is filed, the aggressor will be detained and trial procedures will be initiated. A protection/restraining order can also be obtained under this category. If the aggressor violates the order, the victim must file a new police report. There are very few domestic violence shelters in Honduras at this time. The U.S. Embassy is only aware of two, one in the city of La Ceiba and another in Tegucigalpa. These shelters are run by NGOs and have private security. They may house around 15 people at a time. They do not usually take clients on a walk-in basis, a referral by local authorities or other entities is usually requested. Children are allowed in the shelters if accompanied by their mother. There are no domestic violence hotlines in Honduras.

Stalking is considered a crime in Honduras if the stalker is an authority figure (i.e, teacher, boss, etc).

**Special Information for Cases of Child Abuse**

The Honduran government authority responsible for the protection of children is the "Instituto Hondureño de la Niñez y la Familia (IHNFA)". Child abuse allegations are investigated by the Public Ministry. Child abuse may be reported by anyone through a phone call, a letter or by filing a police report. A child who has been removed from his or her home is placed at an IHNFA orphanage. The Public Ministry's forensic laboratories

will provide physical and psychological evaluations for abused children only. The Public Ministry's forensic lab will provide physical and psychological evaluations for abused children to be used at a trial. If the abuser is charged, the child will be expected to testify. Special accommodations for the child to minimize the trauma of testifying are sometimes provided.

## Special Information for Cases of Kidnapping

Kidnappings are investigated by the local criminal investigative police (DNIC). The U.S. Embassy's Regional Security Office is the primary liaison with the U.S. and Honduran authorities in kidnapping cases. Any kidnapping of an American citizen should be reported to the U.S. Embassy immediately.

## Special Information for Cases of Homicide

Autopsies are required in all homicide cases. If the estate is seized by the Honduran authorities as evidence, the release of these effects will not become available until the trial is over. If the effects are not seized by the authorities, the U.S. Embassy can assist the family with the disposition of the estate. The U.S. Embassy has made arrangements with the Honduran Attorney General's office to create a unit which deals with criminal cases involving Americans citizens.

This site is managed by the U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Home    About    Contact OSAC        How to Join    Newsletter    Help

Hello, welcome to OSAC! | Advanced Search

Daily News    Reports    Events    Incidents    Country Councils    Common Interest Councils    Other Resources    LOGIN

## Report DETAILS

## Attachments

Honduras 2015
CSR.pdf    128.73KB

🖨 Print    ✉ Email

Honduras 2015 Crime and Safety Report

Travel Health and Safety; Transportation Security; Stolen Items; Theft; Murder; Kidnapping; Carjacking; Burglary; Extortion; Fraud; Financial Security; Maritime; Riots/Civil Unrest; Hurricanes; Floods; Landslides and mudslides

Western Hemisphere > Honduras; Western Hemisphere > Honduras > Tegucigalpa

4/21/2015

**Overall Crime and Safety Situation**

Most resort areas and tourist destinations have lower levels of crime and violence than other areas of the country, though still high by international standards. Tens of thousands of U.S. citizens visit Honduras each year for study, tourism, business, and volunteer work without incident, but the government lacks the resources to fully address crime and violence. While citizen security is the government's highest priority, it still faces difficult challenges. The vast majority of serious crimes, including those against U.S. citizens, are never solved.

Crime Rating: Critical

**Crime Threats**

Crime and violence are serious problems and can occur anywhere and at any time. The location and timing of criminal activity is unpredictable. Since 2010, Honduras has had one of the highest murder rates in the world. The National Violence Observatory (NVO), an academic research institution based out of Honduras' National Public University, reported a murder rate of 86.5 per 100,000 people in 2011, 85.5 per 100,000 people in 2012, and 79 murders per 100,000 for 2013. The government reported that the rate had fallen to 66.4 per 100,000 as of December 31, 2014. Most of Honduras' major cities (Tegucigalpa, San Pedro Sula, La Ceiba, and others), as well as several Honduran "departments" (a geographic designation similar to U.S. states) have homicide rates higher than the national average for 2014, including:

| DEPARTMENT | CAPITAL |
|---|---|
| Atlántida | La Ceiba |
| Colón | Trujillo |
| Cortés | San Pedro Sula |
| Francisco Morazán | Tegucigalpa |
| Yoro | Yoro |

Since 2000, the U.S. Embassy has recorded over 100 murders of U.S. citizens. Several U.S. citizens have been murdered in San Pedro Sula and La Ceiba shortly after arriving in the country. These may have been based on tips from sources at airport arrival areas. In 2014, there were 10 murder cases of U.S. citizens; seven have resulted in arrests/prosecutions. Many of the cases over the last 14 years are still awaiting trial.

U.S. citizens are victims of crime at levels similar to those of the local population. There is no information to suggest that criminals specifically target U.S. citizens and other Westerners. Tourists traveling with tour groups report fewer criminal incidents. However, the San Pedro Sula area has seen armed robberies against tourist vans, minibuses, and cars traveling from the airport to area hotels, and there have also been armed robberies along the road to Copan. Armed men have forced vehicles transporting tourists off the road and robbed the victims, occasionally assaulting the driver or

passengers.

Incidents of crime along roads, including carjacking and kidnapping, are also common. Several U.S. citizens have reported being robbed while walking on isolated beaches. The effect and threat of violent crime, including in neighborhoods where many Americans live/work, leads to the curtailment of some normal outdoor activities.

Armed robberies, home invasions, and extortions also occur, and closely guarded officials, business persons, and diplomats are not immune from these attacks. Even in neighborhoods with heightened security, there is street crime. In November 2014, a maid working for an Embassy employee was held up at gun point at about 8:00 am by an individual on a motorcycle while she wait for her employer to buzz her into the residence, which is located inside of a secured neighborhood.

Many people report that they have received threatening phone calls or extortion attempts, especially during the Christmas and Easter holidays. Typically, these calls are random calls that originate from imprisoned gang members using cell phones.

Credit card skimming is also common. Individuals, including Embassy employees, have been victimized at well-known restaurants, hotels, and retailers. There is often a spike in credit card skimming in December; during the 2014 holiday season, four Embassy employees reported unauthorized charges, some totaling thousands of dollars.

The Roatan and the Bay Islands are geographically separated and experience lower crime rates than on the mainland. The government, Roatan authorities, and businesses took measures in 2014 to improve tourism security. However, thefts, break-ins, assaults, rapes, and murders do occur on the islands.

In a country of approximately eight million people, there are an estimated 7,000 street-gang members. The 18th Street and MS-13 ("Mara Salvatrucha") gangs are the most active and powerful. Gangs are not reluctant to use violence and specialize in murder-for-hire, carjacking, extortion, and other violent street crime. They are also known to control some of the taxi services. Violent transnational criminal organizations also conduct narcotics trafficking and other illicit commerce throughout the country.

Cyber

Extortion threats are made through social engineering. Personal information is sometimes obtained through social media, the Internet, or a victim's family member.

Areas of Concern

The U.S. Department of State has issued a Travel Warning for Honduras since late 2012 to caution American travelers about high crime rates. There are no areas within Tegucigalpa, or in other major urban areas, that are deemed free of violent crime. Notably dangerous locations include: the area surrounding Suyapa Cathedral and Comayaguela on the outskirts of Tegucigalpa.

There are no reliable statistics for the department of Gracias a Dios; however, travelers to the area should note that it is a remote location where narcotics trafficking is frequent, and where infrastructure is weak, government services are limited, and police/military presence is scarce.

**Transportation-Safety Situation**

Road Safety and Road Conditions

Honduran road conditions differ significantly from those in the U.S., and driving can be very dangerous.

Roads are poorly illuminated and marked. Because of a lack of enforcement of traffic laws, drivers must make an extraordinary effort to drive defensively. If traffic signals are working, they are often ignored, and passing on blind corners is common. Vehicles are often driven at night without adequate illumination, and animals and people wander onto the roads at all hours. Traffic signs, even on major highways, are often inadequate, and streets in the major cities are often unmarked. Major cities are connected by an inconsistently maintained, two-lane system of paved roads, and many secondary roads are unpaved. A significant percentage of vehicles are in disrepair, under-powered, and beyond their lifecycle, and do not meet U.S. road safety standards.

For these reasons, and because of the high incidence of crime, the U.S. Embassy strongly discourages

car and bus travel after dark. Motorists should avoid traveling at night and always drive with their doors locked and windows rolled up to deter potential robberies at traffic lights and on congested downtown streets. Additionally, travelers should always try to carry a cell phone in case of an emergency, and exercise extreme caution while driving on isolated stretches of road and passing other vehicles on mountainous curves.

Public Transportation Conditions

Travelers are warned to avoid all public transportation. Passengers on public buses are sometimes robbed en-route, at roadblocks, and at bus stops, even during daylight hours. Some would-be muggers and gang members are known to keep to a daily schedule, riding city buses from one stop to the next, committing criminal acts with impunity.

Travelers should not use taxis that pick up multiple riders, referred to as collective taxis. In September 2014, in Tegucigalpa, a maid working for an Embassy family was robbed at gunpoint after hailing a taxi from the local mall frequented by foreigners. The taxi was a collective cab and stopped to allow more passengers to enter the vehicle. All occupants were kidnapped and taken to an undisclosed location and relieved of all of their belongings. The thief does not take any money/belongings from the taxi driver, which indicates that they are complicit.

Other Travel Conditions

Cruise ship passengers should also take safety precautions, avoid unfamiliar areas, and book only with reputable tour companies during their stopover in Honduras. Cruise lines and port agencies have approved tour companies offering packages. Additionally, port agencies have worked to improve taxi service to and from the ports. The vast majority of cruise line passengers experience no problems, but incidents of armed robbery and carjacking have been reported.

**Political, Economic, Religious, and Ethnic Violence**

Political Violence Rating: High

Local, Regional, and International Terrorism Threats/Concerns

There are no known international terrorist groups operating in Honduras. Honduras does not appear to be utilized as a terrorist safe haven. There were no legal cases involving instances of terrorism affecting U.S. citizens or facilities brought before the Honduran judicial system, nor were there any judicial developments that would appear to have an impact on U.S. counterterrorism efforts.

The CA-4 agreement among El Salvador, Guatemala, Honduras, and Nicaragua, allows for the inspection-free movement of citizens among these countries and reduces overall inspection at land crossings. The limited nature of inspections could facilitate movements of terrorists.

Terrorism Rating: Low

Civil Unrest

Public demonstrations, protests, and strikes are common. Most demonstrations are concentrated in/around city centers, public buildings, and other public areas. Most protests have been peaceful; however, on rare occasion, there have been violent confrontations between the police and demonstrators. Additionally, there have been demonstrations and road blockades along key routes (the road leading to the international airport in Tegucigalpa).

**Post-specific Concerns**

Environmental Hazards

Periodically, Honduras is hit by tropical storms and hurricanes. The rainy season usually runs May-November. There have been approximately nine significant tropical storms/hurricanes that have affected Honduras since 1995. Two of the most damaging storms were Hurricane Mitch in 1998 and Hurricane Stan in 2005. While hurricanes are a concern, much of the damage to infrastructure is a result of flooding and rock/mudslides.

Kidnapping Threat

Kidnappings and disappearances affect both the local and expatriate communities, with victims sometimes paying large ransoms for the prospect of release. Kidnapping is believed to be underreported. Since January 1, 2012, four cases of kidnapped U.S. citizens were reported to the U.S. Embassy; all kidnapping victims were released.

## Police Response

The government lacks resources to properly investigate and prosecute cases, and police often lack vehicles or fuel to respond to calls for assistance. In practice, this means police may take hours to arrive at the scene of a violent crime or may not respond at all. As a result, criminals operate with a high degree of impunity. Honduras is in the early stages of substantial reforms to its criminal justice institutions.

The government has special police forces in areas frequented by tourists (the Copan Mayan ruins, Roatan). The government is implementing similar programs for other locations (La Ceiba, Trujillo), and major hotels and other tourist installations have increased private and police security. The government has also begun implementing a series of police reforms that it hopes can tackle the crime situation, such as the creation of an Inter-Agency Security Task Force to combat crime.

U.S. citizens are subject to the laws of the country in which they are traveling. Penalties for possession, use, or trafficking illegal drugs are strict, and convicted offenders can expect lengthy jail sentences and fines.

## How to Handle Incidents of Police Detention or Harassment

U.S. citizen detained by the police should insist on speaking to U.S. Embassy representatives as soon as possible. Detained foreigners are generally treated well by the police. Except in some very rural locations, police are aware of a U.S. citizen detainee's right to contact the Embassy. Travelers should be aware, however, that the assistance the Embassy can provide is limited to making sure U.S. citizens are not being mistreated and providing them with a list of local attorneys. The Embassy cannot secure the release or act as legal representation for any U.S. citizen. Local law allows the police to detain someone for up to 48 hours for administrative processing. This is a common practice for most automobile accidents where there is personal injury and for cases in which someone is accused of a criminal act. Travelers are reminded to seek legal representation before admitting or signing any legal form that acknowledges culpability.

## Crime Victim Assistance

If you or someone you know becomes the victim of a crime, you should contact the local police and the U.S. Embassy in Tegucigalpa. If you are in Tegucigalpa or San Pedro Sula, you can reach the local police by dialing 911; other smaller cities/rural areas have their own local police assistance numbers. For public safety emergencies, dial "911." Fire Department Headquarters: (504) 2232-4092, 2231-1687, 2239-3479.

U.S. Embassy, Tegucigalpa, American Citizens Services Unit is open to walk-in services Monday-Friday, 8:00-11:30 am, and can be reached directly at:
Tel: (504) 2238-5114 ext. 4400
After Hours: (504) 2238-5114 / 2236-9320 ext.4100
Fax: (504) 2238-4357
Email: usahonduras@state.gov
Facebook: www.facebook.com/acstegucigalpa

## Police/Security Agencies

As a reaction to criminal threats, many citizens hire private bodyguards for protection. Neighborhood watch groups employ armed private security guards and maintain security checkpoints at entrances to "barrios seguros" (safe neighborhoods).

## Medical Emergencies

Medical care is limited. Emergency services, even in Tegucigalpa, are basic at best. Although many physicians are trained in the U.S., their staff and equipment are generally not up to U.S. standards.

Red Cross ambulance: 195, 2227-7474 or 2227-7575
Rescate Medico Movil (Private Ambulance Service): 2239-9999 or 2221-4444.

Contact Information for Recommended Hospitals/Clinics

Hospital Honduras Medical Center: 2280-1500
Hospital Centro Medico: 2225-0035/36, 2225-0028, 2225-4060
Hospital Viera: 2238-0736, 2238-0697, 2237-7136 or 2237-3160.
Hospital Militar: 2229-0010/18
DIME: 2239-9628/30 or 2239-2598

Recommended Air Ambulance Services

Air Ambulance Service: (305) 535-7380
(International SOS, Mount Sinai Hospital, Miami Beach, Florida)

CDC Country-specific Vaccination and Health Guidance

For additional information on vaccines and health guidance, please visit the CDC at:
http://wwwnc.cdc.gov/travel/destinations/traveler/none/honduras?s_cid=ncezid-dgmq-travel-single-001.

Tips on How to Avoid Becoming a Victim

Situational Awareness Best Practices

The majority of U.S. business persons conduct their daily activities without security-related incidents by
following basic security precautions and exercising good judgment. The U.S. Embassy recommends
that travelers exercise caution; however, certain areas of the country demonstrate higher levels of
criminal activity than others. U.S. citizens should be vigilant of their surroundings, especially when
entering or exiting their homes, hotels, cars, garages, schools, and workplaces. Whenever possible,
U.S. citizens should travel in groups of two or more. Keep a low personal profile. It is also advisable to
avoid wearing jewelry and carrying large sums of money or displaying cash, ATM/credit cards, or other
valuables (gold chains, distinctive jewelry, expensive watches). Carry a cell phone with emergency
numbers programmed; however, cell phones are favorite targets of thieves, so keep them concealed as
much as possible. It is important to maintain direct visual contact with your credit cards at all times, and
also regularly and closely check monthly statements. Be aware of increased vulnerability after using
alcohol. If you become a victim—DO NOT RESIST. Think about how you will react if confronted. When
safe, immediately call for help. Know nearby safe areas (hotels, malls, gas stations, and colleagues'
residences) that can be used in an emergency.

Visitors are strongly urged to exercise caution in discussing travel plans in public. Avoid disputes with
local citizens. Better to be safe than "right." Exercise particular caution walking on isolated beaches,
especially at night. U.S. citizens should avoid walking at night in most areas or walking alone on
beaches, historic ruins, and trails. Outdoor activities such as walking and running are strongly
discouraged, especially in the bigger cities, like Tegucigalpa and San Pedro Sula. Plan ahead and have
an itinerary.

Even on the Islands, U.S. citizens should exercise caution, especially at night. It is recommended that
U.S. citizens book tours and sightseeing through resorts or reputable tour companies. Coxen Hole on
the island of Roatan should be avoided after dark.

Be alert for two men on a motorcycle, as this is against the law. All should be considered armed and
dangerous until proven otherwise.

Do not lower your guard because armed security is present. They are not always reliable.

U.S. Embassy Location and Contact Information

Embassy Address and Hours of Operation

U.S. Embassy Tegucigalpa
Avenida La Paz
Tegucigalpa

Embassy Contact Numbers

Tel: (504) 2236-9320

Fax: (504) 2236-9037
After Hours: (504) 2236-8497
Website: honduras.usembassy.gov

Embassy Guidance

U.S. citizens who live in or who are visiting Honduras are encouraged to register with U.S. Embassy Tegucigalpa. Citizens can register online at https://travel.state.gov

The U.S. Consular Agency in San Pedro Sula is located on the eleventh floor of the Banco Atlántida building (across from Central Park). The agency is open to walk-in services on Monday, Wednesday, and Friday from 12:00 to 4:00 pm. Tel: (504) 2558-1580

OSAC Country Council Information

There is an active OSAC Country Council in Honduras that meets periodically. To reach OSAC's Western Hemisphere team with questions about the Honduras Country Council, please email OSACWHA@state.gov.

Stephen P. Brunette
OSAC Executive Director

Lisa Grice
OSAC Deputy Executive Director

Daniel Schlehr
OSAC Co-Chair
Vice President, Global Security Services
Raytheon Company

Telephone: 571-345-2223

This is a U.S. Government inter-agency website managed by the Bureau of Diplomatic Security, U.S. Department of State.

Please note that all OSAC products are for internal U.S. private sector purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.

The Overseas Security Advisory Council (OSAC) provides links to non-government websites as a public service only. The U.S. government, including OSAC, neither endorses nor guarantees in any way the external organizations, services, advice, or products included in these website links. For more information, please read our full disclaimer.

Overseas Security Advisory Council · Bureau of Diplomatic Security
U.S. Department of State · Washington, D.C. 20522-2008
Telephone: 571-345-2223 · Facsimile: 571-346-2238



United Nations

# General Assembly

A/HRC/29/27/Add.1

Distr.: General
31 March 2015

Original: English

**Human Rights Council**
Twenty-ninth session
Agenda item 3
Promotion and protection of all human rights, civil,
political, economic, social and cultural rights,
including the right to development

## Report of the Special Rapporteur on violence against women, its causes and consequences, Rashida Manjoo

Addendum

### Mission to Honduras*

*Summary*

The present report contains the findings of the Special Rapporteur on violence against women, its causes and consequences, from her visit to Honduras, conducted from 1 to 8 July 2014. In the report, the Special Rapporteur examines the situation of violence against women in the country, taking into account its causes and consequences and implications for the effective exercise and enjoyment of all human rights by women. She also discusses the State's responses, through an analysis of the obligation to act with due diligence, to prevent such violence, to protect and provide remedies to women who have been subjected to violence, and to prosecute and punish the perpetrators.

---

* The summary of the present report is circulated in all official languages. The report itself, which is annexed to the summary, is circulated in the language of submission and Spanish only.

GE.15-06864  (E)

Please recycle 

A/HRC/29/27/Add.1

# Annex

[English and Spanish only]

## Report of the Special Rapporteur on violence against women, its causes and consequences, on her mission to Honduras (1–8 July 2014)

## Contents

|  |  | Paragraphs | Page |
|---|---|---|---|
| I. | Introduction | 1–4 | 3 |
| II. | Context | 5–8 | 3 |
| III. | Manifestations of violence against women | 9–28 | 4 |
| | A. Violence against women in the family | 12–14 | 4 |
| | B. Violence against women in the community | 15–18 | 5 |
| | C. Violence perpetrated and/or condoned by the State | 19–25 | 6 |
| | D. Violence linked to the transnational sphere | 26–28 | 8 |
| IV. | Implications of inequality, discrimination and violence | 29–53 | 9 |
| | A. Civil and political rights | 30–38 | 9 |
| | B. Economic and developmental rights | 39–48 | 11 |
| | C. Social and cultural rights | 49–53 | 13 |
| V. | Challenges in fulfilling the State's obligation to act with due diligence to eliminate violence against women | 54–81 | 14 |
| | A. Prevention | 59–65 | 15 |
| | B. Protection | 66–71 | 16 |
| | C. Investigation, prosecution and punishment | 72–77 | 17 |
| | D. Provision of effective remedies, including reparations | 78–81 | 18 |
| VI. | Conclusions and recommendations | 82–88 | 19 |
| | A. Law and policy reforms | 84 | 19 |
| | B. Accountability | 85 | 20 |
| | C. Societal transformation, including awareness-raising, addressing gender stereotypes and women's empowerment | 86 | 21 |
| | D. Statistics and data collection | 87 | 21 |
| | E. Recommendation to United Nations agencies and entities | 88 | 21 |

## I.  Introduction

1.    The Special Rapporteur on violence against women, its causes and consequences, Rashida Manjoo, visited Honduras from 1 to 8 July 2014. The purpose of the visit was to examine the situation of violence against women in the country in a comprehensive manner, including violence perpetrated within the family, in the community, in institutional settings and in the transnational sphere. During the visit she met with relevant stakeholders in Tegucigalpa, San Pedro Sula and La Ceiba.

2.    In Tegucigalpa, the Special Rapporteur met with the Deputy Minister for Security, the Deputy Secretary for Justice and Human Rights and representatives of her department;[1] the Deputy Secretary for Social Development and representatives of her department, including the Deputy Chair of the National Institute for Women (INAM); representatives of the Gender Unit of the Honduran National Police; the President of the Supreme Court of Justice; members of the congressional Commission on Gender Equity; staff of the Office of the Public Prosecutor (Fiscalía General); and representatives of the Office of the National Commissioner for Human Rights (CONADEH), the National Committee for the Prevention of Torture and Other Cruel, Inhuman or Degrading Treatment (CONAPREV) and the Inter-Agency Commission to Combat Commercial Sexual Exploitation and Trafficking in Persons (CICESCT). In San Pedro Sula and in La Ceiba, she met with the mayors and with the staff of each city's Municipal Office for Women (OMM).

3.    The Special Rapporteur had the opportunity to speak with the staff and women survivors of violence in three shelters and to hear the testimonies of women and girls in detention facilities. In La Ceiba, she visited a comprehensive centre for victims of domestic and sexual violence (Centro MAI), where she met with the staff working in the medical and legal units. She also met with representatives of civil society, including women's organizations, and representatives of United Nations agencies, funds and programmes.

4.    The Special Rapporteur expresses her deep appreciation to all her interlocutors, including State authorities and representatives of civil society organizations and United Nations agencies. Most importantly, she wishes to thank the individual women who shared their personal experiences of violence and survival with her. She looks forward to a fruitful and continued dialogue with the Government and other stakeholders on the implementation of her recommendations.

## II.  Context

5.    Honduras is classified as a lower middle-income country with a population estimated at 8.1 million in 2013. Approximately 65 per cent of the population lives in poverty. While 60 per cent of the national income is earned by the wealthiest 20 per cent of the nation, the poorest 20 per cent earn just 2.02 per cent of the income.[2] High levels of illiteracy and low levels of school attendance are also challenges facing Honduras.

6.    In a historical context of poverty, underdevelopment and citizen insecurity, the 2009 coup further resulted in serious human rights violations being committed. On 28 June 2009, the Honduran military forces apprehended the then President of Honduras, Manuel Zelaya,

---

[1]  Prior to the recent restructuring of the Government, the Department of Justice and Human Rights was a ministry.

[2]  World Bank data indicators of income share held by lowest 20 per cent. See www.tradingeconomics.com/honduras/income-share-held-by-lowest-20percent-wb-data.html.

3

and led to his forced exit out of the country. The justification given was that he had planned to organize a poll on the possibility of holding a referendum on constitutional reforms prior to the November 2009 elections. Thereafter the then Speaker of Congress, Roberto Micheletti, was sworn in as the new President of Honduras. The international community largely recognized these actions as a military coup, which further exacerbated the situation and negatively affected Honduran society as a whole. As a response to the coup, the international community imposed sanctions and economic pressure on the country. The socioeconomic inequalities are compounded by high homicide rates, alarming levels of other expressions of violence, robberies, extortion, the proliferation of small and light weapons, and an increase in organized crime and the drug trade. The actions of violent gangs (*maras*) further contribute to high levels of insecurity.

7.     In recent years, Honduras has been undergoing a period of stabilization. A number of measures have been taken to address the climate of widespread and systematic crime, corruption and impunity, including, among others, the establishment in 2010 of a ministry of justice and human rights and the setting up of the Truth Commission to examine events surrounding the 2009 coup. To address the growing insecurity and violence, in November 2011 the Congress passed an emergency decree allowing military personnel to carry out public service duties. In August 2013 it authorized the creation of a military police force with powers to seize control of violent neighbourhoods and make arrests, among other duties.[3] The role and continuing influence of the military in general, but particularly in policing and education activities, was a concern expressed by many interviewees.

8.     In addition, the current Government, which has been in place since January 2014, has adopted strategies to tackle the financial crisis and reduce costs, while enhancing efficiency in responding to critical issues at the national level. For example, there has been a considerable reduction in the number of government ministries. However, the overall lack of institution-building, the high turnover of staff in the civil service, the reduction of specialized services and the politicization of appointment processes negatively affect the continuity and sustainability of Government policies and programmes.

## III.  Manifestations of violence against women

9.     Violence against women is widespread and systematic and affects women and girls in numerous ways. A climate of fear in both the public and private spheres, and a lack of accountability for violations of human rights of women are the norm, despite legislative and institutional developments.

10.    In 2006, the Committee on the Elimination of Discrimination against Women expressed concern about the prevalence of many forms of violence against women, including sexual abuse against women and girls, particularly incestuous abuse of girls, as well as rape, domestic violence and femicide (CEDAW/C/HON/CO/6, para. 18).

11.    The existence of multiple and conflicting statistics reported by different stakeholders gives rise to concerns about the accuracy of data collection.

## A.  Violence against women in the family

12.    According to the national health and population survey for the period covering 2011/12, 27 per cent of women aged between 15 and 49 years interviewed stated that they

---

[3]  See Decree No. 168-2013 establishing the Military Police for Public Order.

had been subjected to physical violence at some point in their lives.[4] In 2012, the Statistical Observatory of the Office of the Public Prosecutor reported receiving more than 16 thousand complaints related to violence against women. About 74.6 per cent of those complaints pertained to domestic violence and intrafamily violence, followed by sex crimes, which accounted for almost 20 per cent of the total.

13.    Domestic violence remains the leading reported crime at the national level. Between 2009 and 2012, 82,547 domestic violence complaints were lodged in both *juzgados de letras* (first instance courts) and *juzgados de paz* (local courts that address minor cases) across the territory.[5] Statistics illustrate that Honduran women are disproportionately affected by domestic violence: of the 21,170 such complaints received by the courts in 2013, 19,458 (92 per cent) were filed by women, as compared to 1,712 filed by men.[6] Statistics provided by the Special Prosecutor for Women show a low percentage of convictions as compared to the large number of complaints. During the 2012–2014 period, 4,992 complaints were registered, with just 134 convictions.[7]

14.    Femicides have increased alarmingly in recent years and were highlighted as a major source of concern by all interlocutors. In 2012, 606 cases of femicides were reported, which represents, on average, 51 women murdered per month.[8] According to preliminary statistics from official sources, 629 cases of femicide were registered in 2013. A total of 445 violent deaths of women were reported through the main media outlets during the same period.[9] Traditionally, domestic violence and intrafamily violence were the leading causes of femicides, but new scenarios involving sexual violence, gang-related violence and organized crime have emerged in Honduras. It is reported that one in five cases of femicide occurs in the context of domestic or intrafamiliar violence; 7 per cent are linked to sexual violence and 60 per cent are linked to organized crime.[10]

## B.    Violence against women in the community

15.    Violence against women in the community can include rape and other forms of sexual assault and harassment. During the period from 2006 to 2010, the number of cases of sexual violence reported to the police per 100,000 inhabitants ranged from 42.35 in 2006 to 52.65 in 2009.[11] The online database of the judiciary indicates that 2,850 cases relating to sexual offences were registered between 2011 and 2013, including, among others, cases of

---

[4]  Honduras, "Encuesta Nacional de Demografía y Salud 2011–2012: informe resumen", p. 16.
[5]  Liana Funez and Sara Aviléz Tomé, "Informe de la consulta de la Estrategia de Seguridad en Centro América, ESCA: informe de Honduras" (2013).
[6]  Judiciary of Honduras (Poder Judicial), "Boletín estadístico", Juzgados de letras y paz en materia de violencia doméstica, Ingresos por departamento, 2013. Available from www.poderjudicial.gob.hn/CEDIJ/Documents/Bolet%C3%ADn%20Estad%C3%ADstico%20A%C3%B1o%202013.pdf.
[7]  The Government of Honduras provided statistics in its response to the draft report provided, and informed the Special Rapporteur that a technical agency for criminal investigation would soon be established.
[8]  National Autonomous University of Honduras (UNAH), "Boletín especial: violencia contra las mujeres y femicidios en el Distrito Central año 2012", special edition No. 12 (June 2013) (www.unicef.org/honduras/Mujeres_DC_2012.pdf).
[9]  UNAH, "Boletín especial sobre muerte violenta de mujeres", special edition No. 17 (January 2014).
[10] Mirta Kennedy, "Informe preliminar de la consulta de la ESCA en seis países" (Tegucigalpa, 2014).
[11] Ipas and the United Nations Population Fund (UNFPA), "Estudio sobre la situación y la calidad de los servicios seleccionados de atención a la violencia sexual en Honduras", December 2011.

rape, sexual intercourse with a minor and abduction.[12] However, other sources claim that in 2013 alone, approximately 2,851 sexual violence complaints were filed.[13]

16.     The acts of gangs further exacerbate the levels of violence and insecurity in Honduras. Young girls involved in gangs are subjected to rape and are forced to carry drugs and guns. They are also pressured to have sex during initiation rituals. The Special Rapporteur was informed that women and girls between the ages of 15 and 34 are often killed in vengeance acts to settle disputes between gang members. The victims' bodies reveal the brutality inflicted, including appalling levels of mutilation and torture, and also decapitation to erase all traces of identity. Those acts, which are most common in urban areas, are often also associated with acts of kidnapping and sexual violence.

17.     Violence against sex workers is escalating. The lesbian, gay, bisexual, transgender and intersex community is also facing escalating violence; the Special Rapporteur was informed that 107 members of this community were murdered between 1994 and October 2012 in the departments of Francisco Morazán, Cortés, Atlántida, Islas de la Bahía, Choluteca, Comayagua, Olancho and El Paraíso.[14] Lesbians and other women who live outside of heterosexual norms are often subjected to violence, rape and other forms of discrimination. In the workplace they are often bullied, harassed or overlooked for promotions, and may even be denied employment due to their style of dress.[15] The Special Rapporteur was informed of an increasing trend of migration, especially among transgender sex workers seeking to flee from discrimination and abuse.

18.     The working conditions in *maquila* plants in the country's export processing zones (EPZs) are also a subject of concern. The *maquila* industry employs approximately 125,000 people, 65 per cent of whom are women.[16] Most of the employees are young women from rural areas between the ages of 17 to 25. Interviewees referred to recurrent violations of their rights, including verbal and physical abuse by supervisors, sexual harassment, being subjected to pre-employment pregnancy tests, unfair dismissal and discrimination on the grounds of pregnancy, and denial of maternity leave and other social benefits.

## C.    Violence perpetrated and/or condoned by the State

19.     It has been reported that, during and after the coup, hundreds of people were brutally repressed by the police, the military and security forces to break up demonstrations, and that more than 10 people died. Multiple cases of threats, intimidation, illegal arrests, kidnappings and torture occurred.[17] The Special Rapporteur was also informed of cases of enforced disappearances of women. Sources indicate that there has been a 281 per cent

---

[12]  Data from the Centro Electrónico de Documentación e Información Judicial, "Tribunales de sentencia a nivel nacional, ingresos y resoluciones: delitos contra la libertad sexual y la honestidad cometidos a mujeres, años 2011–2013".

[13]  Calculations of the Centre for Women's Rights, based on complaints lodged nationally.

[14]  Cattrachas, "Situación de las muertes violentas de la comunidad LGTTBI en Honduras, 1994-2012".

[15]  Asociación para el Desarrollo Integral de la Mujer (ADEIM Simbiosis) and others, *Unnatural, Unsuitable, Unemployed! Lesbians and Workplace Discrimination in Bolivia, Brazil, Colombia, Honduras and Mexico* (2005).

[16]  Jennifer M. Swedish, "The SETISA factory: mandatory pregnancy testing violates the human rights of Honduran maquila workers, *Northwestern Journal of International Human Rights*, vol. 4, No. 2 (2005).

[17]  International Federation for Human Rights (FIDH), "Honduras: human rights violations in Bajo Aguán" (2011).

increase in reported cases of disappeared women, up from 91 cases in 2008 to 347 in 2013.[18]

20.     As regards the situation in prisons and other detention facilities, in 2009 the Committee against Torture expressed concern at reports of frequent ill-treatment and torture and excessive use of force on arrest, as well as acts of extortion by law enforcement officials, and at the persistent high number of detainees, both children and adults, in prolonged pretrial detention (CAT/C/HND/CO/1, para. 14). In 2012, the Inter-American Commission on Human Rights reported that the main structural deficiencies in the Honduran prison system included the delegation of internal control of the prisons to the prisoners themselves; overcrowding; lack of sufficient budget and adequate legal structure; lack of professional prison staff that was trained and specialized; and the lack of separation between male and female inmates and between those awaiting trial and those who had been convicted. In 2012, CONADEH reported that 56 per cent of the total prison population consisted of convicted persons, whereas the remaining 44 per cent had yet to be sentenced.[19] CONAPREV, established in 2008, monitors detention centres and ensures that the treatment of prisoners is in compliance with the Standard Minimum Rules for the Treatment of Prisoners.

21.     As in most countries, the number of incarcerated women in Honduras has been growing, with a female inmate population of 718 female prisoners across 24 prisons. The Special Rapporteur visited the national penitentiary for women (Penitenciaría Nacional Femenina de Adaptación Social), the only prison exclusively for women, in Tamara, 40 kilometres from Tegucigalpa. At the time of the visit, 300 inmates and 12 children, who are allowed to stay with their mothers up to the age of 4, were housed in the facility. Although high degrees of overcrowding were not observed, the Special Rapporteur was informed that at times there were up to 16 women in a 4 metre by 4 metre cell. Currently the food budget allocated to each inmate is about 13 lempiras for three meals, which is the equivalent of approximately US$ 0.60.[20] In addition, while there is a complaints procedure within the facility to report abuse, the Special Rapporteur was informed that fear of repercussions against families prevents inmates from voicing their concerns.

22.     Women are held for crimes such as theft, extortion, possession and trafficking of drugs, kidnapping and murder. While some have been convicted, many women were still awaiting sentencing or trial.[21] The women in the latter situation regularly miss their hearings due to inadequate legal representation and the unavailability of transportation to go to court. The Special Rapporteur was informed that after two years as pretrial detainees, the women are released. Through interviews with both inmates and staff, the Special Rapporteur confirmed that many women in detention have a history of being subjected to violence prior to being imprisoned. The links between violence against women and women's incarceration, whether prior to, during or after incarceration, is not being adequately addressed.

23.     Located in the vicinity of the women's penitentiary are two rehabilitation facilities for 12- to 18-year-old adolescents who are in conflict with the law. Those institutions were

---

[18]   Report submitted by feminist organizations in Honduras to the Special Rapporteur, entitled "Situación de las violencias contra las mujeres en Honduras" (2014).

[19]   CONADEH, annual report for 2012 (http://app.conadeh.hn/Anual2013/Informes/CONADEH_2012.pdf).

[20]   CONAPREV, "Relatora de la ONU se reúne con el MNP-CONAPREV" (www.conaprev.gob.hn/index.php/noticias/83-relatora-de-la-onu-se-reune-con-el-mnp-conaprev).

[21]   National Directorate of Special Preventive Services, under the Ministry of Security, as at 7 October 2013.

under the administration of the Honduran Institute for Children and the Family (IHNFA), with one facility for adolescent boys and the other for girls. Due to recent changes by the Government, the Institute is no longer in existence. At the time of the visit, 22 girls had been temporarily transferred to the premises of the Casita 21 de Octubre, a centre for vulnerable adolescent boys who are not yet in trouble with the law. The boys were moved to the girls' detention centre in Tamara. Reasons for the urgent relocation of the girls include allegations of improper management; the need to address repeated break-out attempts; and the need to prevent the girls from fraternizing with the boys in the other detention facility.

24.    The majority of the girls had been detained for theft and drug crimes and on the presumption that they were involved with gangs, in accordance with article 332 of the Criminal Code on "unlawful associations". The Special Rapporteur heard from the girls and also witnessed the injuries sustained by some of them due to the excessive use of force to enforce cooperation and obedience to the rules set by the administrators of the facility. The issue of violence against the girls was raised with CONAPREV during the mission. The Special Rapporteur also notes the lack of rehabilitation activities offered to the girls in the facility.

25.    The problematic nature of article 332 is of concern, as the term "unlawful associations" can and has led to the incarceration of girls without proper due process. In 2009, the Committee against Torture expressed concern that a suspected member of an "unlawful association" could be arrested without an arrest warrant and that his/her detention on remand was mandatory. It expressed further concern at the repressive social policy in combating "unlawful associations", or *"maras"* or *"pandillas"*, which did not adequately consider the root causes of the phenomenon and might criminalize children and young people on the sole ground of their appearance (CAT/C/HND/CO/1, para. 19).

## D.    Violence linked to the transnational sphere

26.    Due to its strategic location, Honduras is a country of origin and transit in Central America and, to a lesser extent, a destination country, confronted with numerous challenges related to migration and to trafficking, both of persons and of narcotics.

27.    The lack of economic opportunities pushes people to leave their homes and communities in search of better lives. Some are drawn to neighbouring countries, while others migrate to the United States of America. Reportedly, 17,582 unaccompanied undocumented minors were apprehended at United States borders in 2014. Of the 98 children from Honduras interviewed by the Office of the United Nations High Commissioner for Refugees (UNHCR), 44 per cent had been threatened with or were victims of violence by organized armed criminal actors; 24 per cent reported abuse at home; 11 per cent reported that they had been victims of both violence in society and abuse in the home; and 21 per cent discussed situations of deprivation.[22] Sources indicate that from 1997 to 2012, 250,205 migrants were returned/deported by the United States back to Honduras.[23]

28.    Impoverished women and children are particularly vulnerable and are often tricked or forced into commercial sexual exploitation or servitude. Although they are promised well-paying jobs in the service-related sector, upon arrival at their destinations, they are made to work under inhumane conditions and are often subjected to threats of deportation

---

[22]  UNHCR, *Children on the Run* (2014).

[23]  Information from the Directorate-General for Migration and Foreign Nationals.

or incarceration, physical and emotional abuse and violence. Trafficking remains grossly underreported due to the hidden nature of the crime, and also the prevalence of organized crime. The Office of the Public Prosecutor registered 27 complaints of trafficking of women for sexual exploitation in 2013.

## IV.   Implications of inequality, discrimination and violence

29.   Equality and non-discrimination principles are enshrined in the Constitution of Honduras and other legal instruments, but there is still considerable de facto gender inequality in the civil, political, economic and social spheres, which precludes the full enjoyment of human rights by women and girls.

### A.   Civil and political rights

30.   Violence against women negatively affects civil and political rights, including, among others, women's right to life, bodily integrity and equal protection under the law. The right to life is guaranteed under article 65 of the Constitution. During her visit, the Special Rapporteur was informed that the number of violent deaths of women had risen by 263.4 per cent between 2005 and 2013. Evidence suggests a direct correlation between femicide rates and the proliferation and use of small arms. In Honduras, a person is legally allowed to register up to five firearms.[24] Given that men comprise the majority of those who use small arms, they represent a threat both at home and on the streets, thus contributing to the generalized culture of violence and insecurity facing women and girls in particular.

31.   Violence against women also restricts women's freedom of movement in a number of ways. The Special Rapporteur was informed that during the demonstrations that had taken place during the coup, several women had been arbitrarily detained and suffered sexual abuse. This type of behaviour further served to intimidate women into avoiding the public arena, thus affecting women's effective participation in decision-making processes, both in the public and private spheres. Prior to the restructuring of the Government, women held 3 out of 17 ministerial positions.[25] The Equal Opportunities for Women Act of 2000 established, for the first time, a minimum 30 per cent quota for women with respect to posts filled by popular vote. Despite this provision, women represented only 7.1 per cent of elected officials in Congress in 2001. The mandatory requirement for political parties to comply with the provisions on participation by women, contained in the reform of the Elections and Political Organizations Act in 2004, proved to be effective, as in 2005, women constituted 24.2 per cent of the candidates elected. However, women's representation in parliament dropped to 19.5 per cent in 2009.

32.   In April 2012, Congress approved an amendment to article 105 of the elections law which increased the minimum quota of women candidates from 30 to 40 per cent for primary elections. The amendment also stipulated that the quota would increase to 50 per cent for future election processes.[26]

---

[24]   Control of Firearms, Ammunition, Explosives and Other Related Material Act, art. 27, as amended through Decree No. 69-2007.

[25]   Inter-Parliamentary Union and the United Nations Entity for Gender Equality and the Empowerment of Women, "Women in politics: 2014" (www.ipu.org/pdf/publications/wmnmap14_en.pdf).

[26]   European Union Election Observation Mission, Honduras 2013, "Honduras: final report — general elections 2013".

33.   Women made up 40.4 per cent of candidates for Congress and 20.8 per cent of candidates for mayor in the 2013 general elections. The elections resulted in a Congress with 24.2 per cent women members, and local governments in which 6.7 per cent of mayors are women.[27] With regard to the judiciary, there are 798 judges and magistrates in Honduras; of those, 398 are women.[28] Of the 15 magistrates in the Supreme Court, 3 are women.[29] A gender unit was established within the Supreme Court pursuant to Accord No. 04-2010 of 30 September 2010.

34.   The Special Rapporteur notes that access to justice for women, including for indigenous and Afro-descendant women, is seriously compromised due to a range of institutional and procedural factors. These obstacles include insufficient resources and poor infrastructure; the lack of specialized units and staff trained on gender issues within the different criminal justice institutions, including police, prosecutors and judges; and the length of trials and delays in the criminal justice process. Moreover, the lack of proper investigation, evidence collection and forensic facilities and capacities further hinder women's access to justice.

35.   Reporting of violence against women is extremely low compared to the actual occurrence. Reasons that prevent women and girls from seeking help or reporting acts of violence include stigma, shame, discrimination, fear of reprisals from the perpetrators, feelings of guilt and lack of support from friends and family, as well as complications and risks on prior to lodging the complaints.[30] The Special Rapporteur was informed that even when women wish to file complaints, they are often encouraged to withdraw the case. The lack of a responsive environment, and the lack of economic independence, results in many victims being compelled to stay in abusive relationships.

36.   As regards domestic violence, while there are legal provisions aimed at securing the safety of those accessing justice through protection orders, injunctions or other interim measures, the Special Rapporteur was informed that perpetrators seldom abide by these provisions. In theory, the latest amendment to article 23 (8) of the Domestic Violence Act of 1997 protects the confidentiality of the concerned parties, but in fact it restricts victims' access to justice by preventing service providers from having access to information necessary to assist such clients with their cases.[31] The Special Rapporteur also notes the absence of an effective witness protection programme and safe accommodation for those at risk of further violations.[32]

37.   Human rights defenders, particularly those working on issues linked to land claims, environmental protection and the rights of minorities, face numerous challenges, including harassment, intimidation and reprisals related to their activities. The Special Rapporteur was informed of the case of Gregoria Flores Martínez, a member of the Honduran Black Fraternal Organization (OFRANEH), who was shot and wounded by security forces on 30 May 2005 as she was collecting testimony to present before the Inter-American Court of Human Rights. The Court issued a ruling acknowledging the precarious security situation

---

[27]  Ibid.

[28]  Judiciary of Honduras, "Memoria anual 2012" (www.poderjudicial.gob.hn/transparencia/planeacion/informes/memorias/Documents/Memoria%20PJ%202012.pdf).

[29]  Information retrieved from the website of the judicial branch (www.poderjudicial.gob.hn/).

[30]  Ipas and UNFPA, "Estudio sobre la situación".

[31]  In its response, the Government stated that the amendment to article 23 (8) had been abolished by Decree 66-2014 as of September 2014.

[32]  Despite the response from the Government indicating that victims in need of special protection are provided with special accommodation, interlocutors assert that the system is not functioning as specified in the protocols.

of the Garifuna activists and asked the Government of Honduras to adopt protective measures for Ms. Flores, her family and other members of OFRANEH.[33]

38.    Interviewees largely confirmed the findings of the Special Rapporteur on the situation of human rights defenders that women defenders are more at risk of certain forms of violence and other violations, such as prejudice, exclusion and repudiation, than their male counterparts due to the fact that they are seen as challenging accepted sociocultural norms, traditions, perceptions and stereotypes about femininity, sexual orientation and the role and status of women in society, which often serve to normalize and perpetuate forms of violence and oppression. Furthermore, their complaints are often dismissed and they are subjected to repeated threats and intimidation by the authorities (see A/HRC/22/47/Add.1).

## B.    Economic and developmental rights

39.    Honduras is the second poorest country in Central America, with an estimated gross domestic product of US$ 18.55 billion in 2013.[34] The country faces an extremely unequal distribution of income and a high unemployment rate. Due to the economic crisis and high levels of poverty, many men and some women have been forced to migrate in search of better means to support their families. It is reported that women head approximately 32 per cent of households.[35] This phenomenon is attributable to the disintegration of families due to domestic and intrafamiliar violence, and also the high level of homicide in the country. It is estimated that the annual cost of violence amounts to 10 per cent of the gross domestic product (nearly US$ 900 million).[36]

40.    The Special Rapporteur notes the efforts made by the Government to alleviate poverty through its poverty reduction strategy and to promote women's economic development and empowerment through the adoption of the National Policy on Women and the Second Plan for Equality and Gender Equity (2010–2022). Furthermore, the principle of equal remuneration for work of equal value applies to all workers without any discrimination pursuant to article 128 (3) of the Constitution and article 367 of the Labour Code. In practice however, gender-based discrimination in employment occurs. Although women's literacy rate is almost the same as men's, on average women are paid 67.6 per cent of the wage earned by men and women's unemployment rate is double that of men.[37] The areas in which women work, particularly the *maquila* industry and domestic work in private homes, tend to be less subject to regulation. Women are thus exposed to poor working conditions, low wages, little job security and the potential risk of exploitation and violence.

41.    Historically dependent on agriculture and the export of bananas and coffee, Honduras has established EPZs as a means to stimulate economic growth by attracting foreign direct investment. It has diversified its export base to include the clothing and automobile industries. The first free zone was established in 1977 in the city of Puerto Cortés. In 2007, 342 companies operated in 67 EPZs. As at 2010, there were 102 EPZs and 19 industrial parks in Honduras.[38]

---

[33]  Inter-American Court of Human Rights, *López Álvares* v. *Honduras*, order of 13 June 2005.
[34]  World Bank, data on Honduras (http://data.worldbank.org/country/honduras).
[35]  Centro de Estudio de la Mujer, "Investigación sobre el cumplimento de los DESC de las mujeres en Honduras" (2010).
[36]  World Bank, Honduras Overview (www.worldbank.org/en/country/honduras/overview).
[37]  International Trade Union Confederation (ITUC), "Internationally recognized core labour standards in Honduras: report for the WTO general council review of the trade policies of Honduras" (2010).
[38]  Ibid.

42.    A study on these zones conducted in 2010 revealed that 110,912 people were employed in various industries, with 78.5 per cent of them employed in garment factories.[39] Companies in the zones operate 24 hours per day, seven days per week and their production targets range from 1,800 to as high as 4,800 pieces per day, with the more a worker produces in one day, the higher the quota.[40] According to one report, women EPZ workers were allowed two timed bathroom breaks per shift and were not paid for their overtime if their production requirements were not met. The report also states that the workers' minimum wage is less than US$ 0.70 per hour; that in many cases the employers do not contribute to the social security fund; that the workers have no health care rights; and that any attempt to organize or protest is punished with firing and blacklisting.[41]

43.    Former *maquila* workers shared their testimonies with the Special Rapporteur and confirmed that they often worked long hours without rest. They also witnessed co-workers succumb to chronic fatigue, depression and musculoskeletal disorders as a result of the hazardous working conditions. Women working in EPZs are unable to claim their social benefits, including maternity leave, and earn between 28 and 51 per cent less than the minimum wage. Employers justify lower wages for women with the stereotype that women's work is less demanding than men's work.

44.    Domestic workers are also at an increased risk of exploitation, as they work in private households. There are an estimated 64,000 domestic workers in Honduras; of which 20,000 are women. Article 131 of the Constitution states that domestic workers are covered by "social legislation", which provides health coverage for illness and maternity and allowances for family members, including the elderly and orphans. The law also addresses issues of lockouts, accidents, unemployment benefits, occupational diseases and all other contingencies that affect the ability to be productive. Unfortunately, in practice, many domestic workers are denied such protections.

45.    Interlocutors also raised the issue of access to land for farmers as a concern. Since 2009, the Bajo Aguán region in northern Honduras has been the setting of land disputes. Some concerns raised in interviews include the problematic nature of the land reform programme of 1972; the allocation, over two decades, of an estimated 120,000 hectares of land to farmers who had migrated from the south of the country; and the subsequent modification of the land reform in 1992, which allowed the farmers to sell their land to third parties. It was argued that thousands of acres of land had been transferred from the farmer communities to large agro-industrial firms, with entrepreneurs in palm oil production seizing the opportunity and acquiring a significant percentage of the land.[42]

46.    Farmer communities have disputed the legality of such land sales, claiming that they are still the rightful owners of the land. Information was shared indicating that between January 2010 and March 2011, 25 deaths had been registered relating to conflicts over land. The Special Rapporteur also received allegations that Margarita Murillo, president of farmers organization Las Ventanas and the founder of the National Farmers Trade Union (Unión Nacional de Campesinos), had been assassinated in August 2014 as she was working on a piece of land in the department of Cortés. It is alleged that her death may be due to her work defending the rights of farmers.

---

[39]  Metropolitan Autonomous University in Xochimilco and Colectiva de Mujeres Hondureñas, "Condiciones de trabajo y prevalencia de trastornos musculoesqueléticos y psíquicos en población trabajadora de la maquila de la confección, Departamento de Cortés, Honduras" (2012).

[40]  Jaime K. McCallum, "Export processing zones: comparative data from China, Honduras, Nicaragua and South Africa", International Labour Office Working Paper No. 21 (Geneva, 2011).

[41]  ITUC, "Internationally recognized core labour standards".

[42]  FIDH, "Honduras: human rights violations".

47.   Sources indicate that 1,487 land-ownership deeds were issued to farmers between February and August 2010, but less than one third of these (482) were awarded to women. Furthermore women were allocated 28.4 per cent of the ownership rights for agricultural land during this period. Some sources argue that women are largely denied access to and control of productive resources and that, in most cases, they are unable to obtain credit to enable them to be successful farmers. This results in their dependency on their husbands or male relatives being reinforced, and renders them vulnerable to violence.[43]

48.   One report states that 300,000 children between the ages of 5 and 14 work in Honduras, with 63 per cent of them in the agricultural sector. The report also reveals the prevalence of child labour within indigenous communities.[44]

## C.   Social and cultural rights

49.   Obstacles to the promotion, protection and fulfilment of women's human rights and a life free from all forms of violence include deeply rooted patriarchal attitudes and the pervasiveness of a *machista* culture that reinforces stereotypes about the roles and responsibilities of women and men in the family, in the workplace and in society.

50.   Education is free in the public system, and the number of girls enrolled in primary school is higher than that of boys. However, the level of education remains inadequate, particularly in rural areas. The Special Rapporteur was informed that due to the prevalent and visible drug trade, which has given rise to concerns about safety and exposure to drug dealers, parents living in certain areas are reluctant to send their children to school.

51.   The lack of education and employment opportunities are among the major causes of gang involvement by children. The Government established the Guardians of the Homeland initiative in 2007[45] which extends the mandate of the military to incorporate the training of vulnerable children aged between 5 and 18, and adults up to 23 years of age, in "values", with a view to discouraging children from joining gangs and to reducing delinquency. It was estimated that 75,000 children participated in the initiative in 2013.

52.   A study conducted between September and December 2010 revealed that there are approximately 4,281 active gang members operating in different cities, including 872 female adolescents, with 60 per cent of them in San Pedro Sula and 21 per cent operating in Tegucigalpa.[46] In addition, 447 active gang members were in detention in January 2014. Amendments to article 332 of the Criminal Code resulted in the migration of members from urban to rural areas, turning these areas into new hubs for gangs.[47]

53.   Reproductive rights remain an area of particular concern. Honduras has the second highest rate of teenage fertility, with a rate of 102 per 100,000 live births. On 2 April 2009, Congress prohibited the promotion, use, sale, purchase and creation of any policy or programme related to the emergency contraception pill. It also banned the distribution and the commercialization of emergency contraception through pharmacies, drug stores and any other means. Additionally, Congress prohibited the use of oral contraceptives as a method

[43] Centro de Estudios de la Mujer, "Honduras: unbearable levels of violence", in Social Watch, *Report 2012.*
[44] ITUC, "Internationally recognized core labour standards".
[45] See Decree No. 1816 of 2007.
[46] National Programme for Prevention, Rehabilitation and Social Reintegration, "Situación de maras y pandillas en Honduras" (www.unicef.org/honduras/Informe_situacion_maras_pandillas_honduras.pdf).
[47] Ibid.

of emergency contraception.[48] The Supreme Court subsequently declared the ban on emergency contraception constitutional, upholding the view that emergency contraception was a method of abortion and therefore violated article 126 of the Criminal Code of Honduras, which criminalizes abortion without exception. The Article 132 of the Code provides for a sentence of four to six years' imprisonment for anyone who causes an abortion through acts of violence, even if unintentionally, while knowing the victim's state of pregnancy. The absolute prohibition of abortion implies that women and girls are condemned to continue pregnancies and to face revictimization by society. It has also led women and girls who are impregnated as a result of rape or incest to resort to unsafe and clandestine abortion services and practices, sometimes with fatal consequences.

## V.   Challenges in fulfilling the State's obligation to act with due diligence to eliminate violence against women

54.     Honduras has committed to protecting and promoting the rights of women through its ratification of numerous international instruments, including the International Covenant on Civil and Political Rights (1997) and its Optional Protocols; the International Covenant on Economic, Social and Cultural Rights (1981); the Convention on the Elimination of All Forms of Discrimination against Women (1983); the Convention on the Rights of the Child (1990) and the first two Optional Protocols thereto; the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1996) and the Optional Protocol thereto; the International Convention on the Elimination of All Forms of Racial Discrimination (2002); the International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families (2005); the Convention on the Rights of Persons with Disabilities (2008) and the Optional Protocol thereto; and the International Convention for the Protection of All Persons from Enforced Disappearance (2008).

55.     The Special Rapporteur notes that Honduras is not yet a party to the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women or the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights.

56.     At the regional level, Honduras has ratified, among others, the Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women.

57.     The National Institute for Women, established by Decree No. 232-98 of 1999, is the central body responsible for the implementation of the country's obligations with regard to women's rights, and its gender policy. The Special Rapporteur expressed concern that the Institute falls under the Social Development Department, perpetuating the view that violence against women needs to be addressed through a social welfare lens as opposed to through a human rights-based approach. She also expressed concern at the lack of resources allocated to the different mechanisms, which limits their capacity to effectively respond to violence against women.

58.     The following section examines the measures taken by the Government to fulfil its international obligations to prevent, investigate, prosecute, and punish violence against women, as well as to protect victims and provide them with effective remedies.

---

[48] See Decree No. 54-2009.

## A.   Prevention

59.   Measures by which States can fulfil their due diligence obligation to prevent violence against women include the enactment of laws, policies and programmes; the development of awareness-raising campaigns; the provision of training for relevant professionals; and the development of action plans to coordinate multisectoral approaches to addressing violence against women. Short illustrated publications, such as the popular version of the gender equality policy prepared by La Ceiba Municipality, can be considered a good practice for raising the awareness of a wider range of actors, including children.

60.   The Domestic Violence Act is a preventive mechanism to combat domestic violence. Penalties of one to three years, and up to four years in aggravated cases, are set under article 179 (a) and (b) of the Criminal Code.[49] In many cases victims are reluctant to press charges against abusers for fear of reprisals. In addition to the Act, a national plan on violence against women was adopted in 2014 for the period covering 2014–2022. The Special Rapporteur regrets the lack of consultation with civil society in the elaboration of the plan.

61.   The law against trafficking in persons was passed in April 2012. It prohibits all forms of trafficking and prescribes penalties ranging from 10 to 15 years of imprisonment. It also sets out, among other things, the structure and role of the Inter-Agency Commission to Combat Commercial Sexual Exploitation and Trafficking in Persons (art. 7).

62.   Rape is considered a "public crime" and proceedings can be initiated even if the victim does not press charges.[50] In the absence of a complaint on the part of the victim of spousal rape, only a judge can take the decision to bring proceedings on an ad hoc basis. The penalties for sexual violence, including rape, vary depending on the type of the violation and aggravating circumstances. Penalties depend on factors such as the age, capacity, and state of the victim; the relationship between the victim and the aggressor; and the intentional transmission of sexually transmitted diseases, including HIV. The maximum sentence ranges from 15 to 20 years.[51] Article 149 of the Criminal Code also makes provisions to address the sexual abuse of minors. Preventive measures are included in the protocol provided to police on assistance to women survivors of violence, the National Mental Health Policy and the Third National Strategic Response to HIV and AIDS, among others.[52] Sexual harassment is criminalized under article 147 A of the Criminal Code and sentences range from one to three years' imprisonment. Pregnancy testing, as a condition of employment, is outlawed under the law.

63.   In terms of education and training, the Government has expressed its intention to revise the school curricula to incorporate sections on human rights education, health, sexual and reproductive rights and gender equity.

64.   The Gender Unit of the Supreme Court provides training at the national level on domestic violence. The Special Rapporteur was informed that the Department of Justice and Human Rights had conducted a series of training sessions in June 2014, aimed at ensuring the effective implementation of the national human rights policy and its action plan, for 9,000 civil servants across Honduras. The training was also extended to enforcement officers and the military. The National Institute for Women provides the Ministry of Security with guidelines and materials on prevention of domestic violence for

---

[49]   In its response, the Government indicated that reforms to the Domestic Violence Act were under way. There are conflicting views about the integration of criminal provisions within the Act.

[50]   See Decree No. 54-2009.

[51]   Ipas and UNFPA, "Estudio sobre la situación".

[52]   Ibid.

use in police training centres.[53] The National Autonomous University of Honduras offers the opportunity for civil society organizations to enrol in a 200-hour certification programme on gender and public policy. The Government of Honduras organizes awareness-raising activities during the 16 Days of Activism Against Gender Violence campaign.

65.     The minimal attention to, and the lack of effective measures to address, women's empowerment needs is a factor that contributes to continuing insecurity and fear, and precludes the possibility of eliminating all forms of violence against women and girls. The Special Rapporteur expressed her concern at the ineffective measures to address social transformation through activities that are not sustainable and that do not meet the goal of addressing myths and stereotypes about gender roles and responsibilities.

## B.     Protection

66.     Measures by which States can fulfil their due diligence obligation to protect women from violence include the provision of services such as telephone helplines, health care, counselling centres, legal assistance, access to shelters, protection orders and financial aid for victims.

67.     The Department of Health manages the Integral Family Support programme, which offers services to women and adolescents in some municipalities where specialized clinics for battered women have been established.[54] In Tegucigalpa, the Ministry of Health and Doctors Without Borders set up the *servicio prioritario* (priority service) in 2011, which provides free-of-charge emergency attention for people suffering the medical and psychological consequences of violence, including sexual violence.[55] In 2011, Honduras had 16 family counsellors specialized in the provision of assistance to victims of intrafamily violence in the Department of Health. However, they lack sufficient technical and material resources, and their focus is largely on domestic violence cases that are referred by the courts.[56]

68.     In March 2014, the Inter-Agency Commission on the Implementation of the Domestic Violence Act, composed of representatives of the National Institute for Women, the Public Ministry, the Department of Health, the Central District Municipality, the National Human Rights Commission and civil society organizations, launched the Centre for Support and Protection of Women's Rights (CAPRODEM) in the city of Comayaguela. The Centre offers orientation, medical, legal and psychological assistance to victims of domestic and intrafamiliar violence. The Special Rapporteur was informed of a protocol that outlines the procedures and practices to follow in providing comprehensive assistance to victims of domestic and intrafamiliar violence.

69.     The Centro MAI in La Ceiba is a one-stop centre where victims receive legal, medical and psychological assistance, but it does not cater exclusively to the needs of women. There are guidelines for the implementation of model comprehensive care for medical personnel and agencies involved in the criminal justice system. The Special Rapporteur expressed concern at the absence of a gender-responsive reception area at the

---

[53] Central America Women's Network, "The response of international aid agencies to violence against women in Central America: the case of Honduras" (2008).

[54] Ibid.

[55] Doctors Without Borders, "Honduras: MSF makes care for rape survivors a priority" (www.msf.org.uk/article/honduras-msf-makes-care-rape-survivors-priority).

[56] Ipas and UNFPA, "Estudio sobre la situación".

Centre and raised the concern of confidentiality and possible breaches of security as regards the management and storing of case files.

70.   Moreover, the Special Rapporteur expressed concern at the lack of sufficient facilities, such as shelters for battered women and safe houses for women who have to enter the witness protection programme. A visit was conducted to the only such shelter in Tegucigalpa, which is for victims of domestic violence and run by a non-governmental organization. During the visit, the Special Rapporteur was informed that the Office of the Special Prosecutor for Women had on multiple occasions referred high-risk cases involving women linked to, inter alia, murderers, organized crime and gangs, to this shelter. The practice has continued, despite repeated warnings by the director that such practices place the shelter, its staff and its residents in a state of extreme vulnerability, and hinders the ability to effectively provide assistance to victims and guarantee their safety. A similar situation was highlighted in La Ceiba, where a woman under witness protection in relation to the murder of a relative was placed in a shelter for victims of domestic violence. The State has a duty to provide differentiated and appropriate protection or assistance to women victims of violence, based on whether they are witnesses or direct victims of violence. The State cannot justify imposing on third parties its primary responsibility to prevent acts of violence against women and to protect victims who are witnesses in criminal cases.

71.   Efforts to provide services at the municipal level include having a gender unit or department with professional staff to address the therapeutic and other needs of women. Unfortunately, such services are linked to donor funding and their sustainability is a source of concern.

## C.   Investigation, prosecution and punishment

72.   There are several ways in which States can fulfil their obligation to ensure perpetrators' accountability for acts of violence against women, including by adopting or amending legislation and strengthening the capacities of the different criminal justice system agencies. In Honduras, the challenges to an effective criminal justice response are the lack of coordination of the different mechanisms and the lack of expertise and resources to conduct credible investigations of crimes relating to gender-based violence, including domestic violence, sexual abuse and femicide.

73.   Victims of gender-based violence can file complaints with the police, the National Human Rights Commission, the Office of the Public Prosecutor or the Municipal Offices for Women, among others. Women who file complaints of gender-based offences are often revictimized through the process. In general, no space is set aside where such complaints can be filed in a manner that guarantees the complainant's privacy and security. Often such statements have to be made in open areas in front of the general public, which compounds the complainant's sense of vulnerability. Furthermore, the complainant has to provide her testimony multiple times in the presence of various actors who, although members of different institutions, are nonetheless part of the same criminal justice system. The Special Rapporteur welcomed the fact that the Centro MAI in La Ceiba offered the possibility of a one-stop approach where victims and witnesses recorded their testimony once, thereby avoiding repetition.

74.   There are also structural problems associated with the justice system that have a negative impact on the investigation and prosecution of cases, including the lack of police stations, courts and forensic units across the country. The closure or merging of investigation units has also led to concerns about the lack of specificity in prosecuting crimes against women, the lack of appropriate equipment and tools and the lack of human resources, thereby further eroding the need for accountability for such crimes. A further source of concern at both the central and municipal levels is the limited collection of data on the prevalence of, and

on outcomes of, investigations and prosecutions. The Special Rapporteur also wishes to stress that the multiple and intersecting forms of discrimination facing women of indigenous background and Afro-descendant women further affects their access to justice.

75.    The Special Rapporteur's findings echo those highlighted in the Inter-American Commission on Human Rights report *Access to Justice for Women Victims of Sexual Violence in Mesoamerica*. In the report, the Commission indicates that the failure to investigate gender-related crimes can be partially attributed to discriminatory sociocultural patterns that discredit women victims and reinforce the perception that such crimes are not priorities. The Special Rapporteur was informed that in some cases, the police laugh or refuse to register complaints from women. Increasing the number of female police officers would encourage a more responsive reporting environment and may help address the issue of frequent withdrawal of complaints, which negatively impacts prosecution rates.

76.    While noting the positive measures taken to criminalize femicide, the Special Rapporteur is concerned that very few cases have been tried under the newly created offence. In fact, she was informed that prosecutors have a tendency to take to trial only those cases in which the evidence is considered sufficient to win a conviction. The Special Rapporteur was also informed of difficulties in obtaining evidence, including DNA, due to the shortage of forensic facilities. She was also informed that the presence of a prosecutor was required in order to authorize forensic physicians to begin gathering evidence in rape cases. However interviewees were not in agreement about such a requirement, and were unable to confirm the legal basis for such a requirement.

77.    Without making any assumptions about or expressing an opinion on the facts of cases shared during the visit to the national penitentiary, or on the veracity of the testimonies received, the Special Rapporteur notes that the information shared by interviewees seems to indicate serious limitations during the investigative stages of the criminal justice system. Furthermore, the lack of adequate legal assistance for women, as well as the allegations that female offenders seem to face harsher sentences and that women are treated differently from their male counterparts by the criminal justice system, seem to indicate gender stereotyping and gender bias practices by the criminal justice system.

## D.    Provision of effective remedies, including reparations

78.    The provision of effective remedies involves ensuring the rights of women to access both criminal and civil remedies and the establishment of effective protection, support and rehabilitation services (A/HRC/14/22, p. 1). The failure to provide victims with legal assistance, information and support obstructs the right to effective remedies.

79.    Under the Domestic Violence Act, the offender is obliged to provide full compensation to the survivor, including payment for damages and the expenses incurred by victims in dealing with the effects of the acts of violence. No information was shared on the effectiveness of this provision.

80.    Following the second regional meeting of the Central American Court of Justice, held in Tegucigalpa, a set of rules for the assistance to victims of gender-based violence with an emphasis on sexual violence was adopted in October 2011. The rules provide for the establishment of a State compensation fund for the harm caused by gender-based violence. Compensation is not limited to financial compensation, but also includes socioeconomic programmes to help victims to rebuild their lives. The rules further provide that remedial measures should include medical and psychological rehabilitation. No information was shared on the effectiveness of this provision.

81.    According to interviewees, there is no national assistance office for crime victims and the Government does not provide monetary compensation to such victims. This seems

to corroborate the view that there is a major gap between laws and their implementation and enforcement, which leaves victims with a sense of insecurity, defenselessness and loss of confidence in the justice system.

## VI.   Conclusions and recommendations

82.   The Government has undertaken a number of legislative and institutional initiatives to meet its human rights obligations to address the situation of women and girls in the country. However, these have not been translated into practical improvements in the lives of the majority of women who remain marginalized, discriminated against and at a high risk of being subjected to numerous human rights violations, including violence and sexual and reproductive rights violations. Impunity, socioeconomic disparities and corruption continue to foster a generalized state of violence. The absence of a comprehensive data collection system to guide policy development and to monitor progress in the field of violence against women is a further challenge. Moreover, the failure of the State to exercise its due diligence obligation to investigate, prosecute and punish perpetrators of gender-based violence contributes to an environment of impunity that results in a decline of trust in national mechanisms and the rule of law among the Honduran population.

83.   In the light of the above, the Special Rapporteur would like to make the following recommendations.

## A.   Law and policy reforms

84.   The Special Rapporteur recommends that the Government:

   (a)   Ratify all outstanding international human rights instruments, including the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women and the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights;

   (b)   Revise article 332 of the Criminal Code on "unlawful associations" and ensure that the enforcement of this provision does not result in due process rights violations and the criminalization of juveniles, including girls;

   (c)   Establish a specialized investigation and prosecution unit on femicide to combat impunity in cases of gender-based murder and conduct effective criminal investigations;

   (d)   Ensure adequate funding to improve existing infrastructure to support victims of gender-based violence and to create new centres that provide psychosocial, legal and residential services throughout the country, paying special attention to the increased vulnerability of indigenous women and Afro-descendant women living in rural areas;

   (e)   Build the capacity of institutions, such as the National Institute for Women, the National Police, the Office of the Public Prosecutor the Supreme Court of Justice and the Institute of Forensic Medicine, including by increasing their human and material resources;

   (f)   Strengthen the independence of the National Human Rights Commission in accordance with the principles relating to the status of national institutions for the promotion and protection of human rights (Paris Principles) and ensure that the nomination and selection process is fair and transparent;

(g)   Establish an independent national women's commission in accordance with the Paris Principles and which is mandated to receive and investigate complaints about violations of women's rights. The commission must be equipped with sufficient human, technical and financial resources to fulfil its mandate;

(h)   Strengthen cross-border cooperation with neighbouring countries with a view to reduce the incidence of trafficking in persons;

(i)   Establish and/or strengthen existing monitoring mechanisms to ensure that female workers, particularly those working in the informal sectors, are protected from all forms of exploitation, and hold businesses accountable for practices that negatively affect the health, well-being and security of workers;

(j)   Ensure that all police stations, tribunals and courts are equipped with specialized professionals who have received training on gender-based violence and gender sensitivity.

## B.   Accountability

85.   The Special Rapporteur recommends that the Government:

(a)   Take effective measures to ensure access to justice and effective remedies for all women victims of violence, and in particular:

(i)   Develop mechanisms to ensure a holistic, coordinated and sustained response to violence against women in order to apprehend, prosecute and convict offenders, contribute to the health and safety of the victim and prevent revictimization;

(ii)   Ensure the fast and efficient management of cases;

(iii)   Ensure that all incidents of violence against women are thoroughly investigated by the police and are prosecuted effectively, and that perpetrators are sanctioned in proportion to the severity of their crime;

(iv)   Strengthen fair trial safeguards by ensuring access to legal counsel during all phases of pretrial detention and the investigative stages of cases;

(v)   Undertake a comprehensive review of the criminal justice system and ensure that case files relating to the sentencing of female offenders and the prosecution of gender-based violence are reviewed for evidence of gender bias;

(vi)   Establish specific safeguards to ensure that women's histories of victimization and abuse are taken into consideration when making decisions about incarceration, especially in respect of custodial sentencing for non-violent crimes;

(vii)   Ensure that protection measures are put in place to ensure the safety, privacy and dignity of victims and their families at all stages of the criminal justice process, and ensure that witness and victim protection programmes are established;

(viii)   Ensure that all procedures and complaint mechanisms are accessible to women who are victims of violence and their family members and other witnesses without fear of reprisal;

(b)   Allocate adequate human, technical and financial resources to ensure that police officers, prosecutors and criminal justice officials can fulfil their mandate and ensure fair and equitable distribution of resources across the country.

## C.   Societal transformation, including awareness-raising, addressing gender stereotypes and women's empowerment

86.   The Special Rapporteur recommends that the Government:

(a)   Design and launch targeted awareness-raising campaigns to educate and change the mindsets and attitudes of men, women and children through all available means, including schools and the media;

(b)   Train and sensitize the media in issues related to women's rights generally and violence against women in particular, in order to contribute to changing the predominant social and cultural beliefs and attitudes that are harmful to women; and address the current sensational reporting practices.

## D.   Statistics and data collection

87.   The Special Rapporteur recommends that the Government:

(a)   Improve data collection and analysis of incidents of violence and discrimination against women in all sectors, particularly those relating to labour, health, education and the criminal justice system, while ensuring safety and privacy rights throughout the process;

(b)   Ensure common, reliable and transparent recording methods on all forms of violence against women, its causes and consequences. Such data should be disaggregated by sex, race, age, ethnicity, geographic location and other relevant characteristics, in order to understand the magnitude, trends and patterns of violence against women in the country, both general and gender-specific;

(c)   In cooperation with civil society organizations, develop monitoring and evaluation tools to evaluate progress made in eradicating violence against women in a clear systematic way, and integrate such tools in the country's periodic demographic and health surveys;

(d)   Conduct studies to assess the scope of violence against women across Honduras in cooperation with relevant research institutions, civil society organizations and United Nations agencies as appropriate.

## E.   Recommendation to United Nations agencies and entities

88.   The Special Rapporteur recommends that, in light of the systemic, widespread and pervasive problem of violence against women and girls in Honduras, there is a need to review the presence, programmes and resources of United Nations agencies that exist in the country in the quest to respond to and prevent violence against women and girls. Technical cooperation and assistance is needed to ensure that this human rights violation is addressed more substantively by United Nations agencies.

Ilana Etkin Greenstein                      **Detained**
Macias & Greenstein, LLC
20 Meridian Street, 3rd Floor
East Boston, MA 02128
(617) 561-0400
igreenstein@mgk-law.com

## UNITED STATES DEPARTMENT OF JUSTICE
## BOARD OF IMMIGRATION APPEALS
## FALLS CHURCH, VIRGINIA

In the Matter of:                          **In Removal Proceedings**

Clivian Melissa CONTRERAS-Casco
A202 138 499

Helen Naomi BETANCO Contreras
A206 887 159

## MOTION TO STRIKE DHS'
## MOTION FOR SUMMARY AFFIRMANCE

Now come the respondents, by and through counsel, and move this Board to strike the
Department of Homeland Security's motion for summary affirmance from the record for failure
to comply with Ch. 3.2(a) of the BIA Practice Manual (service requirement).

The respondent was previously represented in this appeal by CARA Pro Bono Project
lead attorney Brian Hoffman. On June 25, 2015, undersigned counsel filed a Form EOIR-27,
along with a motion for an extension of time in which to submit Ms. Contreras' brief on appeal.
On that same day, she served a copy of the appearance form and motion on DHS counsel. On
June 29, 2015, the Board granted that motion and sent notice of the new briefing schedule. That
notice lists undersigned counsel as the attorney of record.

On July 17, 2015, attorney Hoffman informed undersigned counsel that he had been served with a copy of DHS' motion for summary affirmance.  To date, DHS has not served Ms. Contreras' attorney of record with the motion for summary affirmance.

Accordingly, Ms. Contreras respectfully moves this Board to strike DHS' motion for summary affirmance from the record.


Respectfully submitted
Clivian Melissa Contreras-Casco &
Naomi Betanco Contreras, by their attorney,

Ilana Etkin Greenstein
Macias & Greenstein, LLC
20 Meridian Street, 3rd Floor
East Boston, MA 02128
(617) 561-0400


CERTIFICATE OF SERVICE

I, Ilana Etkin Greenstein, hereby certify that a copy of the enclosed documents were delivered by regular mail, postage prepaid to:

Office of Chief Counsel
Department of Homeland Security
12445 East Caley Avenue
Centennial, CO 80111-5663

this 23rd day of July, 2015

Ilana Etkin Greenstein